CONFIDENTIAL

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3
 4   ERIC PODWALL, AN INDIVIDUAL )
                                 )
 5            PLAINTIFF,         )
                                 ) CASE NO.
 6                               ) 2:16-CV-06088-ODW
     VS.                         ) (AJWX)
 7                               )
     WILLIAM "SMOKEY" ROBINSON,  )
 8   JR., AN INDIVIDUAL,         )
                                 )
 9            DEFENDANT.         )
     _____)
10
11
12        (THE FOLLOWING PAGES CONTAIN CONFIDENTIAL
13         MATERIAL SUBJECT TO PROTECTIVE ORDER.)
14              DEPOSITION OF JAN STERN
15               LAS VEGAS, NEVADA
16            SATURDAY, APRIL 27, 2019
17                 AT 11:59 A.M.
18
19
20
21   JOB NO: 3294513
22   REPORTED BY:
23   LISA MAKOWSKI,
24   CCR 345, CA CSR 13400
25   PAGES 1-246
```

Page 1

CONFIDENTIAL

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFF:
 3                  FREEDMAN + TAITELMAN, LLP
                    BY:  JESSE A. KAPLAN, ESQ.
 4                  1901 AVENUE OF THE STARS
                    SUITE 500
 5                  LOS ANGELES, CALIFORNIA 90067
                    (310)201-0005
 6                  JKAPLAN@FTLLP.COM
 7
     FOR THE DEFENDANT:
 8
                    WILLIS LAW FIRM, PLLC
 9                  BY:  RHONDA H. WILLIS, ESQ.
                    1776 YORKTOWN STREET
10                  SUITE 570
                    HOUSTON, TEXAS 77056
11                  (713)528-4455
                    RWILLIS@WILLISLAWFIRM.COM
12                       *  *  *  *  *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

CONFIDENTIAL

```
 1                      INDEX
 2   WITNESS                                    PAGE
 3   JAN STERN
 4      EXAMINATION BY MR. KAPLAN               10
        EXAMINATION BY MS. WILLIS              219
 5      FURTHER EXAMINATION BY MR. KAPLAN      241
        FURTHER EXAMINATION BY MS. WILLIS      244
 6
 7                 INDEX OF EXHIBITS
 8   EXHIBIT                                    PAGE
 9   EXHIBIT 1      SUBPOENA                    4
10   EXHIBIT 2      SUBPOENA WITH ATTACHMENT    4
11   EXHIBIT 3      WILLIAM ROBINSON JR         4
                    LEDGER REPORT
12
     EXHIBIT 4      WILLIAM ROBINSON JR.        4
13                  LEDGER REPORT 1/1/13
                    THROUGH 12/31/13
14
     EXHIBIT 5      WILLIAM ROBINSON JR.        4
15                  LEDGER REPORT 1/1/14
                    THROUGH 12/31/14
16
     EXHIBIT 6      WILLIAM ROBINSON JR         4
17                  LEDGER REPORT 1/1/15
                    THROUGH 12/31/15
18
     EXHIBIT 7      WILLIAM ROBINSON JR.        4
19                  LEDGER REPORT 1/1/16
                    THROUGH 12/31/16
20
     EXHIBIT 8      WILLIAM ROBINSON JR.        4
21                  ACCOUNTS PAYABLE VENDOR
                    DETAIL HISTORY
22
     EXHIBIT 9      PODWALL ENTERPRISES         205
23                  INVOICE 082013
24   EXHIBIT 10     VOIDED CHECKS               205
25                      -O0O-
```

CONFIDENTIAL

```
 1              LAS VEGAS, NEVADA, SATURDAY, APRIL 27, 2019
 2                        11:59 A.M.
 3                         -o0o-
 4            (Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4,
 5             Exhibit 5, Exhibit 6, Exhibit 7, and
 6             Exhibit 8 were marked for identification.)
 7              MS. WILLIS:  Ms. Stern, you understand my
 8    name is Rhonda Wills, and I represent Smokey
 9    Robinson in this deposition.  I'd like to give you
10    an admonition as you have appeared here without an
11    attorney of your own.  You are a non party, you are
12    not a party to this lawsuit.  You are appearing
13    here voluntarily.  You are not under a lawful
14    subpoena.  You are here because --
15              MR. KAPLAN:  That's not true.
16              MS. WILLIS:  -- you chose to be here.  If
17    you choose not to be here, you don't have to be
18    here.  Mr. Kaplan represented to the court that you
19    voluntarily chose to be here, so I want to make it
20    very clear to you you are not under a subpoena and
21    you are only here because you want to be here.
22              THE WITNESS:  I thought I was under
23    subpoena.
24              MS. WILLIS:  No.  No, you're not.  You're
25    not here --
```

CONFIDENTIAL

1              THE WITNESS:  I have a subpoena right on

2    the --

3              MS. WILLIS:  You are not under a

4    subpoena.

5              MR. KAPLAN:  This is -- this is -- this

6    is totally inappropriate.

7              MS. WILLIS:  You are voluntarily here.

8    And that is a representation Mr. Kaplan admitted to

9    the court that he did not have you under a valid

10   subpoena but that he had talked to and you wanted

11   to come here and you voluntarily were coming here

12   to give your testimony.

13             Now, let me explain to you that because

14   you are here voluntarily, you have chosen to be

15   here of your own volition because you want to be

16   here, I need to inform you of some things since you

17   don't have an attorney of your own.

18             I must warn you about your Fifth

19   Amendment privilege against self-incrimination.  I

20   must inform you that you may be under investigation

21   for criminal activity with regard to your

22   bookkeeping and things that you may have done in

23   your employment with Mr. Robinson.

24             You have a Fifth Amendment right against

25   giving testimony and answering questions that may

1    lead to you being prosecuted and being put in jail.

2    Answers that you give today could lead to the

3    criminal prosecution and possible lead to jail time

4    for not only you but also your daughter Donna in

5    relation to work and activities that you did for

6    Mr. Robinson.

7            So I must warn that you have a right to

8    refuse to answer questions on the basis of the

9    Fifth Amendment which protects you against

10   self-incrimination.  I must also inform you that

11   you could be prosecuted for a crime.  And I'm

12   reading from the court's order.  I must also inform

13   you that Mr. Robinson has or may press charges

14   against you as well as your daughter Donna.

15           I must tell you that Mr. Robinson

16   believes that you and/or your daughter Donna have

17   committed crimes with regard to your employment

18   with him, your keeping of his records and other

19   matters involving Mr. Robinson's finances.

20           I must also inform you that the testimony

21   you give today and answers you give may incriminate

22   you and may also incriminate your daughter Donna.

23   I must tell that you the Fifth Amendment privilege

24   against self-incrimination applies to you.  You

25   have the absolute right -- in response to each and

CONFIDENTIAL

```
 1   every question that's posed to you, you have the
 2   right to say I invoke my Fifth Amendment right
 3   against self-incrimination, and you absolutely have
 4   the right to refuse to answer any and all questions
 5   today.
 6           You also have the right to leave as you
 7   are not here under a lawful subpoena.  However, if
 8   you choose to stay and you choose to voluntarily
 9   answer questions and you do not invoke your Fifth
10   Amendment right against self-incrimination, all
11   answers that you give can and may and will likely
12   be used to prosecute you and/or your daughter Donna
13   to seek jail time.
14           I must give you that warning as you don't
15   have your own lawyer.
16           MR. KAPLAN:  I will say for the record
17   that the admonition given by counsel is entirely
18   inappropriate and not what was permitted and is
19   designed to harass this witness.  Also there are
20   many material misstatements of fact that Counsel
21   has just made among others that, Ms. Stern, you are
22   not under a subpoena.  I did serve you with a
23   subpoena and you are here pursuant to that.
24           With that said, I am going to begin my
25   questioning, if that's okay.
```

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1          MS. WILLIS:  You have the right to leave.
2     You are not under a subpoena and you also have the
3     right --
4          MR. KAPLAN:  You've already said that.
5          THE WITNESS:  Am I allowed to ask
6     something?
7          MS. WILLIS:  Absolutely, absolutely.
8          THE WITNESS:  I was under the impression
9     this only had to do with the lawsuit that Eric has
10    against Smokey, and I agreed to come to give
11    whatever information I could regarding that.
12         What you're telling me has absolutely
13    nothing to do with that lawsuit.
14         MS. WILLIS:  Yeah, it does.  So I must
15    warn you that answers you give today -- answers
16    that -- you give today --
17         MR. KAPLAN:  Ma'am, you've already given
18    the warning.  This is highly inappropriate and
19    badgering and harassing.
20         MS. WILLIS:  The answers that you give
21    today may lead to you and your daughter being
22    prosecuted.
23         THE WITNESS:  Yes, I have heard that.
24    And I am not stupid.  I understand exactly what you
25    said.  I'm here, though, to only discuss the

                                        Page 8

1   lawsuit regarding Eric.

2          MS. WILLIS:  And any answers that you

3   give -- I just want to be clear so that later on --

4          MR. KAPLAN:  You have been perfectly

5   clear.

6          MS. WILLIS:  -- you are not -- be quiet

7   and let me finish.

8          MR. KAPLAN:  Ma'am, you are harassing --

9          THE WITNESS:  You are repeating yourself.

10          MS. WILLIS:  Answers that you give --

11   just so that we're clear, answers that you give --

12   even if you feel that it's relating to the lawsuit

13   with Eric, answers that you give can and may be

14   used against you in a criminal prosecution.  Not

15   just against you, but against your daughter Donna

16   as well.  I have to give you that warning.

17          THE WITNESS:  Fine.

18          MS. WILLIS:  If you choose to sit here

19   and answer questions, that's a risk that you are

20   willing to take.

21          THE WITNESS:  Fine.  I understand exactly

22   what you said.

23                    JAN STERN,

24   having been first duly sworn, did testify as follows:

25   / / /

```
1                          EXAMINATION

2    BY MR. KAPLAN:

3         Q.    Thank you.  All right, Ms. Stern, I am

4    going to begin the examination.

5               Have you ever been deposed before?

6         A.    No.

7         Q.    All right.  I'm going to go over at least

8    a few ground rules.  The first one is that you're

9    here today as a witness, and I appreciate you

10   making yourself available pursuant to the subpoena.

11   So, therefore, I want to make sure that you are

12   comfortable the entire time.  Therefore, if there

13   is any questions or anything that anyone says that

14   makes you uncomfortable, please let us know.

15        A.    Fine.

16        Q.    If you need to take a break for whatever

17   reason, let us know.  This is not a marathon.  This

18   is not something where you need to sit here for

19   hours without taking a break.  Any time, just let

20   us know, we will take a break and accommodate that.

21        A.    Fine.

22        Q.    Before we went on the record, you

23   indicated that you had some problem hearing, so I

24   am going to try my best to speak slowly and a

25   little loudly.  But if there is anything that you
```

Page 10

CONFIDENTIAL

1    can't hear, let me know and I will try to do my

2    best.

3          A.    Okay.

4          Q.    Likewise, believe it or not, some of the

5    questions I may be asking today may not be great,

6    and they may not be clear.  So if there's not

7    something you understand, if something is unclear,

8    you need me to rephrase, repeat something, just let

9    me know, and I'm happy to do that.

10          A.    Okay.

11          Q.    The other rule that is very important

12    here is the court reporter here, Lisa, she is

13    excellent.  But one of the things I'm pretty sure

14    she cannot do is take down two people talking at

15    the same time.  It's almost impossible.  It

16    actually might be impossible.

17               So what I am going to do is I am going to

18    do my best not to speak while you're speaking and

19    you will try to do the same.

20          A.    Fine.

21          Q.    There also may be times when the

22    attorneys in the room may be making objections and

23    we may need to do that for the record.  That's

24    really for the most part not something that

25    concerns you.  It's something the judge may rule on

CONFIDENTIAL

```
1    later on in this proceeding.

2         A.   Okay.

3         Q.   Okay.  Is there any reason why you can't

4    give your best testimony today?

5         A.   None.

6         Q.   Okay.  Now, I've premarked several

7    exhibits that I've placed in front of you.  And we

8    will be looking at at least some of these, probably

9    all of them throughout the deposition.

10             The first -- I'll just review them for

11   record right now.  The first is a subpoena dated

12   April 12, 2019, calling for this deposition today.

13   That's Exhibit 1 that I issued.  Exhibit 2 is a

14   subpoena again to you, dated August 21st, 2018.

15   Exhibit 3 is -- it should be and please confirm

16   this.  It should be a 40-page document Bates

17   stamped MKA1 to MKA40.

18        A.   Yeah, I know what these are.  Okay.

19        Q.   What are these?

20        A.   They are from the general ledger.  They

21   are the monies to do with whatever shows Smokey

22   performed.

23        Q.   Okay.  Is this your general ledger you

24   prepared?

25        A.   Yes.
```

CONFIDENTIAL

```
 1        Q.   Okay.   So just -- so Exhibit 3, MKA1
 2   through 40, is -- with the heading William
 3   Robinson, Jr., 627 in parentheses ledger report,
 4   this is a ledger that you prepared; correct?
 5        A.   Yes.
 6        Q.   Okay.  All right.  I'm going to keep on
 7   going.
 8             Exhibit 4 I'll represent to you are
 9   documents.  They are not Bates stamped, but they
10   are portions of documents that Gary Iskowitz
11   produced to my office pursuant to a subpoena.
12   There are some redacted pages.  And I believe --
13   well, Exhibit 5, also, I'll represent to you are
14   documents that Gary Iskowitz produced to me
15   pursuant to subpoena.
16             Okay.  Exhibit 6 is a document -- and by
17   the way, four through six have all had the same
18   category, William Robinson, Jr., 6267 Ledger
19   Report.  Exhibit 6 also I will represent to you are
20   a portion of documents that Mr. Iskowitz has
21   produced to me pursuant to the subpoena.  Exhibit 7
22   again with the heading William Robinson, Jr., 6267
23   Ledger Report.  Again, these are documents that I
24   will represent to you Mr. Ledger has produced to my
25   office pursuant to subpoena.
```

CONFIDENTIAL

```
 1              And then we have Exhibit 8.  Exhibit 8 is
 2    a one-page document Bates stamped Robinson 2.  And
 3    the heading is 626 William Robinson, Jr. Accounts
 4    Payable Vendor Detail History.  And I will
 5    represent to you this is a document that
 6    Mr. Robinson has produced in this litigation.
 7              Now, we may look at some other documents,
 8    but I wanted to just have these documents here.  I
 9    may be asking -- well, I will be asking you some
10    questions.  And when I ask them, if there is any
11    documents that you -- in this stack in front of you
12    that you want to refer to or look at to help answer
13    the questions or explain the answers to the
14    questions, feel free to do so.  I want to make sure
15    that you have those in front of you when I'm asking
16    the questions.
17              Okay.  Now, I hate to ask this, but when
18    were you born?
19         A.   1935.
20         Q.   And am I correct -- well, where do you
21    currently reside?
22         A.   1328 West Van Buren Avenue, Las Vegas
23    89106.
24         Q.   Okay.  And how long have you lived there?
25         A.   Approximately six months; however, I have
```

                                              Page 14

CONFIDENTIAL

```
1    owned the house for three years.
2         Q.   Okay.  Is that now currently your
3    permanent residence?
4         A.   As of today, yes.
5         Q.   Okay.  Since you moved there -- well, let
6    me ask a foundational question.  Did you
7    previously -- where did you previously live?
8         A.   In Sherman Oaks, California.
9         Q.   Okay.  And so you moved from Sherman
10   Oaks, California to the Las Vegas area
11   approximately six months ago?
12        A.   November 1st to be exact.
13        Q.   And since November, the Van Buren,
14   Las Vegas address has been your permanent address?
15        A.   Correct.
16        Q.   And why did you decide to move?
17        A.   I had no reason to stay in California
18   anymore.  Since I own the house here, it's cheaper
19   to live here.
20        Q.   Did you own a house in California?
21        A.   No.
22        Q.   Okay.
23        A.   Many years ago, yeah.
24        Q.   Fair enough.  That was a poor question,
25   but I will move on.
```

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1              As you sit here today, do you have any
2    current plans to move back to the Los Angeles area?
3         A.    I might.
4         Q.    But do you currently intend to do so?
5         A.    Right now, no, but you never know.
6         Q.    Okay.  And is it fair to say that you now
7    retired in the Las Vegas area?
8         A.    Correct.
9         Q.    And you -- therefore, you no longer live
10   in the Los Angeles, Southern California area;
11   correct?
12        A.    Correct.
13        Q.    Okay.  Let's take a look at Exhibit 1.
14        A.    That's the subpoena?
15        Q.    That's correct.  Take a look at that
16   document.  Are you familiar with it?
17        A.    Yes, I have seen it before.
18        Q.    Were you served with a copy of that
19   document?
20              MS. WILLIS:  Objection; calls for a legal
21   conclusion.
22              THE WITNESS:  What?  I'm sorry.
23   BY MR. KAPLAN:
24        Q.    Did someone provide that document to you?
25              MS. WILLIS:  Objection; calls for a legal

CONFIDENTIAL

1    conclusion with respect to whether or not it was

2    properly served pursuant to Federal Rule of Civil

3    Procedure 45.

4            THE WITNESS:  I didn't hear a word you

5    said.  I know you said something.

6            MS. WILLIS:  I made an objection, and I

7    will restate my objection so you can hear it.  I

8    objected to Mr. Kaplan's question on the basis that

9    I believe his question is misleading and I believe

10   his question calls for a legal conclusion as to

11   whether or not a subpoena was served upon you

12   pursuant to the Federal Rule of Civil Procedure 45.

13   BY MR. KAPLAN:

14       Q.   Do you need to hear the question read

15   back?

16       A.   I don't understand what she said.

17       Q.   It doesn't matter.  She is just making an

18   objection for the record.  Would you like to have

19   the question read back to you so you have it?

20       A.   Yes, please.  What was the original

21   question?

22            (The requested portion of the record was

23            read by the court reporter.)

24            THE WITNESS:  Yes, I was.

25   / / /

CONFIDENTIAL

1    BY MR. KAPLAN:

2        Q.    And when did that happen, approximately?

3        A.    Thursday.  What was the date?

4        Q.    Let me ask you this:  Were you served

5    twice with it?

6        A.    Yes, I was.

7        Q.    The first time, when you were served with

8    that?

9             MS. WILLIS:  Same objection that --

10            THE WITNESS:  I don't remember the date.

11            MS. WILLIS:  Hang on.  When I make an

12   objection, you have to wait and allow me to make my

13   objection before you answer, because the court

14   reporter can't take down both of us talking at the

15   same time.  This is a federal court legal

16   proceeding, so the record must be very clear.

17            My objection is Mr. Kaplan's question is

18   inappropriate because it calls for a legal

19   conclusion as to whether or not the witness was

20   served in accordance with the definition of that

21   legal term "serve" under Federal Rule of Civil

22   Procedure 45.

23            THE WITNESS:  I can't answer according to

24   the way she put it, because I don't know --

25   understand what she's talking about.

Page 18

CONFIDENTIAL

1    BY MR. KAPLAN:

2        Q.    The question was, Ms. Stern, when -- the

3    first time did someone handed you a copy of that

4    subpoena; correct?

5        A.    Yes.

6        Q.    And the first time, was that about a week

7    or so ago, little more?

8        A.    Approximately.

9        Q.    And the second time someone handed that

10   subpoena to you, it was a few days ago?

11       A.    Yes.

12       Q.    Okay.  And --

13       A.    Actually, it was yesterday.

14       Q.    Was it yesterday or Thursday?

15       A.    Yesterday.

16       Q.    Okay.  And the first time, did a

17   gentleman come to your house and hand it to you?

18       A.    I believe he handed it to my daughter

19   because I was not home, and she gave it to me.

20       Q.    And the time -- the second time, was

21   someone hand it to you?

22       A.    Yes, the process server.

23       Q.    Okay.  All right.

24             And you understand that -- that you're

25   appearing here pursuant to the subpoena, which has

Page 19

CONFIDENTIAL

```
 1    been marked as Exhibit 1?
 2         A.   I understand.
 3              MS. WILLIS:  We will also object that
 4    this is not a -- Exhibit 1 does not constitute a
 5    proper subpoena pursuant to Federal Rule of Civil
 6    Procedure 45.
 7    BY MR. KAPLAN:
 8         Q.   Now, Ms. Stern, I want to ask a little
 9    bit about your work history, in particular sort of
10    in the field of an accountant or CPA or business
11    manager.
12         A.   Okay.
13         Q.   I will ask a foundational question.  Have
14    you ever professionally been an accountant?
15         A.   No.
16         Q.   Have you ever been professionally a
17    bookkeeper?
18         A.   Yes.
19         Q.   Have you ever been professionally a
20    business manager, as that term is sometimes used?
21              MS. WILLIS:  Objection; vague and
22    ambiguous.
23    BY MR. KAPLAN:
24         Q.   You can answer.
25         A.   I am a little leery as to how to answer
```

Page 20

CONFIDENTIAL

```
 1    that question because a business manager gives
 2    advice to the client.  I didn't.
 3         Q.   Okay.
 4         A.   Though I was called a business manager.
 5         Q.   Who called you a business manager?
 6         A.   Whoever I dealt with.
 7         Q.   Okay.  All right.  And so it sounds like
 8    you professionally have acted as a bookkeeper in
 9    the past.
10              When did you begin doing that
11    professionally?
12         A.   1960.
13         Q.   Okay.  And am I correct that you stopped
14    professionally being a bookkeeper in November of
15    2018, approximately?
16         A.   In October.
17         Q.   Of 2018?
18         A.   Yes.
19         Q.   All right.  So just so the record is
20    clear, between 1960 and October 2018,
21    professionally you were a bookkeeper?
22         A.   Correct.
23         Q.   Okay.  And did you have any education or
24    training for -- for that profession?
25         A.   Not official training, education no, but
```

Page 21

1  as years went on as I worked, that training, yes.

2       Q.   Okay.  Did you -- what was the highest

3  level of education that you attended?

4       A.   I left high school in -- when I was 15.

5       Q.   Okay.  And was that in New York?

6       A.   Yes, it was.

7       Q.   In the Bronx?

8       A.   Yes.

9       Q.   At some point, did you move to

10  California?

11      A.   I did.

12      Q.   When was that, approximately?

13      A.   The first time or second time?

14           The first time was 1956, I believe.

15      Q.   Okay.  And when was the second time?

16      A.   1978.

17      Q.   All right.  So let's start -- in 1960,

18  how did it become -- or how did you become a

19  bookkeeper?

20      A.   I applied for a job.

21      Q.   Okay.  How many different bookkeeping

22  jobs have you had sort of in that -- between 1960

23  and 2018?

24      A.   I can't answer that.

25      Q.   Is that because it's quite a few?

Page 22

CONFIDENTIAL

```
 1              MS. WILLIS:  Objection; calls for
 2     speculation.
 3              THE WITNESS:  Yes, it was quite a few.
 4     BY MR. KAPLAN:
 5        Q.   Do you think it was more than ten?
 6              MS. WILLIS:  Objection; calls for
 7     speculation.  The witness has already stated she
 8     doesn't know.
 9              THE WITNESS:  Are you talking about
10     individual clients or companies that I worked for?
11     BY MR. KAPLAN:
12        Q.   That's a fair question.  I'm talking
13     about individual or different companies.
14        A.   No, it wasn't more than ten.
15        Q.   Do you think it was more than five?
16        A.   I don't think so.
17        Q.   Okay.  More than three?
18        A.   Yes.
19        Q.   So probably between three and five
20     companies you've worked for between 1960 and 2018
21     in the capacity as a bookkeeper?
22        A.   Yes.
23        Q.   Okay.  Do you remember the first company
24     you worked for?
25        A.   Pardon?
```

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1       Q.    Sorry, Ms. Stern.  Do you remember the

2  first bookkeeping job that you had?

3       A.    Actually, it was here in Vegas.  An

4  accountant or CPA by the name of Irving Haut --

5       Q.    Okay.

6       A.    -- well, of course, has since died.

7       Q.    And how long did you hold that job for?

8       A.    Maybe three years.

9       Q.    Okay.  What did you do for Mr. Haut?

10      A.    Bookkeeping.  He handled a couple of the

11  casinos.  We would go in and check the monies taken

12  in, things like that.

13      Q.    So Mr. Haut had some casino clients, and

14  you would help with the bookkeeping for those

15  casino clients.

16      A.    Not for the casino.  For him.

17      Q.    For him.  What did he do?  What was his

18  business?

19      A.    He was a CPA.

20      Q.    I see.  What was your next bookkeeping

21  job after that?

22      A.    Let me think.  I can't remember.

23      Q.    At some point, did you start doing

24  bookkeeping work for individuals or companies in

25  the entertainment business?

Page 24

CONFIDENTIAL

1     A.    For the companies in the Entertainment

2  business, yes.

3     Q.    When did you start doing that,

4  approximately?

5     A.    1978.

6     Q.    Okay.  And where were you doing that?

7     A.    For Michael Mesnick.

8     Q.    Is he a CPA?

9     A.    He is.

10    Q.    Would you refer to him as a business

11 manager in the industry?

12    A.    Yes.

13    Q.    Okay.

14          MS. WILLIS:  Same objection with respect

15 to the term "business manager."

16 BY MR. KAPLAN:

17    Q.    Okay.  And how long did you work for

18 Mr. Mesnick's office?

19    A.    Well, I worked for him twice from 1978 to

20 1990.

21    Q.    Okay.

22    A.    And then I moved on to -- I'm trying to

23 think of the name.  It was another company.  And

24 then in 1999, I went back to Mr. Mesnick.

25    Q.    And the second stent with Mr. Mesnick,

CONFIDENTIAL

1    how long did you work for him beginning in 1999?

2         A.   In '99?

3         Q.   Correct.

4         A.   Maybe three years.

5         Q.   All right.  And in between -- between '90

6    and '99, do you remember where you worked at all?

7         A.   I worked for a company -- the gentleman's

8    name was Jenkins.  But I can't remember what the

9    company name was.

10        Q.   It was a bookkeeping job there?

11        A.   Yeah.

12        Q.   What type of bookkeeping work did you do

13   there?

14        A.   Entertainment.

15        Q.   And was it entertainment clients?

16        A.   Yes.

17        Q.   Like celebrities?

18        A.   Yes.

19        Q.   Actors?  Musicians?

20        A.   Writers, yeah.

21        Q.   Those type of clients?

22        A.   Yes.

23        Q.   Let's go back to the first time you were

24   with Mr. Mesnick between 1978 and 1990.  What sort

25   of bookkeeping work did you do there?

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1      A.    I handled the money for the clients.

2      Q.    What type of clients were they?

3      A.    Actors, actresses.  I can name some, if

4   you want.

5      Q.    No, no, just generically I want to know

6   what type.

7      A.    That's what they were.  Musicians, you

8   know, bands, things like that.

9      Q.    So they were people or individuals or

10   companies in the entertainment bookkeeping?

11      A.    Only intermittent.

12      Q.    Okay.  So it sounds like -- in your

13   second time with Mr. Mesnick, was it the same type

14   of work for --

15      A.    Yes.

16      Q.    -- doing books for people in the

17   entertainment industry?

18      A.    Yes.

19      Q.    So it seems like between 1978 and through

20   the early 2000s, when you finished your second time

21   with Mr. Mesnick, you were working or doing

22   bookkeeping for individuals in the entertainment

23   business?

24      A.    Correct.

25      Q.    And generally speaking, what would that

Page 27

1   entail?

2        A.   Keeping track of the money they were

3   being paid, whether it be royalties or for

4   performances.  Basically balancing their bank

5   accounts, paying their bills.

6        Q.   Okay.  Now, after your second job with

7   Mr. Mesnick, what did you do next professionally as

8   a bookkeeper?

9        A.   I went to another company and I can't

10  remember the name.

11       Q.   Okay.  Did you do the same type of work?

12       A.   Yes.

13       Q.   And just so I am clear, by same type of

14  work you were a bookkeeper for entertainment

15  clients?

16       A.   That's correct.

17       Q.   I know you don't remember the name of the

18  company.  How long were you there for,

19  approximately?

20       A.   I'm trying to remember.  I don't remember

21  when I left.  Maybe ten years.

22       Q.   And did you have a boss there?  Was it

23  your own company or did you have a boss?

24       A.   No, no, I was an employee.

25       Q.   Okay.  And were you doing the same type

1    of work as you were doing with Mr. Mesnick and

2    Jenkins?

3         A.   Yes.

4         Q.   Okay.  Was there any material difference

5    in the work you were doing?

6         A.   None.

7         Q.   All right.  So after approximately ten

8    years working as a bookkeeper at the company you

9    can't remember, what did you do next professionally

10   in terms of a bookkeeping job?

11        A.   When I left the last company that I

12   worked for, I semi-retired.

13        Q.   Okay.  When was that approximately?

14   Around -- I'm doing my math.

15        A.   2011, I think.

16        Q.   You say semi-retired.  Does that mean you

17   were also doing some work?

18        A.   I did work out of my residence.

19        Q.   And was that your residence in Sherman

20   Oaks, California?

21        A.   Yes.

22        Q.   Between, let's say, 2011 and 2018 when

23   you moved from Sherman Oaks to Las Vegas, were you

24   living out of the same residence in Sherman Oaks?

25        A.   No, I may have moved.  But it was --

Page 29

CONFIDENTIAL

1    yeah.

2         Q.   Okay.  So is it fair to say between 2011

3    and 2018 when you retired and moved to Las Vegas,

4    you were working part-time as a bookkeeper?

5         A.   Correct.

6         Q.   Were you working for any employer or were

7    you on your own?

8         A.   On my own.

9         Q.   So you were on your own between 2011 and

10   2018?

11        A.   Approximately, yeah.

12        Q.   And that was bookkeeping work; correct?

13        A.   Yes.

14        Q.   By the way, the company you worked for

15   for about ten years from 1999 through maybe

16   2011-ish, where you were doing bookkeeping work,

17   was that a business manager you were working for?

18        A.   Yes.  Yes.  They were CPAs.

19        Q.   Okay.  Now, between 2011 and 2018, when

20   you went out on your own, did you have your own

21   clients?

22        A.   When I left the firm, a couple of the

23   clients left with me.

24        Q.   Approximately how many?

25        A.   Three.

Page 30

CONFIDENTIAL

1        Q.    Do you remember their names?

2        A.    Well, one of them was Smokey Robinson.

3    The other was Daryl Brown, who was a songwriter

4    producer.  And Roger -- I can't think of his

5    last -- but he was in -- I don't know how -- what

6    you would call it.  He took care of people who were

7    addicted and in recovery, things like that.

8        Q.    Was he an entertainment client?

9        A.    No.

10        Q.    And what sort -- well, how long did you

11   represent -- I know you don't remember his last

12   name Roger?

13        A.    As long as I did Daryl.  They're a

14   couple.

15        Q.    I see.  Was Daryl an entertainment

16   client?

17        A.    He's a music writer producer, yes.

18        Q.    Okay.  So how long did you represent

19   Daryl Brown and Roger, approximately?

20        A.    Six, seven years, something like that.

21        Q.    Okay.  And then you stopped representing

22   them?

23        A.    Yeah.

24        Q.    Any particular reason why?

25        A.    Daryl Brown decided to take care of his

Page 31

CONFIDENTIAL

```
 1    own stuff.
 2         Q.   Okay.  And you indicated that you also
 3    represented Smokey Robinson --
 4         A.   Correct.
 5         Q.   -- on your own.  Did you represent him --
 6    well, what sort of services on your own did you
 7    provide to him?
 8         A.   Bookkeeping.
 9         Q.   And that was from -- on your own from
10    2011 through 2018?
11         A.   Correct.
12         Q.   When in 2018?  When did you're
13    relationship end in 2018?
14         A.   I think it was the end of September.
15         Q.   Now, it sounds like you represented
16    Mr. Robinson before you went off on your own?
17         A.   I did when I worked for Michael Mesnick.
18         Q.   So before you went off on your own --
19    well, it sounds like -- so was Mr. Robinson a
20    client of Mr. Mesnick's office?
21         A.   I believe so.
22         Q.   When did you --
23         A.   And then he moved to the next firm that I
24    was with.  And I can't remember their name.
25    They're still in existence, though.
```

Page 32

```
 1        Q.    So when -- when did you begin providing
 2   bookkeeping services to Mr. Robinson at the
 3   Metnick [sic] firm?
 4        A.    At Mesnick?
 5        Q.    Mesnick, I'm sorry.
 6        A.    1999.
 7        Q.    Okay.  So is it fair to say that you
 8   represented Smokey Robinson from approximately 1999
 9   through 2018?
10             MS. WILLIS:  Objection with respect to
11   the term "represented."
12             THE WITNESS:  No.  Mesnick represented
13   him.  I just did the bookkeeping for Mr. Mesnick.
14   BY MR. KAPLAN:
15        Q.    Is it fair to say that since 1999 you
16   have done bookkeeping work for Mr. Robinson -- let
17   me withdraw that question and start over.
18             Is it fair to say between 1999 and
19   approximately 2018 you provided bookkeeping
20   services to Mr. Robinson?
21        A.    Correct.
22        Q.    Okay.  And that continued at the firm
23   that you don't remember the name of?
24        A.    Yeah.
25        Q.    While at Mesnick's shop, what sort of
```

Page 33

CONFIDENTIAL

1    bookkeeping services did you provide to

2    Mr. Robinson?

3          A.    We handled the monies he earned from his

4    performances, his investments, pay his bills,

5    things like that.

6          Q.    Okay.   So while at the Mesnick firm, was

7    Mr. Robinson frequently performing?

8          A.    Yes.

9          Q.    Doing live performances shows?

10         A.    Yeah.

11         Q.    And when Mr. Robinson would make -- earn

12   monies from those shows -- again, this is during

13   the Mesnick period -- you would do the bookkeeping

14   for those earnings?

15         A.    Yes.

16         Q.    And that continued at that company that

17   you don't remember the name of?

18         A.    Same thing.

19         Q.    Okay.   And that continued after you went

20   off on your own; correct?

21         A.    Yes.

22         Q.    And let me be more clear.   Bookkeeping in

23   terms of doing the bookkeeping on Mr. Robinson's

24   live performance shows and the revenue that came in

25   from it?

Page 34

CONFIDENTIAL

1        A.   Yes.

2        Q.   Now, when you went off on your own in

3    approximately 2011 through 2018, did you have any

4    employees or coworkers that helped you with your

5    bookkeeping?

6        A.   No.

7        Q.   You did it all on your own?

8        A.   Yes.

9        Q.   Now, I'm going to focus on a period of

10   time after 2011 when you went off on your own and

11   you were doing -- well, after you went off on your

12   own in 2011 after that point, did you consider that

13   you were representing Mr. Robinson?

14       A.   Yes.

15            MS. WILLIS:   Objection; vague and

16   ambiguous with respect to the term "representing."

17            THE WITNESS:   Yes, I was not representing

18   him.   I was doing his bookkeeping.

19   BY MR. KAPLAN:

20       Q.   Got it.   Okay.   Now, during that time

21   period when you were off on your own between 2011

22   and 2018, did Mr. Robinson have any affiliated

23   companies such as a loan out company?

24            MS. WILLIS:   Objection; vague and

25   ambiguous.

Page 35

CONFIDENTIAL

1          THE WITNESS:  Well, I'm sorry, I don't

2   understand.  He wasn't a corporation.  He was a

3   DBA, and he had earnings coming in under other

4   company names from -- for royalties.

5   BY MR. KAPLAN:

6       Q.   What I'm asking, though, have you ever

7   heard in the entertainment industry sometimes

8   actors or performers have what's called a loan out

9   company?

10      A.   Yes, I have heard the expression, but ...

11      Q.   Did Mr. Robinson have such a loan out

12  company during this 2011 to 2018 time period?

13      A.   Not that I can remember.

14      Q.   Are you familiar with an entity called

15  Bertram, B-E-R-T-R-A-M?

16      A.   Yes.

17      Q.   What is that?

18      A.   That's one of his DBAs.

19      Q.   So was it a company that was affiliated

20  with Mr. Robinson?

21      A.   It was Mr. Robinson.

22      Q.   It was his company?

23      A.   Yeah.

24      Q.   And you did bookkeeping for that company,

25  Bertram?

CONFIDENTIAL

1      A.    Correct.

2      Q.    Did you do bookkeeping for any other

3  companies or DBAs that may have been related to

4  Mr. Robinson during that 2011 to 2018 time period?

5      A.    Other than taking in royalties under

6  other names and depositing the money, no.

7      Q.    Okay.  So again, let's -- I'm just going

8  to focus now on the 2011 to 2018 time period.  I

9  don't think I'm going to go back, but if I do I'll

10  let you know.

11         What were the -- can you describe

12  generally the bookkeeping services you provided to

13  Mr. Robinson during that period?

14      A.    His agent would book a performance at a

15  venue.  The venue would sign a contract.  The agent

16  received the deposit for the performance.

17  Mr. Robinson would show up with his entourage, do

18  the performance and I'd get the balance of the

19  contract amount.

20      Q.    And did Mr. Robinson tell you all that?

21      A.    No.  Most of the time I dealt with his

22  road manager, Earl Bryant.

23      Q.    Okay.  All right.  What else would you

24  do, what other bookkeeping services would you

25  provide to Mr. Robinson during that period?

Page 37

CONFIDENTIAL

1        A.    I handled his individual houses, paying

2   his staff people who did, you know, services at the

3   residence.  Whatever bills had to be paid, that's

4   what I did.

5        Q.    All right.  Is it fair to say, though,

6   one of your responsibilities as Mr. Robinson's

7   bookkeeper during the 2011 to 2018 time period was

8   to keep track of his earnings from live

9   performances?

10        A.    Absolutely.

11        Q.    Okay.  And you did that consistently

12   throughout that period?

13        A.    Yes.

14        Q.    Did your -- again, during the 2011

15   through 2018 time period, did your duties and

16   responsibilities for Smokey Robinson ever change?

17        A.    None, no.

18        Q.    So they were fairly consistent over that

19   time period?

20        A.    Yes.

21        Q.    And is it true you were responsible for

22   keeping records of at least certain business

23   transactions or financial transactions for Smokey

24   Robinson and his related companies?

25        A.    Yes.

CONFIDENTIAL

1      Q.   Now, if you want to take a look at some

2   of the documents I placed in front of you, in

3   particular Exhibit 3 through 8, you will notice

4   that there is this number on the top of the

5   documents 6267.  Do you see that?

6      A.   Yes.  And I don't remember -- do you have

7   a chart of accounts?

8      Q.   I don't.

9      A.   Yeah, I don't --

10      Q.   But go ahead.  I'm sorry, I interrupted

11   you.

12      A.   There was a chart of accounts that

13   started with number 1,000 right up through 9,000.

14   And it broke down whatever costs were involved

15   and -- such as, let's say, publicity would be a

16   certain number.  Mortgage payment would be a

17   certain number.  I don't remember what 6267 is.

18      Q.   Is that a client ID number for

19   Mr. Robinson?

20      A.   No, that's an expense number.

21      Q.   I see.  Did you have a client number you

22   would use in connection with Smokey Robinson?

23      A.   Every show he did had a different client

24   number.

25      Q.   Okay.  Now, without disclosing any

Page 39

CONFIDENTIAL

1     amounts, but am I correct that Mr. Robinson would

2     compensate you for your bookkeeping services during

3     the 2011 to 2018 period?

4          A.   Yes.

5          Q.   And again, I don't want to disclose

6     amounts.  But what was sort of the nature or form

7     of the compensation?  In other words, was it a

8     commission, was it hourly, salary, something else?

9          A.   It was straight -- it wasn't even a

10    salary, it was just a payment to an individual.

11         Q.   Was it flat fee?

12         A.   A flat fee.  And I got a 1099 at the end

13    of the year.

14         Q.   Okay.  So again, just to clarify, and I

15    don't want you to get into how much or what it was,

16    but it's fair to say that Mr. Robinson would pay

17    you some sort of fee for your bookkeeping services

18    during the 2011 to 2018 time period?

19         A.   Correct.

20         Q.   You weren't doing this work for free;

21    correct?

22         A.   No.

23         Q.   During that time period, did Mr. Robinson

24    have any other bookkeepers that were working for

25    him?

CONFIDENTIAL

```
 1         A.    Not to my knowledge.
 2         Q.    Did he have any business managers that
 3    were working for him during that time period?
 4         A.    Again, not that I know of.
 5         Q.    Just so I am clear, between 2011 and
 6    2018?
 7         A.    No.
 8         Q.    Mr. Robinson had a CPA, though; correct?
 9         A.    Yes.
10         Q.    Who was that?
11         A.    Iskowitz.
12         Q.    Gary Iskowitz?
13         A.    Gary Iskowitz.
14         Q.    Mr. Iskowitz, however, did not provide
15    bookkeeping services, did he?
16         A.    No, he did not.
17         Q.    He did the taxes?
18         A.    He did the taxes.  He analyzed the
19    general ledger, I guess, at the end of the year.
20         Q.    Okay.  And the general ledger, that's
21    something that who created?
22         A.    Yes.
23         Q.    No, who created it?
24         A.    Created it or -- I didn't create it.
25         Q.    Who -- who inputted the information into
```

Page 41

CONFIDENTIAL

1    it?

2          A.    I did.

3          Q.    That's a good distinction.  Did anyone

4    else during the 2011 to 2018 time period input data

5    or information into the Smokey Robinson ledgers?

6          A.    No.

7          Q.    Only you?

8          A.    Yes.

9          Q.    What was the purpose of you creating

10   those ledgers for Mr. Robinson?

11         A.    That's how you keep track of his money

12   coming in and money going out.

13         Q.    Is it fair to say, then, the purpose of

14   creating those ledgers was so that there would be

15   an accurate and complete record of his finances?

16         A.    That's correct.

17         Q.    Any other reason?

18         A.    For tax purposes.

19         Q.    And sort of a sub purpose would be to

20   make sure that there was a accurate and complete

21   record of all of Mr. Robinson's earnings; correct?

22         A.    Correct.

23         Q.    And that included an accurate and

24   complete record of Mr. Robinson's earnings from

25   live performances?

CONFIDENTIAL

1      A.   Live performances and royalties.

2      Q.   Among other things?

3      A.   Yes.

4      Q.   But certainly live performances?

5      A.   That was his biggest income, yeah.

6      Q.   Now, I, want to fast-forward a little bit

7   to the 2013 to 2016 time frame.  So it's a potion

8   of the time, I think you were out on your own

9   providing bookkeeping services to Mr. Robinson.

10         Am I correct, as Smokey Robinson's

11   business manager, you maintained financial business

12   record that were recording and memorializing, at

13   least, some of Mr. Robinson's financial

14   transactions in the 2013, 2016 time tram.

15         MS. WILLIS:  I'm going to object.  The

16   witness has already said she was not his business

17   manager.  Yet that question was posed saying as his

18   business manager.

19         MR. KAPLAN:  Did I say business manager

20   or bookkeeper?

21         MS. WILLIS:  You said as his business

22   manager.

23         MR. KAPLAN:  I apologize.

24   BY MR. KAPLAN:

25      Q.   Let me rephrase that.  I didn't mean to

Page 43

CONFIDENTIAL

1    say that.

2              As Smokey Robinson's bookkeeper, is it

3    fair to say you created and maintained financial

4    business records that were recording and

5    memorialized, at least, some of Mr. Robinson's

6    financial and business transactions in the 2013

7    through 2016 time frame?

8              MS. WILLIS:   Objection; vague and

9    ambiguous, compound, calls for speculation.

10             THE WITNESS:   Business and personal.

11   BY MR. KAPLAN:

12        Q.   Okay.   And you maintained and would --

13   you don't like the work "created," do you?   What's

14   a better word to use than created?

15        A.   It depends on what you're referring to.

16        Q.   When you would put information into the

17   ledgers, what's the word you like to use?

18        A.   Record.

19        Q.   Record, there you go.   It's fair to say

20   you would update and make the recordings in

21   Mr. Robinson's financial ledgers in 2013 through

22   2016 time period?

23        A.   Correct.

24        Q.   Okay.   And you refer to those documents

25   as ledgers?

Page 44

CONFIDENTIAL

1          A.    The ledgers --

2                MS. WILLIS:   Hang on.   Objection; vague

3     and ambiguous.

4     BY MR. KAPLAN:

5          Q.    You can answer.

6          A.    The ledger is what -- what his accounting

7     and writing is called.

8          Q.    But that's the name of the financial

9     document that you would make recordings in?

10         A.    Yes.

11               MS. WILLIS:   Same objection; vague and

12    ambiguous.

13    BY MR. KAPLAN:

14         Q.    During the 2013 to 2016 time period?

15               MS. WILLIS:   Same objection; vague and

16    ambiguous.

17               THE WITNESS:   Yes.

18    BY MR. KAPLAN:

19         Q.    Would you make recordings about

20    Mr. Robinson's financial transactions in any other

21    documents during the 2013 to 2016 time frame?

22               MS. WILLIS:   Objection; vague and

23    ambiguous.

24               THE WITNESS:   No.

25    / / /

CONFIDENTIAL

```
 1   BY MR. KAPLAN:
 2        Q.   Okay.   Since I'm getting objections, what
 3   was the name of the document where you would make
 4   recordings of Mr. Robinson's business or financial
 5   transactions in the 2013 to 2016 time frame?
 6        A.   I don't know -- I don't understand the
 7   question.   Please speak a little louder.
 8        Q.   Yeah, and I will rephrase it.
 9             What was the name of the document or
10   documents that you would use to record
11   Mr. Robinson's financial or business transactions
12   in during the 2013 to 2016 time frame?
13        A.   If you're referring to his performances,
14   it was taken from a contract.
15        Q.   But I'm asking what's the name of the
16   document where you would make the recordings in?
17        A.   Well, all accounting, as far as I was
18   concerned, was on Datafaction.
19        Q.   And is that electronic software?
20        A.   Yes.
21        Q.   And you would make ledgers in that
22   software?
23             MS. WILLIS:   Objection; leading, and
24   misstates the witness' prior testimony, vague and
25   ambiguous.
```

CONFIDENTIAL

1              THE WITNESS:  The Datafaction created the

2    ledgers.

3    BY MR. KAPLAN:

4         Q.   I see.  And then what you do to make the

5    recordings in the Datafaction ledgers?

6              MS. WILLIS:  Objection; vague and

7    ambiguous.

8              Go ahead.

9              THE WITNESS:  I would record it on

10   Datafaction.

11   BY MR. KAPLAN:

12        Q.   Okay.  Just so the record is clear, when

13   did you begin using Datafaction?

14        A.   Back when I was with Mesnick, but I don't

15   know the exact year.

16        Q.   Is it fair to say you used Datafaction

17   for your bookkeeping for Mr. Robinson between 2011

18   and 2018?

19        A.   Yes.

20        Q.   Did you ever use any other software,

21   other than Datafaction, during that time period for

22   Mr. --

23        A.   No.

24        Q.   -- for Mr. Robinson?

25        A.   No.

CONFIDENTIAL

```
1          Q.    Did you or anyone else have to pay any
2     sort of fee for the use of Datafaction?
3          A.    Did I what?
4          Q.    Have to pay a fee to use Datafaction.
5          A.    Yes.
6          Q.    Did you incur that fee?
7          A.    Yes.
8          Q.    Was it a monthly fee?
9          A.    It was a -- yeah, a monthly fee.
10         Q.    And silly question, but what is
11    Datafaction, generally speaking?
12         A.    I don't know how to explain it.  It's an
13    electronic computer --
14         Q.    Is it bookkeeping software?
15         A.    Yes.
16              MS. WILLIS:  Objection; leading.
17    BY MR. KAPLAN:
18         Q.    What did you use it for, the Datafaction
19    software?
20         A.    For all the bookkeeping.
21         Q.    For Mr. Robinson?
22         A.    For any client that I had.
23         Q.    And what does it allow you to do for a
24    client like Mr. Robinson?
25              MS. WILLIS:  Objection; vague and
```

Page 48

CONFIDENTIAL

1    ambiguous.

2          THE WITNESS:   It allows me to record

3    everything that goes on in his life.

4    BY MR. KAPLAN:

5          Q.   So would you use the Datafaction software

6    in the 2011 to 2018 time period to record all or at

7    least some of Mr. Robinson's business and financial

8    transactions?

9          A.   Yes.

10         Q.   And that would include payments made to

11   Mr. Robinson?

12         A.   Yes, and payments that he made to things

13   he dealt with.

14         Q.   How long -- I may have asked this, I

15   apologize if I did.  But how long have you been

16   using Datafaction for?

17         A.   It start with Mesnick.  I start working

18   for him in 1960, I think.  No.

19         Q.   I think --

20         A.   1968 I started to work for Mesnick.

21         Q.   Before you said, and I may have taken bad

22   notes, 1978 to 1990?

23         A.   '78 --

24         MS. WILLIS:  Objection; misstates the

25   witness' testimony.

Page 49

CONFIDENTIAL

```
 1              THE WITNESS:  You're right, that's when I
 2    started with Mesnick.
 3    BY MR. KAPLAN:
 4         Q.   So based on that, do you have a memory as
 5    to when you began using Datafaction software?
 6         A.   It was sometime after?
 7         Q.   After 1978?
 8         A.   Right.
 9         Q.   So you used it for quite some time, then?
10    For quite some time you used Datafaction?
11         A.   Yes.
12         Q.   Did you use Datafaction consistently for
13    your bookkeeping career since you began with
14    Mesnick in 1978?
15         A.   Yes.
16              MS. WILLIS:  Objection; vague and
17    ambiguous.
18    BY MR. KAPLAN:
19         Q.   Did you ever use any other bookkeeping
20    software other than Datafaction since 1978?
21         A.   Not since then.  Prior I did.
22         Q.   Do you feel fairly comfortable using it,
23    Datafaction?
24              MS. WILLIS:  Objection; vague and
25    ambiguous.
```

Page 50

CONFIDENTIAL

1  BY MR. KAPLAN:

2      Q.   Let's me reask it.  Do you feel fairly

3  comfortable using Datafaction?

4      A.   Yes.

5           MS. WILLIS:  Objection; vague and

6  ambiguous and leading.

7  BY MR. KAPLAN:

8      Q.   You know how to use it?

9      A.   I did.  I don't know if my memory is

10  still with it.

11      Q.   All right.  Did you consider yourself

12  proficient in Datafaction?

13      A.   Yes.

14      Q.   Okay.  Let's focus on Smokey Robinson

15  again in the 2013 to 2016 period.

16           Would you use Datafaction to create

17  general ledgers?

18      A.   Yes.

19           MS. WILLIS:  Objection; vague and

20  ambiguous.

21  BY MR. KAPLAN:

22      Q.   For Mr. Robinson, at least, what was the

23  general ledger?  How would you characterize that?

24           MS. WILLIS:  Objection; vague and

25  ambiguous.

Page 51

CONFIDENTIAL

```
 1              THE WITNESS:  The general ledger is
 2   everything that goes on in his life.
 3   BY MR. KAPLAN:
 4        Q.   All right.
 5        A.   There are separate accounts for it.
 6        Q.   So the general ledger is a combination of
 7   all the ledgers; is that fair?
 8              MS. WILLIS:  Objection; leading.
 9              THE WITNESS:  Not of all the ledgers, of
10   all the accounts.
11   BY MR. KAPLAN:
12        Q.   Okay.  Were there any subsidiary or sub
13   ledgers you had for Mr. Robinson?
14        A.   No.
15        Q.   Were there subaccounts you had for
16   Mr. Robinson?
17              MS. WILLIS:  Objection; vague and
18   ambiguous.
19              THE WITNESS:  I'm sorry.
20   BY MR. KAPLAN:
21        Q.   I'm sorry.  Were there subaccounts that
22   you had for Mr. Robinson?
23              MS. WILLIS:  Objection; vague and
24   ambiguous.
25              THE WITNESS:  I don't know what you mean
```

Page 52

CONFIDENTIAL

```
 1    by subaccounts.
 2    BY MR. KAPLAN:
 3         Q.   I think I'm using the wrong term.  There
 4    were different accounts for Mr. Robinson, though?
 5              MS. WILLIS:  Objection; leading, vague
 6    and ambiguous.
 7              THE WITNESS:  Well, there are different
 8    categories.
 9    BY MR. KAPLAN:
10         Q.   What were some of those categories?
11         A.   Office expense.
12              MS. WILLIS:  Objection; vague and
13    ambiguous.
14              THE WITNESS:  Utilities, payrolls.
15    Everything was categorized separately.
16    BY MR. KAPLAN:
17         Q.   Were there account categories dealing
18    with his earnings?
19              MS. WILLIS:  Objection.
20              THE WITNESS:  I --
21    BY MR. KAPLAN:
22         Q.   Were there account categories for
23    Mr. Robinson's earnings?
24              MS. WILLIS:  Objection; vague and
25    ambiguous.
```

Page 53

CONFIDENTIAL

```
 1              THE WITNESS:  Yes.
 2    BY MR. KAPLAN:
 3         Q.   What were some of those categories?
 4         A.   The earnings were the contracts that I
 5    got in from venues which were given separate
 6    account numbers.
 7         Q.   Okay.  And would you record as Smokey
 8    Robinson's bookkeeper in the 2013 to 2016 time
 9    frame earnings that he received from live
10    performances?
11         A.   Yes.
12         Q.   And those would be recorded where?
13              MS. WILLIS:  Objection; vague and
14    ambiguous.
15              THE WITNESS:  They would -- each separate
16    venue had a number.  That's how it was recorded.
17    BY MR. KAPLAN:
18         Q.   You would record it, though, using what
19    software?
20         A.   Datafaction.
21         Q.   Okay.  And that would be recorded in the
22    ledger in Datafaction?
23              MS. WILLIS:  Objection; leading.
24              THE WITNESS:  Yes.
25    / / /
```

Page 54

CONFIDENTIAL

```
 1    BY MR. KAPLAN:
 2         Q.   Okay.  Now, Datafaction, was that -- it's
 3    electronic, so you would need to access a computer
 4    to use it, am I correct?
 5              MS. WILLIS:  Objection; leading.
 6              THE WITNESS:  I'm sorry?
 7    BY MR. KAPLAN:
 8         Q.   How would you access Datafaction?
 9         A.   You go into the computer.
10         Q.   Okay.  Now, is it something that you need
11    to log on to?
12         A.   Yes.
13         Q.   Okay.  So you had a password, something
14    like that?
15         A.   I don't remember whether it was a
16    password or a number or something.
17         Q.   All right.  But you needed some sort of
18    credentials to get into the Datafaction?
19         A.   Well, on my computer only had
20    Datafaction.
21         Q.   Did you have to go online to get on to
22    Datafaction?
23         A.   I don't understand.
24         Q.   Did you have to go access the Internet to
25    go into Datafaction?
```

Page 55

CONFIDENTIAL

```
 1        A.   No.
 2        Q.   As part of -- you said there was some
 3  sort of fee that would be paid to Datafaction.  As
 4  part of that fee, would Datafaction back up the
 5  Smokey Robinson Datafaction documents?
 6             MS. WILLIS:  Objection; vague and
 7  ambiguous.
 8             THE WITNESS:  Again, I don't understand
 9  the question.
10  BY MR. KAPLAN:
11        Q.   Do you know whether or not the -- when
12  you created ledgers or documents on Datafaction for
13  Mr. Robinson, whether or not those would be backed
14  up somewhere?
15             MS. WILLIS:  Same objection; vague and
16  ambiguous.
17             THE WITNESS:  Well, I assume that
18  Datafaction had everything backed up.  In case I
19  lost it, they would have it.
20  BY MR. KAPLAN:
21        Q.   Did you ever lose Mr. Robinson's
22  Datafaction information?
23        A.   No.
24        Q.   Did Mr. Robinson have access to the
25  Datafaction account?
```

Page 56

CONFIDENTIAL

1      A.   He had access to it, but I don't think he

2   ever used it.

3           MS. WILLIS:  Objection; calls for

4   speculation.

5   BY MR. KAPLAN:

6      Q.   How do you know he had access to it?

7      A.   Because he paid for it.

8      Q.   Did you provide him with access?

9      A.   No.  He never asked.

10      Q.   Someone -- if he did have access, he

11   could review all the transactions that were

12   recorded on Datafaction; correct?

13      A.   If he wanted to.

14           MS. WILLIS:  Objection; calls for

15   speculation, assumes facts not in evidence.

16   BY MR. KAPLAN:

17      Q.   Did Mr. Robinson ever discuss with you or

18   tell you that he had looked at the Datafaction

19   records?

20      A.   No.

21      Q.   Did you ever provide Mr. Robinson between

22   2011 and '18 any sort of reports or financial

23   reports?

24      A.   I believe I did.

25      Q.   Okay.  And what would be the form of

Page 57

1   those reports?

2       A.   Well, if he wanted to know how much he

3   was spending on a certain particular show or item,

4   I could print it out from -- on my computer.

5       Q.   From Datafaction?

6       A.   Yes.

7       Q.   Did you ever provide Mr. Robinson any

8   documents or reports about his earnings?

9       A.   I didn't, but I'm sure the CPA did.

10          MS. WILLIS:  Objection; calls for

11   speculation with respect to everything after I

12   didn't.

13   BY MR. KAPLAN:

14      Q.   Did Mr. Robinson ever tell you that he

15   received reports from Mr. Iskowitz or documents

16   from Mr. Iskowitz?

17      A.   He never discussed it with me, no.

18      Q.   Did you ever have any problems using

19   Datafaction?

20      A.   None that I remember.

21      Q.   Do you believe in your experience, at

22   least, that Datafaction was reliable?

23      A.   Yes.

24          MS. WILLIS:  Objection; vague and

25   ambiguous, calls for speculation.

Page 58

1    BY MR. KAPLAN:

2         Q.    Why do you believe that it was reliable?

3         A.    Because it gave me what I needed.

4         Q.    Fair enough.  Do you know whether or not

5    Datafaction is a commonplace software that's used

6    in accounting industry?

7              MS. WILLIS:  Objection; this witness is

8    not an expert and cannot speak to industry

9    standards; therefore, this is an improper question.

10   It also calls for speculation.

11             THE WITNESS:  I know there are other

12   companies that use it, but that's all.

13   BY MR. KAPLAN:

14        Q.    Okay.  Now, what were the Smokey

15   Robinson-related ledgers that you created on

16   Datafaction for his account be used for?

17             MS. WILLIS:  Objection; misstates the

18   witness' prior testimony.  She has repeatedly

19   stated she didn't create anything.

20             THE WITNESS:  Repeat the question,

21   please.

22   BY MR. KAPLAN:

23        Q.    The ledgers that you recorded on for

24   Smokey Robinson during the 2011 through 2018 time

25   period, what would those ledgers be used for?

Page 59

CONFIDENTIAL

```
1            MS. WILLIS:   Objection; calls for
2    speculation.
3            THE WITNESS:   His tax returns at the end
4    of the year.
5    BY MR. KAPLAN:
6        Q.   Did you provide the ledgers to
7    Mr. Iskowitz --
8        A.   Yes.
9        Q.   -- each year?
10       A.   Yes.
11       Q.   How would you provide those -- withdrawn.
12   Let me start over.
13           How would you provide the Datafaction
14   ledgers for Smokey Robinson to Mr. Iskowitz each
15   year?
16       A.   By printing them from the computer.
17       Q.   Okay.   And then would you send them to
18   Mr. Iskowitz?
19       A.   Yes.
20       Q.   Would he request them each year?   Would
21   he request them each year?
22       A.   He didn't have to request them.   I knew
23   he had to have them to do his taxes.
24       Q.   All right.   So you would send --
25   withdrawn.   Let me start over.
```

Page 60

CONFIDENTIAL

1          You would print out and send Smokey

2    Robinson's ledgers to Mr. Iskowitz each year for

3    the purpose of creating Mr. Robinson's tax returns?

4          MS. WILLIS:  Objection; compound,

5    leading.

6          THE WITNESS:  Yes.

7    BY MR. KAPLAN:

8      Q.   All right.  Again, let's limit this --

9          MS. WILLIS:  When we get to a point, can

10   we take a quick restroom break?

11         MR. KAPLAN:  Yeah, we can take one now.

12         (A brief recess was taken.)

13   BY MR. KAPLAN:

14     Q.   Again, I want to focus on the 2013 to '18

15   time period.  So during that time period when you

16   were working as Mr. Robinson's bookkeeper, did

17   Mr. Robinson have a team of people working with him

18   in connection with his business at that time?

19         MS. WILLIS:  Objection; vague and

20   ambiguous.

21         THE WITNESS:  Well, he had an agent.

22   BY MR. KAPLAN:

23     Q.   Okay.

24     A.   He had a road manager.

25     Q.   Okay.  Anyone else?

Page 61

1          A.    He had musicians that traveled with him
2    for performances.
3          Q.    Who was the road manager?
4          A.    Earl Bryant.   Is that his name?
5          Q.    Earl Bryant?
6          A.    I think that's his last name.
7          Q.    And what did -- and you mentioned an
8    agent.
9          A.    William Morris.
10         Q.    That's the name of the agency; correct?
11         A.    Yeah.
12         Q.    Do you recall the name of the
13   individual -- any of the individual at WME or at
14   William Morris who were on --
15         A.    I don't recall the name.
16         Q.    Let me see if I can research your memory.
17   Have you ever heard of somebody by the name of Rob
18   Heller?
19         A.    That's who it was.   And then I think Rob
20   left and somebody else took over.
21         Q.    So at least for some of that time was Rob
22   Heller Mr. Robinson's agent at William Morris?
23         A.    Yes.
24         Q.    Did Mr. Heller focus on any type of
25   aspect of entertainment business?

CONFIDENTIAL

1            MS. WILLIS:  Objection; calls for

2    speculation, no foundation.

3            THE WITNESS:  Venues that hired the type

4    of performance that Smokey did.

5    BY MR. KAPLAN:

6        Q.    Like booking shows?

7        A.    Right.

8            MS. WILLIS:  Objection; leading, calls

9    for speculation, no foundation.

10   BY MR. KAPLAN:

11       Q.    What was the answer?

12       A.    Booking shows; right.

13       Q.    How do you know that?

14       A.    Because I get contracts from him.

15       Q.    Did you ever speak to Smokey Robinson

16   about WME?  Did you ever speak to Mr. Robinson

17   about William Morris?

18       A.    No.

19       Q.    Earl Bryant was the road manager.

20   Generally what would Mr. Bryant do?

21           MS. WILLIS:  Objection; calls for

22   speculation, no foundation.

23           THE WITNESS:  He was really more or less

24   a bodyguard, but he also booked shows for Smokey.

25   / / /

CONFIDENTIAL

1    BY MR. KAPLAN:

2        Q.   Okay.   Did you interact and work directly

3    with Mr. Bryant?

4        A.   Yeah.

5        Q.   And what was the nature of your

6    interactions with Mr. Bryant?

7        A.   Well, because he would be the one to pick

8    up the money, to advise me of any extra expenses

9    that may be incurred, things like that.  I have him

10   written down, so I think I have him in my address

11   book.  Because Bryant, for some reason, is not --

12   it doesn't sound right to me.

13       Q.   You're looking for his name?

14       A.   Yes.

15       Q.   You want to just confirm what his last

16   name was?

17       A.   I know it's Earl.  And I think I kept it

18   in my book.

19            MR. KAPLAN:  I think we can stipulate, if

20   Ms. Wills would.

21            MS. WILLIS:  I would like to see what's

22   in the book.

23            THE WITNESS:  Yes, it was Earl Bryant.

24   BY MR. KAPLAN:

25       Q.   Okay.  And you just looked at something

Page 64

1  to refresh your memory that it was Earl Bryant?

2      A.   He was the road manager.  He had been

3  with Smokey for many years.

4      Q.   And you interacted with Mr. Bryant?

5      A.   Yeah, he would advise me if there were

6  any differences going on, if they -- a musician was

7  going to be replaced, things like that.

8          MS. WILLIS:  I'm going to object to all

9  of her testimony and move to strike it as hearsay.

10  BY MR. KAPLAN:

11     Q.   When did you begin interacting or working

12  with Mr. Earl Bryant in connection with Smokey

13  Robinson?

14     A.   Same time I started with Smokey.

15     Q.   So going back to the Mesnick days in

16  the -- I forget when it was.

17     A.   Yeah.

18         MS. WILLIS:  Objection; leading.

19  BY MR. KAPLAN:

20     Q.   When did you start working with Mr. Earl

21  Bryant in connection with the Smokey Robinson

22  business?

23     A.   I can't remember the exact year.  But

24  when I took -- when I started working with Smokey,

25  I worked with Earl at the same time.

Page 65

CONFIDENTIAL

```
 1          Q.    Do you remember the decade?  Do you
 2     remember the decade?
 3          A.    Well, it was when I was with Mesnick.
 4     But I think it was -- I don't remember.  I think it
 5     was '99, something like that.
 6          Q.    Approximately?
 7          A.    Approximately.
 8          Q.    Okay.  And so between 1999 and 2018, you
 9     would interact with Earl Bryant?
10          A.    When it came to the shows, yes.
11          Q.    How often would you interact with
12     Mr. Bryant?
13          A.    Depends on how many shows Smokey did.
14          Q.    Did Mr. Robinson do a lot of shows?
15                MS. WILLIS:  Objection; vague and
16     ambiguous.
17                THE WITNESS:  I think it was between 50
18     and 60 a year.
19     BY MR. KAPLAN:
20          Q.    Was that sort of generally how many
21     Mr. Robinson would do each year over that time
22     period?
23                MS. WILLIS:  Objection; calls for
24     speculation, leading.
25                THE WITNESS:  More or less.
```

CONFIDENTIAL

```
 1   BY MR. KAPLAN:
 2        Q.   Okay.  So is it fair to say -- then based
 3   on that, then how often do you think you would
 4   interact with Mr. Earl Bryant over the years?
 5             MS. WILLIS:  Objection; vague and
 6   ambiguous, calls for speculation, relevance, no
 7   foundation.
 8             THE WITNESS:  I don't know exactly, but
 9   it could have been every day.
10   BY MR. KAPLAN:
11        Q.   Okay.  And is it fair to say if
12   Mr. Robinson was doing a show, you would be
13   interacting with Earl Bryant about that show?
14        A.   Absolutely.
15             MS. WILLIS:  Objection; calls for
16   speculation, vague and ambiguous, leading.
17   BY MR. KAPLAN:
18        Q.   All right.  So when Mr. Robinson had a
19   show, what were type of things you would interact
20   with Mr. Bryant about?
21        A.   Picking up the balance of the performance
22   money.
23        Q.   And -- go ahead.  I'm sorry I
24   interrupted.
25        A.   And just being advised if there was
```

Page 67

CONFIDENTIAL

1    anything wrong or extra to do with the shows.

2       Q.    Did you ever speak to Mr. Robinson about

3    his shows?

4       A.    Not really.

5       Q.    Now, you said you would speak to Earl

6    Bryant about picking up the payments?

7             MS. WILLIS:  Objection; leading.  And any

8    answer that she gives about anything Mr. Bryant

9    told her is hearsay and we move to strike it.

10            THE WITNESS:  Earl Bryant was instructed

11   to pick up the balance of the performance payment

12   prior to Mr. Robinson going on stage.

13            MS. WILLIS:  Objection; calls for

14   speculation, hearsay, move to strike.

15   BY MR. KAPLAN:

16      Q.    How do you know that?

17      A.    Because that's the rule.

18      Q.    Was that the procedure and protocol that

19   was in place?

20            MS. WILLIS:  Objection; calls for

21   speculation, no foundation, vague and ambiguous.

22            THE WITNESS:  With most performance, yes.

23   BY MR. KAPLAN:

24      Q.    That was your experience in the business

25   since you became a bookkeeper in the entertainment

Page 68

CONFIDENTIAL

```
 1   business?
 2             MS. WILLIS:  Objection; vague and
 3   ambiguous.
 4             THE WITNESS:  Yes.
 5             MS. WILLIS:  This witness has not been
 6   designated as an expert, cannot testify to an
 7   industry standard.  Move to strike.
 8   BY MR. KAPLAN:
 9        Q.   Okay.  When -- so with Mr. -- with
10   respect to Mr. Robinson, what was the procedure or
11   protocol that was in place in terms of Earl Bryant,
12   I guess, picking up the check.  Tell me about that.
13             MS. WILLIS:  Objection; calls for
14   speculation, no foundation, hearsay.
15             THE WITNESS:  Earl, of course, was on
16   stage with Smokey prior to performing.  He would
17   make sure that the money was paid, unless there was
18   a reason for not being paid.  And then he would
19   collect the checks and FedEx them in to me.
20             MS. WILLIS:  Same objections, move to
21   strike, hearsay, speculation, no foundation.
22   BY MR. KAPLAN:
23        Q.   You indicated that Mr. Bryant would FedEx
24   you the checks?
25        A.   Yes.
```

Page 69

1        Q.    Explain to me that procedure.

2        A.    I don't understand how do you explain it.

3    He picked the checks up, he stuck it in a FedEx

4    package and mailed them to me.

5            MS. WILLIS:   Objection; calls for

6    speculation.

7    BY MR. KAPLAN:

8        Q.    And you would receive the check in the

9    mail?

10       A.    I would receive it from FedEx.

11       Q.    From FedEx.   Thank you.

12            So -- and how often would you receive

13    FedExes from Mr. Bryant with checks in it?

14       A.    After each tour.

15       Q.    All right.   So is it fair to say after

16    each show that you would receive FedExes from

17    Mr. Bryant with checks in it?

18       A.    It may not have been after each show.   If

19    he was doing two or three shows over a weekend, I

20    would get it after the completed three shows were

21    done.

22       Q.    Okay.   And was that something that

23    occurred throughout the 2012 to 2018 time period?

24    Let me reask it.

25            Was that something that occurred between

CONFIDENTIAL

1   the 2011 and 2018 time period --

2          A.   Yes.

3          Q.   -- where you were acting as

4   Mr. Robinson's bookkeeper?

5          A.   Yes.

6          Q.   Okay.  And when you received the FedEx --

7   where did you receive FedExes from Mr. Bryant at?

8          A.   Well, when I worked for a firm, they

9   would come into the firm.  When I worked out of my

10  residence, they would come to my post office box.

11         Q.   And you just raised a point I may have

12  forgotten to ask, maybe I did.

13              But when you went off on your own in

14  approximately 2011, did you work out of your

15  residences?

16         A.   I worked out of my residence.  But that's

17  not where my mail came.  I had a post office box.

18         Q.   So would the FedExes go to your post

19  office box or to your residence?

20         A.   No, to the post office box and they would

21  sign for it.

22         Q.   And then you would go to the post office

23  box and pick up the Earl Bryant FedExes?

24         A.   Or any other mail every day.

25         Q.   When you received the FedExes from Earl

Page 71

1    Bryant after he sent them to you after Smokey

2    Robinson's tours or shows, what would you do with

3    those FedExes?

4         A.   I would record the money coming in and

5    deposit it to the bank.

6         Q.   Would you open up the FedEx?

7         A.   Obviously.

8         Q.   Okay.   And then what was in the FedEx

9    package?

10        A.   Checks, any bills that Earl incurred

11   while on -- on the road, you know.

12        Q.   The checks that were in the FedExes from

13   Earl Bryant that he would send to you after each

14   show or tour, who were those checks from?

15             MS. WILLIS:   Objection; vague and

16   ambiguous.

17   BY MR. KAPLAN:

18        Q.   Generally speaking?

19        A.   From the venue.

20             MS. WILLIS:   Same objection; vague and

21   ambiguous.

22   BY MR. KAPLAN:

23        Q.   From the venue?

24        A.   Whoever booked, whatever venue it was.

25             MS. WILLIS:   Objection; vague and

CONFIDENTIAL

1    ambiguous, calls for speculation.

2    BY MR. KAPLAN:

3         Q.   Okay.  And I take it -- am I correct,

4    when you opened up the FedEx package and took out

5    the check, you would look at the check?

6         A.   Yes, and match it up to the contract.

7         Q.   Okay.  What contract are you referring

8    to?

9              MS. WILLIS:  Objection; vague and

10   ambiguous.

11             THE WITNESS:  Every performance he did he

12   had a contract for it.

13   BY MR. KAPLAN:

14        Q.   And the he in your answer is Smokey

15   Robinson?  The he you are referring to is Smokey

16   Robinson?

17        A.   Well, the contracts were under Bertam

18   [sic].  It was Smokey Robinson, Jr. dba.

19        Q.   Okay.  So you would match the checks up

20   that you received from Earl Bryant with the Smokey

21   Robinson or Bertram contracts for each show?

22        A.   Yes.

23             MS. WILLIS:  Objection; leading.

24   BY MR. KAPLAN:

25        Q.   But you would read that check that the --

Page 73

1      withdrawn.

2              You would take a look at the check you

3      received, obviously; right?

4              MS. WILLIS:  Objection; leading.

5      BY MR. KAPLAN:

6          Q.    Correct?

7          A.    Yes.

8          Q.    What sort of information were on those

9      checks?

10         A.    The dates.

11             MS. WILLIS:  Objection; vague and

12     ambiguous.

13             THE WITNESS:  Usually, the date of the

14     performance and where it was.  If -- if a check

15     came in, you know, and just from a bank, it would

16     have the notice of where the performance was.

17     BY MR. KAPLAN:

18         Q.    Okay.  Would there be any other

19     information on the check?

20         A.    Not that I remember.

21         Q.    Would there be a signature on it?

22             MS. WILLIS:  Objection; leading.

23             THE WITNESS:  Of course.

24     BY MR. KAPLAN:

25         Q.    Would there be an amount on it?

CONFIDENTIAL

1        A.    Yes.

2              MS. WILLIS:   Objection; leading.

3    BY MR. KAPLAN:

4        Q.    Did all the checks have amounts on them?

5              MS. WILLIS:   Objection; leading.

6              THE WITNESS:   Yes.

7    BY MR. KAPLAN:

8        Q.    Would there be a name of where the check

9    was from?

10             MS. WILLIS:   Objection; leading, vague

11   and ambiguous.

12             THE WITNESS:   Usually.

13   BY MR. KAPLAN:

14       Q.    Okay.   All right.   And then you said --

15   well, you may have said this.   So you deposited the

16   check when you received them from Earl Bryant?

17       A.    Correct.

18       Q.    You personally did that?

19       A.    Yes.

20       Q.    How did you do that?

21       A.    I took them to the bank.   When I was with

22   a firm, the firm had runners.   They would take them

23   to the bank.

24       Q.    Let me be more specific about the time

25   frame.

CONFIDENTIAL

1              In the 2011 to 2018 time frame, how would

2    you deposit the checks?

3         A.    I would take them to the bank.

4         Q.    You personally?

5         A.    Yes.

6         Q.    And you would go to the bank and go to

7    the teller?

8         A.    Correct.

9         Q.    And deposit the checks?

10        A.    Yes.

11        Q.    Okay.  And the procedure of Earl Bryant

12   FedExing you checks after Smokey's concerts, tours

13   or shows, you receiving those checks by FedEx and

14   depositing them in the bank, was that a practice

15   and procedure that you adhered to consistently

16   during the 2013 to 2016 time frame?

17        A.    Yes.

18              MS. WILLIS:  Objection; vague and

19   ambiguous, compound, leading, calls for

20   speculation.

21              THE WITNESS:  Yes.

22   BY MR. KAPLAN:

23        Q.    All right.  Let's talk a little more

24   about William Morris.

25              How did you first become familiar with

Page 76

CONFIDENTIAL

```
 1    William Morris agency?
 2         A.   How did I what?
 3         Q.   Become familiar with that agency.
 4         A.   When I started working in the business.
 5         Q.   And do you have an understanding of what
 6    William Morris is?
 7         A.   Yes.
 8         Q.   What?
 9         A.   They book actresses, actors, musicians
10    for shows.
11         Q.   Okay.  So you understand that they
12    represent artists and performers like Smokey
13    Robinson?
14         A.   Correct.
15         Q.   And I think you already talked a little
16    bit about this.  But what's your understanding of
17    William Morris' relationship with Smokey Robinson?
18              MS. WILLIS:  Objection; calls for
19    speculation, no foundation.
20              THE WITNESS:  They would book shows for
21    him.
22    BY MR. KAPLAN:
23         Q.   Okay.  And how long, if you know, did
24    William Morris do that for Mr. Robinson?
25              MS. WILLIS:  Objection; calls for
```

Page 77

CONFIDENTIAL

1    speculation, no foundation.

2            THE WITNESS:  For most of the years that

3    I worked for Smokey.

4    BY MR. KAPLAN:

5        Q.   How do you know that?

6        A.   Because I get money from them.

7        Q.   Okay.  Who is the them?  Who is the them

8    in your answer?  William Morris?

9        A.   I get money from William Morris.

10       Q.   So is that something that went on from

11   when you started representing -- withdrawn.

12           Is that something that -- that began --

13   let me start over.

14           Did William Morris sending you money, was

15   that something that began when you started doing

16   bookkeeping work for Smokey Robinson?

17           MS. WILLIS:  Objection; vague and

18   ambiguous.

19           THE WITNESS:  Yeah, they didn't send me

20   the money.  They sent me an electronic notification

21   that they deposited the money to the bank for me.

22   BY MR. KAPLAN:

23       Q.   When did they start doing that?

24       A.   From the very beginning.

25       Q.   Okay.  And is that something that William

CONFIDENTIAL

1    Morris consistently did over -- over the years?

2         A.   Yes.

3              MS. WILLIS:  Objection; vague and

4    ambiguous, calls for speculation.

5    BY MR. KAPLAN:

6         Q.   And you would receive that electronic

7    notification each time that William Morris sent

8    money?

9         A.   Yeah.

10             MS. WILLIS:  Objection; calls for

11   speculation, no foundation.

12   BY MR. KAPLAN:

13        Q.   And you would actually see that

14   electronic communication?

15        A.   Yes.

16             MS. WILLIS:  Objection; vague and

17   ambiguous.

18   BY MR. KAPLAN:

19        Q.   Where would you see the electronic

20   communication?

21             MS. WILLIS:  Hang on.  Counsel, if I

22   could just get my objection in.

23             MR. KAPLAN:  Sure.

24             MS. WILLIS:  Okay.  Go ahead.

25   / / /

1            MR. KAPLAN:   Are you done?

2            MS. WILLIS:   Yeah, I just wanted to make

3    sure --

4            MR. KAPLAN:   No, that's all right.

5            MS. WILLIS:   I don't want to talk over

6    each other for the court reporter.

7            MR. KAPLAN:   Fair point.   Fair point.

8            THE WITNESS:   They sent me an e-mail.

9    BY MR. KAPLAN:

10        Q.   These electronic communications, where

11   would you view them on?   Where would you look at

12   the electronic communication from William Morris?

13        A.   On my computer.

14        Q.   Who would send it?

15        A.   The accounting office for William Morris.

16   And her name was Katie but I don't -- or Kathy,

17   something like that.

18        Q.   And was that a procedure that was in

19   place in the 2012 to 2018 time period?

20        A.   Yes.

21        Q.   Okay.  And how were you introduced to

22   William Morris as Smokey Robinson's agent, talent

23   agency?

24        A.   I'm sorry, I didn't hear that.

25        Q.   Sure.  I will try to reask it.

Page 80

1           How was it that you became familiar that

2    William Morris was Smokey Robinson's talent agency?

3        A.   I was advised.

4        Q.   By whom?

5        A.   I don't remember whether it was Smokey or

6    Earl.

7        Q.   Okay.

8           MS. WILLIS:  Objection to the extent that

9    it calls for hearsay.  We move to strike.

10   BY MR. KAPLAN:

11       Q.   Smokey may have told you about that,

12   though?

13          MS. WILLIS:  Objection; calls for

14   speculation.

15          THE WITNESS:  He might have.  I don't

16   remember.

17   BY MR. KAPLAN:

18       Q.   What did Smokey Robinson tell you, if

19   anything, about any procedures or protocols that he

20   had with William Morris?

21       A.   He didn't have to.  Once I knew that

22   there was an agent involved, I know that they get a

23   percentage of whatever they book.

24       Q.   Okay.

25          MS. WILLIS:  Objection; non responsive,

Page 81

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1   calls for speculation, hearsay, move to strike.

 2   BY MR. KAPLAN:

 3       Q.   Was that based on your experience as a

 4   bookkeeper in the entertainment industry?

 5       A.   Yes.

 6            MS. WILLIS:  Same objection; calls for

 7   expert opinion.  This in witness has not been

 8   designated as an expert and frankly is not

 9   qualified to give an industry opinion.  And again,

10   we move to strike.

11   BY MR. KAPLAN:

12       Q.   What was that answer?

13       A.   I forgot the question.

14            MR. KAPLAN:  Did you get the answer?

15            (The requested portion of the record was

16            read by the court reporter.)

17   BY MR. KAPLAN:

18       Q.   And while working for -- as Smokey

19   Robinson's bookkeeper over the year, were there

20   procedures concerning William Morris booking shows

21   and William Morris notifying you of that?

22            MS. WILLIS:  Objection; calls for

23   speculation, no foundation, calls for hearsay,

24   compound.

25            THE WITNESS:  Earl usually notified me of
```

```
 1    any shows that were coming up.
 2              MS. WILLIS:  So we move to strike on the
 3    basis of hearsay.
 4              THE WITNESS:  At that point, when --
 5    let's say I got a list of the shows that he is
 6    going to do the following month, when that month
 7    occurred, I would notify -- I would ask William
 8    Morris to send me copies of the contract.
 9              MS. WILLIS:  Okay.  Move to strike,
10    hearsay.
11    BY MR. KAPLAN:
12         Q.   So you would ask William Morris to send
13    you information about each show?
14         A.   Yes.
15              MS. WILLIS:   Objection; leading, hearsay.
16    BY MR. KAPLAN:
17         Q.   Why would you ask for that information?
18         A.   Because I needed something in writing I
19    needed to know what he was being paid.
20         Q.   Who would you make that inquiry to at
21    William Morris generally?
22         A.   Rob Heller's assistant.
23         Q.   And what would Rob Heller's office
24    provide you in response, if anything?
25         A.   They'd send me copies of the contracts.
```

                                               Page 83

1          Q.    And was that the procedure that was in
2     place?
3          A.    Yes.
4                MS. WILLIS:   Objection; calls for
5     speculation.
6     BY MR. KAPLAN:
7          Q.    That was the procedure you had in place
8     with William Morris while you were acting as Smokey
9     Robinson's bookkeeper?
10         A.    Yes.
11               MS. WILLIS:   Objection; vague and
12    ambiguous.
13    BY MR. KAPLAN:
14         Q.    All right.   So I just want to make sure I
15    understand this procedure.
16               So usually you would learn from Earl
17    Bryant that there was a show that was booked?
18               MS. WILLIS:   Objection; calls for
19    hearsay.
20               THE WITNESS:   Correct.
21               MS. WILLIS:   Hearsay, move to strike.
22    BY MR. KAPLAN:
23         Q.    And later on as you got closer to the
24    show date, you would follow up with William Morris
25    about the show?

Page 84

CONFIDENTIAL

1          A.    Yes.

2                MS. WILLIS:   Objection; leading, hearsay.

3     BY MR. KAPLAN:

4          Q.    And then you would make an inquiry to

5     William Morris about the show and they'd provide

6     you with more information?

7                MS. WILLIS:   Objection; leading, hearsay.

8                THE WITNESS:   Yes.

9     BY MR. KAPLAN:

10         Q.    And, in particular, what information

11    would William Morris provide you?

12               MS. WILLIS:   Objection; leading.

13               THE WITNESS:   They'd send me a contract

14    saying what Smokey --

15               MS. WILLIS:   Hearsay.

16               THE WITNESS:   -- was going to be paid for

17    that particular show.

18    BY MR. KAPLAN:

19         Q.    So is it fair to say each time you would

20    make that inquiry, you would receive a copy of the

21    show contract from William Morris?

22         A.    Correct.

23               MS. WILLIS:   Objection; vague and

24    ambiguous.

25    / / /

CONFIDENTIAL

```
 1    BY MR. KAPLAN:
 2         Q.   Okay.
 3              MS. WILLIS:  Calls for speculation.
 4    BY MR. KAPLAN:
 5         Q.   And each time when you would receive the
 6    show contract from William Morris for one of Smokey
 7    Robinson's upcoming performances, what would you do
 8    with that contract?
 9         A.   The contract got filed in my files and
10    the information got included in my computer.
11         Q.   Would you review --
12              MS. WILLIS:  Objection; vague and
13    ambiguous.
14    BY MR. KAPLAN:
15         Q.   Would you review the contracts?
16         A.   I would read it just to see what the
17    money was and when it was.
18         Q.   Okay.  So let me just try to break that
19    down.
20              You would review the contracts to see how
21    much Smokey was getting paid for the concert?
22              MS. WILLIS:  Objection; leading.
23              THE WITNESS:  Correct, and if there were
24    any other additions besides just the performance
25    payment.
```

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1    BY MR. KAPLAN:

2          Q.    Would you look to see where the -- look

3    at the contracts to determine where the -- I'm

4    sorry, let start over.

5                Would you review the contract that you

6    received from William Morris for a Smokey Robinson

7    show to determine the date of the performance?

8          A.    Yes.

9                MS. WILLIS:    Objection; leading.

10   BY MR. KAPLAN:

11         Q.    Would you also review --

12               MS. WILLIS:    Vague and ambiguous.

13   BY MR. KAPLAN:

14         Q.    Would you also review the contracts that

15   you would receive from William Morris for Smokey

16   Robinson's shows to determine the location and

17   venue of his performance?

18               MS. WILLIS:    Objection; leading, vague

19   and ambiguous, calls for speculation, no

20   foundation.

21               THE WITNESS:    Yes.

22   BY MR. KAPLAN:

23         Q.    Other than -- let me ask it this way.

24   Other than looking for the amount of money that

25   Mr. Robinson was being paid for a given

Page 87

CONFIDENTIAL

```
 1    performance, what else would you review the
 2    contract that you would receive from or contracts,
 3    plural, that you would receive from William Morris
 4    for?
 5              MS. WILLIS:  Objection; vague and
 6    ambiguous, no foundation.
 7              THE WITNESS:  To see who was paying for
 8    the hotels, for the bus, any other expenses that
 9    are involved in a show.
10    BY MR. KAPLAN:
11         Q.   And you would want to see the date of the
12    show?
13         A.   Yes.
14         Q.   You would want to see the location of the
15    show?
16              MS. WILLIS:  Objection; leading.
17              THE WITNESS:  Yes.
18    BY MR. KAPLAN:
19         Q.   The venue?
20              MS. WILLIS:  Objection; leading.
21              THE WITNESS:  Yes.
22    BY MR. KAPLAN:
23         Q.   Would you want to see anything about
24    the -- who the promoter or payor was?
25              MS. WILLIS:  Objection; leading.
```

Page 88

```
 1    BY MR. KAPLAN:

 2        Q.   Would you want to see who the payor or

 3    promoter was?

 4             MS. WILLIS:  Objection; leading, calls

 5    for speculation.

 6             THE WITNESS:  No, I didn't care who it

 7    was.

 8    BY MR. KAPLAN:

 9        Q.   When you -- so am I correct?  So when you

10    would consistently receive contracts for Smokey

11    Robinson's shows from William Morris, I think you

12    said you would file them.  Was that a practice that

13    occurred in the 2013 to 2016 time period?

14             MS. WILLIS:  Objection; vague and

15    ambiguous.

16             THE WITNESS:  Yes every show had a

17    separate file and anything to do with that show got

18    filed in there.

19    BY MR. KAPLAN:

20        Q.   All right.  Including the contracts you

21    received from William Morris?

22        A.   Correct.

23        Q.   Okay.  But so this procedure that you

24    have been describing about receiving the show

25    contracts from William Morris and you reviewing
```

Personal Court Reporters, A Veritext Company
818-988-1900

1    those contracts, is that a procedure that you would

2    undertake for each and every one of Smokey

3    Robinson's shows in the 2013 to 2016 time period?

4              MS. WILLIS:   Objection; vague and

5    ambiguous, leading?

6              THE WITNESS:   Yes.

7    BY MR. KAPLAN:

8         Q.   All right.  How frequently would you

9    interact with either Rob Heller or someone in his

10   office?

11             MS. WILLIS:  Objection; compound.

12             THE WITNESS:  I'm sorry?

13   BY MR. KAPLAN:

14        Q.   How often -- let me give a time frame,

15   actually.

16             In the 2013 to 2016 time frame, how often

17   would you interact with either Rob Heller or WME or

18   someone in Rob's office at WME?

19             MS. WILLIS:  Objection; vague and

20   ambiguous, compound.

21             Go ahead.

22             THE WITNESS:  Depending if I had any

23   questions regarding the particular show, there was

24   no reason for me to speak to them.

25   / / /

```
 1    BY MR. KAPLAN:
 2         Q.    Okay.  Is it fair, though, you would
 3    interact with Rob Heller's office each time there
 4    was a show during that period?
 5         A.    Only if I didn't get paid.
 6         Q.    You would have to interact with Rob's
 7    office, though, about getting the contracts,
 8    though?
 9         A.    Yes.
10              MS. WILLIS:  Objection; misstates the
11    witness' prior testimony, leading, no foundation.
12    BY MR. KAPLAN:
13         Q.    All right.  Other than what you have told
14    me already about your receipt of the contracts from
15    William Morris for each of Smokey Robinson's shows,
16    did you have any other procedures in place with
17    William Morris in connection with Smokey Robinson's
18    live performances during the 2013 to 2016 time
19    frame?
20              MS. WILLIS:  Objection; vague and
21    ambiguous.
22              THE WITNESS:  None that I can remember.
23    BY MR. KAPLAN:
24         Q.    Okay.  Now, you also -- well, let me ask
25    this.  You also told me about you would receive
```

1   some sort of electronic communication from William

2   Morris about a payment?

3              MS. WILLIS:  Objection; misstates the

4   witness' prior testimony.

5              THE WITNESS:  After the show was

6   completed, I would get a communication from them

7   showing me that they deposited the deposit that

8   they had been holding.

9   BY MR. KAPLAN:

10      Q.   Okay.  And was that something that

11   frequently occurred?

12      A.   Every show they had to have a deposit,

13   unless specified in the contract for a particular

14   reason.

15      Q.   So is it fair to say for each Smokey

16   Robinson show during the 2013 to 2016 time period,

17   you would typically receive a copy of the show's

18   contract and then would later on receive some sort

19   of electronic communication from William Morris

20   about payment?

21              MS. WILLIS:  Objection; vague and

22   ambiguous.

23              THE WITNESS:  Correct.

24   BY MR. KAPLAN:

25      Q.   That was the procedure in place?

```
 1        A.   Yes.
 2             MS. WILLIS:  Objection; leading, calls
 3   for speculation, vague and ambiguous.
 4   BY MR. KAPLAN:
 5        Q.   Now, the information that you would be
 6   provided by William Morris, such as the contracts,
 7   was that something -- information that you would
 8   rely on?
 9             MS. WILLIS:  Objection; vague and
10   ambiguous.
11             THE WITNESS:  I'm sorry.
12   BY MR. KAPLAN:
13        Q.   Did you rely on the information that you
14   were being provided by William Morris that you just
15   told me about?
16        A.   Yes.
17             MS. WILLIS:  Objection; vague and
18   ambiguous.
19   BY MR. KAPLAN:
20        Q.   How so?
21        A.   I'm sorry.
22        Q.   No problem.  How did you rely on the
23   information you just told us about that you would
24   receive from William Morris?
25        A.   Well, if it's in writing and it's been
```

Page 93

CONFIDENTIAL

```
 1    approved and signed, they have to conform to it.
 2         Q.   Was it part of your business practices
 3    with William Morris that they would furnish you
 4    with accurate information concerning Smokey
 5    Robinson's performances?
 6              MS. WILLIS:  Objection; vague and
 7    ambiguous, no foundation, calls for hearsay, calls
 8    for speculation, leading.
 9              THE WITNESS:  Only when it came to the
10    financial end.
11    BY MR. KAPLAN:
12         Q.   And that would include the copies of the
13    contracts you received?
14              MS. WILLIS:  Same objection; vague and
15    ambiguous, calls for speculation, leading.
16              THE WITNESS:  Yes.
17    BY MR. KAPLAN:
18         Q.   Now, when William Morris followed this
19    procedure of notifying you electronically of some
20    sort of payment, was -- was William Morris -- well,
21    I guess that payment was -- what was the form of
22    that payment, a check, a wire transfer, something
23    else?
24              MS. WILLIS:  Objection; vague and
25    ambiguous.
```

                                        Page 94

1              THE WITNESS:  It was money they had

2     received prior to him even performing because it

3     was a deposit that they hold until the performance

4     is done.

5              MS. WILLIS:  Move to strike based on

6     speculation, no foundation.

7     BY MR. KAPLAN:

8        Q.   Once the performance is done what was --

9     would William Morris then release the funds?

10             MS. WILLIS:  Objection; calls for

11    speculation, no foundation.

12             THE WITNESS:  They would release the

13    funds and they would advise me via an e-mail of the

14    deposit they held, the commission that they would

15    do and the balance going into the checking account.

16             MS. WILLIS:  Objection; hearsay, move to

17    strike.

18    BY MR. KAPLAN:

19       Q.   So that communication you would get was

20    after -- after William Morris was releasing the

21    funds to Smokey Robinson; correct?

22             MS. WILLIS:  Objection; hearsay.

23             THE WITNESS:  Yes.

24             MS. WILLIS:  Calls for speculation.

25             Ma'am, you can't answer until I completed

                                        Page 95

CONFIDENTIAL

1    my objections.   This is a federal court proceeding.

2    I need to get my objections on the record before

3    you answer.

4              Objection; calls for speculation,

5    leading, vague and ambiguous, move to strike.

6    BY MR. KAPLAN:

7         Q.    The electronic communications you would

8    receive from William Morris, you would read those;

9    right?

10        A.    Of course.

11        Q.    And generally, what information would be

12   provided in those correspondence --

13             MS. WILLIS:   Objection.

14             MR. KAPLAN:   I'm sorry.

15   BY MR. KAPLAN:

16        Q.    -- in those electronic correspondence?

17             MS. WILLIS:   Objection; vague and

18   ambiguous.

19             THE WITNESS:   The deposit that they

20   received, showing that are holding -- they're

21   taking back their commission and sending me the

22   balance.

23   BY MR. KAPLAN:

24        Q.    So William Morris would send you balance;

25   correct?

Page 96

CONFIDENTIAL

```
 1              MS. WILLIS:  Objection; vague and
 2    ambiguous.
 3              THE WITNESS:  Well, they would send it to
 4    the bank.
 5    BY MR. KAPLAN:
 6         Q.   And how would William Morris send that to
 7    the bank?
 8              MS. WILLIS:  Objection, calls for
 9    speculation.
10              THE WITNESS:  I assume electronically.
11    BY MR. KAPLAN:
12         Q.   After you would receive those electronic
13    correspondence from William Morris -- well, let me
14    ask this.  Would you typically receive those
15    electronic correspondence from William Morris after
16    each show?
17              MS. WILLIS:  Objection; calls for
18    speculation.
19              THE WITNESS:  Yes, I print it out and put
20    in their file.
21              MS. WILLIS:  Vague and --
22    BY MR. KAPLAN:
23         Q.   Would you receive those correspondence
24    after ever Smokey Robinson show?
25         A.   Yes, if there was money involved.
```

Page 97

1      Q.   Money involved from William Morris, you

2   mean?

3           MS. WILLIS:   Objection; vague and

4   ambiguous, calls for speculation, leading.

5           THE WITNESS:   Money that William Morris

6   had been holding.

7   BY MR. KAPLAN:

8      Q.   Okay.   And after you would receive these

9   electronic communications from William Morris after

10  each Smokey Robinson show, would you then go to the

11  bank accounts to do anything?

12     A.   Well, I would check to see that the money

13  got into the account.

14     Q.   How would you do that?

15     A.   By checking on the computer, going into

16  the bank account.

17     Q.   So after each electronic communication,

18  you -- well, let's ask -- let's find out this.

19          In the 2013 to 2016 -- well, tell me how

20  you would get into the account.

21     A.   Well, I had access to the checking

22  account on the computer.

23     Q.   Okay.   So following your receipt of the

24  electronic communication from William Morris

25  indicating that they had made payment to Smokey

CONFIDENTIAL

1    Robinson, you would then verify that; correct?

2         A.    Correct.

3         Q.    And how would you verify it, by going

4    online to the bank account?

5         A.    Correct.

6         Q.    And you would see that the monies had

7    actually been paid into the bank account?

8         A.    Correct.

9         Q.    And you would do that after each Smokey

10   Robinson show, at least those that where William

11   Morris was holding money for some period of time?

12             MS. WILLIS:   Objection; calls for

13   speculation, vague and ambiguous, leading.

14             THE WITNESS:   After each notification

15   from them.

16   BY MR. KAPLAN:

17        Q.    So it sounds like typically, then, for

18   each Smokey Robinson show, usually there would be

19   two payments.   Is that --

20             MS. WILLIS:   Objection; calls for

21   speculation, misstates the witness' prior

22   testimony, no foundation.

23             THE WITNESS:   Correct, there would be one

24   from the agents and one from his road manager.

25   / / /

CONFIDENTIAL

1    BY MR. KAPLAN:

2         Q.    And the road manager was Earl Bryant?

3         A.    Correct.

4         Q.    Other than being a bodyguard, what would

5    Earl Bryant do for Smokey Robinson?

6              MS. WILLIS:  Objection; calls for

7    speculation.

8              THE WITNESS:  You would have to ask Earl

9    that.

10   BY MR. KAPLAN:

11        Q.    Okay.  All right.  And so the first

12   payment, then, that you just talked about would be

13   the -- would that be some sort of deposit?

14             MS. WILLIS:  Objection; vague and

15   ambiguous.

16   BY MR. KAPLAN:

17        Q.    Let me reask.  The first payment would be

18   a deposit from the venue to William Morris?

19             MS. WILLIS:  Objection; vague and

20   ambiguous.

21             THE WITNESS:  Correct.

22             MS. WILLIS:  Calls for speculation,

23   leading.

24             THE WITNESS:  From the promoter.

25   / / /

Page 100

CONFIDENTIAL

1    BY MR. KAPLAN:

2         Q.    From the promoter?

3         A.    Yeah.

4         Q.    And that's the payment that William

5    Morris would later pay to Smokey Robinson, and then

6    you would go online to the bank account to verify;

7    correct?

8         A.    Correct.

9              MS. WILLIS:   Objection; vague and

10   ambiguous, calls for speculation, leading.

11   BY MR. KAPLAN:

12        Q.    And the second payment for a Smokey

13   Robinson show would be the payment -- the check

14   that was given to Earl Bryant that he would FedEx

15   to you and that you would personally deposit in

16   Smokey Robinson's bank account?

17             MS. WILLIS:   Objection; calls for

18   speculation, compound, misstates the witness' prior

19   testimony, leading.

20             THE WITNESS:   Correct.

21   BY MR. KAPLAN:

22        Q.    Okay.  So those were -- those two

23   payments and your involvement in those payments

24   that was the procedure for your receipt of and

25   verification of Smokey Robinson's payment on each

Page 101

1    show during the 2013 to 2016 time period?

2              MS. WILLIS:  Objection; vague and

3    ambiguous, compound, calls for speculation, no

4    foundation, leading.

5              THE WITNESS:  Correct.

6    BY MR. KAPLAN:

7         Q.   Okay.  Let's just talk real quickly

8    about -- well, did you believe that part of William

9    Morris' job was to furnish you as Smokey Robinson's

10   bookkeeper with accurate information concerning

11   Smokey Robinson's performances?

12             MS. WILLIS:  Objection; vague and

13   ambiguous.

14             THE WITNESS:  It was accurate.

15   BY MR. KAPLAN:

16        Q.   You believe that was part of their job?

17        A.   Yes.

18             MS. WILLIS:  Objection; calls for

19   speculation, vague and ambiguous, no foundation.

20   BY MR. KAPLAN:

21        Q.   Why was -- what was your understanding of

22   why William Morris was providing you with payment

23   information about Smokey Robinson's business, in

24   particular the live performances?

25             MS. WILLIS:  Objection; calls for

Page 102

CONFIDENTIAL

```
 1    speculation.
 2              THE WITNESS:  I don't understand the
 3    question.
 4    BY MR. KAPLAN:
 5         Q.   Why was William Morris providing you with
 6    information about payment on the shows?
 7              MS. WILLIS:  Objection; calls for
 8    speculation, vague and ambiguous.
 9              THE WITNESS:  Because they had his money.
10    BY MR. KAPLAN:
11         Q.   What were you going to use that
12    information for?
13         A.   I'm sorry, the question doesn't make
14    sense to me.
15         Q.   You're right, it doesn't.
16              After you received information about
17    payment from William Morris, did you do anything
18    with that information, in particular information
19    about payment?
20         A.   I printed out the electronic e-mail that
21    they sent me and I filed it in that show's file.
22         Q.   Did you do anything in connection with
23    the ledger?
24         A.   Well, yes, I recorded the money.
25              MS. WILLIS:  Objection; vague and
```

Page 103

CONFIDENTIAL

1  ambiguous.

2  BY MR. KAPLAN:

3       Q.   So after you would receive information

4  from William Morris that Smokey Robinson's at least

5  deposit payment was paid to Smokey Robinson, and

6  after you verified that on Smokey Robinson's bank

7  account, then you would record it on the ledger?

8       A.   Yes.

9            MS. WILLIS:   Objection; vague and

10  ambiguous, calls for speculation.

11  BY MR. KAPLAN:

12       Q.   And how often after doing that

13  procedure -- was that your typical practice in

14  connection with Smokey Robinson shows?

15            MS. WILLIS:   Objection; vague and

16  ambiguous.

17            THE WITNESS:   Well, you had to record it

18  first so that I had something to check with the

19  bank account.

20  BY MR. KAPLAN:

21       Q.   So then you would get the communication

22  from William Morris and then later on check with

23  the bank?

24            MS. WILLIS:   Objection; vague and

25  ambiguous.

Page 104

CONFIDENTIAL

1           THE WITNESS:   Yes.

2    BY MR. KAPLAN:

3      Q.    How long after receiving a communication

4    from William Morris would you check and go online

5    to the bank to verify the payment?

6           MS. WILLIS:   Objection; leading.

7           THE WITNESS:   Maybe a day or two.

8    BY MR. KAPLAN:

9      Q.   So fairly quickly?

10          MS. WILLIS:   Objection; leading.

11          THE WITNESS:   That quickly, yes.

12   BY MR. KAPLAN:

13     Q.   And how long would the -- well, when you

14   recorded the payment on the ledger, when would you

15   do that in connection with learning of the payment

16   from William Morris?

17          MS. WILLIS:   Objection; vague and

18   ambiguous.

19          THE WITNESS:   As soon as I got the

20   e-mail, I would record it.

21   BY MR. KAPLAN:

22     Q.   Okay.   And when you received checks by

23   FedEx from Earl Bryant for each of Smokey

24   Robinson's shows and deposit those checks into

25   Smokey Robinson's bank accounts, would you do

Page 105

CONFIDENTIAL

1    anything in terms of recording those payments?

2         A.    They had to be recorded --

3               MS. WILLIS:   Objection; vague and

4    ambiguous.

5               THE WITNESS:   I'm sorry.

6               MS. WILLIS:   Go ahead.

7               THE WITNESS:   They had to be recorded in

8    order to make the deposit because the accounting

9    system generated the deposit slip.

10   BY MR. KAPLAN:

11        Q.    Okay.   So you would record the check in

12   the ledger?

13        A.    Correct.

14              MS. WILLIS:   Objection; vague and

15   ambiguous, leading.

16   BY MR. KAPLAN:

17        Q.    And then after you recorded the check,

18   you would deposit the check in the bank?

19        A.    Correct.

20              MS. WILLIS:   Objection; leading, vague

21   and ambiguous.

22   BY MR. KAPLAN:

23        Q.    How soon after your receipt of checks

24   from Earl Bryant for each of Smokey Robinson shows

25   would you record that payment in your Datafaction

Page 106

1     ledger?

2          A.    Immediately.

3               MS. WILLIS:    Objection; vague and

4     ambiguous.

5     BY MR. KAPLAN:

6          Q.    By the way, all these recordings that

7     we've just been talking about, where were those

8     recorded in?

9               MS. WILLIS:    Objection; vague and

10    ambiguous.

11              THE WITNESS:    Into the Datafaction

12    accounting.

13    BY MR. KAPLAN:

14         Q.    That you were maintaining on Smokey

15    Robinson's behalf?

16         A.    Correct.

17         Q.    So is it fair to say that -- that --

18    well, let me ask it this way.

19              Well, was it part of your regular

20    business to get the information from WME about

21    Smokey Robinson's payments?

22              MS. WILLIS:  Objection; vague and

23    ambiguous, misstates the witness prior testimony.

24              THE WITNESS:  I'm sorry, repeat the

25    question.

Page 107

CONFIDENTIAL

1   BY MR. KAPLAN:

2        Q.   Was it part of the regular course of the

3   Smokey Robinson business for William Morris to

4   furnish you information that it was releasing the

5   funds to -- to Smokey Robinson after each show?

6        A.   Yes.

7             MS. WILLIS:   Objection; vague and

8   ambiguous, calls for speculation, no foundation,

9   hearsay.

10   BY MR. KAPLAN:

11        Q.   And you say it was the regular course of

12   business because that's what always happened;

13   right?

14             MS. WILLIS:   Objection; calls for

15   speculation, vague and ambiguous, no foundation.

16             THE WITNESS:   Yes.

17   BY MR. KAPLAN:

18        Q.   That's what always happened at least with

19   you?

20             MS. WILLIS:   Objection; vague and

21   ambiguous, leading.

22             THE WITNESS:   Yes.

23   BY MR. KAPLAN:

24        Q.   In your experience, at least, did you

25   find William Morris to be reliable?

Page 108

CONFIDENTIAL

1                  MS. WILLIS:  Objection; calls for

2     speculation, vague and ambiguous, no foundation.

3                  THE WITNESS:  Yes.

4     BY MR. KAPLAN:

5          Q.   All right.  And you found them to be

6     trustworthy?

7          A.   Yes.

8                  MS. WILLIS:  Same objections.

9     BY MR. KAPLAN:

10         Q.   Did you consider yourself and William

11    Morris, at least in the context that you have been

12    testifying about, to be part of Smokey Robinson's

13    business team?

14                 MS. WILLIS:  Objection; vague and

15    ambiguous.

16                 THE WITNESS:  I'm sorry.

17    BY MR. KAPLAN:

18         Q.   It's okay.  Did you consider yourself and

19    William Morris, at least in the context that you

20    have just been telling us about, to be part of

21    Smokey Robinson's business team?

22                 MS. WILLIS:  Objection; vague and

23    ambiguous.

24                 THE WITNESS:  Yes.

25    / / /

Page 109

CONFIDENTIAL

 1    BY MR. KAPLAN:

 2         Q.   And is it accurate that you and William

 3    Morris, at least in the context you just told us

 4    about, work together as part of a common goal, that

 5    goal being Smokey Robinson's business interests?

 6              MS. WILLIS:   Objection; vague and

 7    ambiguous, calls for speculation, no foundation,

 8    leading.

 9              THE WITNESS:   Yes.

10    BY MR. KAPLAN:

11         Q.   That was your understanding; correct?

12         A.   Yes.

13              MS. WILLIS:   Leading -- objection;

14    leading.

15    BY MR. KAPLAN:

16         Q.   The e-mails that you said you would

17    receive from William Morris after each Smokey

18    Robinson show that you filed away, where would you

19    file those?

20         A.   Every show was given a -- a file and that

21    file was -- was put into my cabinet where I kept

22    all of Smokey's information.

23         Q.   So you had a file cabinet for Smokey's

24    documents?

25         A.   A four-drawer file cabinet.

                                        Page 110

```
 1        Q.    And when you received contracts from
 2   William Morris prior to each show, I think you
 3   indicated you would print those out and file them?
 4        A.    Correct.
 5        Q.    Where would you file those?
 6        A.    In that particular show file.
 7        Q.    Okay.  Again, that's one of the file
 8   cabinets you have maintained at your house?
 9        A.    Correct.
10             MS. WILLIS:  Objection; misstates the
11   witness' prior testimony, vague and ambiguous.
12   BY MR. KAPLAN:
13        Q.    All right.  Let's quickly talk about some
14   of the bank accounts.  I don't necessarily want to
15   know all of the bank accounts that you potentially
16   maintained or had access to, but in the 2013 to
17   2016 time period, was there any bank account or
18   bank accounts that would be used for -- for
19   depositing Smokey Robinson's earnings from live
20   performances?
21             MS. WILLIS:  Objection; calls for
22   speculation.
23             THE WITNESS:  There was a Bertam account,
24   which was strictly his performances.
25             Do you want to know how many accounts he
```

Page 111

CONFIDENTIAL

1    had?

2    BY MR. KAPLAN:

3         Q.    No, probably not.   The Bertam account

4    that you -- is it Bertam?

5         A.    Bertam.

6         Q.    Bertam.   Thank you.

7         A.    B-E-R-T-A-M [sic].

8         Q.    So is it fair to say during the 2013 to

9    2016 time period there was only one bank account

10   where monies would be deposited in from live

11   performances, and that was the Bertam account?

12        A.    That's correct.

13              MS. WILLIS:   Objection; calls for

14   speculation.

15   BY MR. KAPLAN:

16        Q.    At least as far as you -- you would

17   deposit into; right?

18        A.    Yes.

19        Q.    And what financial institution was that

20   Bertam account with?

21        A.    City National Bank.

22        Q.    Okay.   And was that Bertam account with

23   City National Bank active through all of 2013 to

24   2016?

25        A.    Yes.

Page 112

 1       Q.   When you were telling us before that you
 2   would deposit checks that you received from Earl
 3   Bryant in the bank, that was City National?
 4       A.   Correct.
 5       Q.   And when you were testifying earlier that
 6   you would go online to check the bank account and
 7   see and verify that the funds had been paid and
 8   deposited in the account, that was the City
 9   National account?
10       A.   Correct.
11       Q.   And do you know if that -- well at least
12   in 2018, was that bank account ever closed?
13       A.   Not to my knowledge.
14       Q.   Okay.  Did you have access to the City
15   National bank account?
16       A.   Online, yes.
17       Q.   Okay.  And how did you get online access?
18       A.   I don't know how it's done, but it's
19   done.
20       Q.   And would you sometimes go online to the
21   City National Bertam bank account to -- to look at
22   things on the bank account?
23       A.   Yes.
24       Q.   Okay.  How often would you do that?
25       A.   Whenever necessary.

1          Q.    Okay.  And what information when you went

2     on there, at least based on your experience, could

3     you see concerning Smokey Robinson's payment

4     from -- from shows?

5               MS. WILLIS:  Objection; vague and

6     ambiguous.

7               THE WITNESS:  I don't understand.

8     BY MR. KAPLAN:

9          Q.    Let me reask it.

10              So in your experience when you would go

11    on to the City National online bank account, you

12    would log in; right?

13         A.    Yes.

14         Q.    And then you would be able to look at

15    different information?

16         A.    Yes.

17         Q.    Would you be able to see deposits and

18    payments that were made?

19         A.    Yes.

20         Q.    Okay.  And if a check was deposited into

21    that City National account, you could pull up a

22    copy of that check; correct?

23         A.    Correct.

24              MS. WILLIS:  Objection; vague and

25    ambiguous, calls for speculation.

Personal Court Reporters, A Veritext Company
818-988-1900

1    BY MR. KAPLAN:

2        Q.    And that was based on your experience

3    with the bank account; correct?

4        A.    Correct.

5        Q.    You have seen checks on that bank account

6    online; correct?

7        A.    Yes.

8        Q.    And additionally, if the payment came

9    into the City National bank account through other

10   means, for example, a wire transfer or electronic

11   transfer, deposit, you would be able to see that as

12   well based on your experience; correct?

13       A.    Correct.

14       Q.    And you, in fact, as you already told us

15   would after each show look at the bank account

16   online to see those transactions?

17       A.    Correct.

18       Q.    All right.   So if -- and that was

19   something that could be done throughout the 2013

20   through 2018 time period?

21           MS. WILLIS:   Objection; leading, calls

22   for speculation, vague and ambiguous.

23           THE WITNESS:   Yes.

24   BY MR. KAPLAN:

25       Q.    You also had access to the bank account

                                        Page 115

CONFIDENTIAL

1    that was sort of a brick and mortar bank, City
2    National Bank, that would exist; correct?
3        A.    I'm sorry?
4        Q.    You could go to one of the City National
5    Bank branch offices at the time and access the
6    account; correct?
7        A.    Yes.
8        Q.    And did you ever do that?
9        A.    I'm sure I did.
10       Q.    Now, when you would initially receive the
11   notification from Earl Bryant that there was a show
12   that had been booked for Smokey Robinson, do you
13   have an understanding as to why you were receiving
14   that information?
15            MS. WILLIS:  Objection; calls for
16   hearsay, vague and ambiguous, calls for
17   speculation.
18            THE WITNESS:  I'm sorry, repeat it,
19   please.
20   BY MR. KAPLAN:
21       Q.    Sure.  When you would initially receive
22   information from Earl Bryant about that a show had
23   been booked, what was your understanding as to why
24   you were receiving that information?
25            MS. WILLIS:  Objection; calls for

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1   speculation, assumes facts not in evidence, calls

 2   for hearsay, relies on hearsay, vague and

 3   ambiguous, leading.

 4           THE WITNESS:  So I would know his

 5   financial position.

 6   BY MR. KAPLAN:

 7       Q.   Okay.  And ultimately you would want to

 8   accurately record the recordings about his

 9   financial position?

10       A.   Yeah.

11           MS. WILLIS:  Objection; leading, calls

12   for speculation.

13   BY MR. KAPLAN:

14       Q.   In particular, what was it that you would

15   want to record concerning Smokey Robinson's

16   finances?

17           MS. WILLIS:  Objection; vague and

18   ambiguous.

19           THE WITNESS:  Well, I would record what

20   he was going to be paid for that show, and as the

21   money came in, it had to balance out.

22   BY MR. KAPLAN:

23       Q.   Okay.  Would there ever be an instance

24   when William Morris would inform you that there had

25   been a electronic transfer of money for a show to
```

Page 117

CONFIDENTIAL

1    Smokey Robinson City National bank account, you
2    would then go look at the account online to verify
3    it and the funds were not there?
4            MS. WILLIS:   Objection; vague and
5    ambiguous.
6            THE WITNESS:   Never.
7    BY MR. KAPLAN:
8        Q.   So in all the instances, you always
9    confirmed that the funds actually had been
10   deposited in the account?
11       A.   Correct.
12       Q.   And you did that personally?
13       A.   Yes.
14       Q.   Are you aware of whether or not after
15   Smokey Robinson, I guess, the two type of payments
16   for his shows were deposited in his account, the
17   first being from William Morris, the second being
18   from the check that you deposited personally from
19   Earl Bryant, did Smokey Robinson receive any
20   notification of those payments?
21       A.   No.
22           MS. WILLIS:   Objection; calls for -- I'm
23   sorry, what was your answer?   You said no?
24           THE WITNESS:   He personally, no.
25           MS. WILLIS:   Okay.   Thank you.

Page 118

CONFIDENTIAL

```
1    BY MR. KAPLAN:
2         Q.    All right.    Now, when -- I guess we have
3    been talking about two types of payments, one was
4    the electronic transfer from William Morris, the
5    second was the check that you would deposit.    These
6    are the payments at least from Smokey Robinson's
7    shows.
8              Let's start with the electronic payment.
9    When that was received into Smokey Robinson's City
10   National account, what, if anything, would you do
11   to record that payment?
12        A.    I would go on the computer.
13             MS. WILLIS:    Objection; vague and
14   ambiguous.
15             THE WITNESS:    Show the money that was
16   deposited and record the commission that William
17   Morris took and the balance into the checking
18   account.
19   BY MR. KAPLAN:
20        Q.    Would you record the amount of the
21   payment?
22             MS. WILLIS:    Objection; leading.
23             THE WITNESS:    Yes.
24   BY MR. KAPLAN:
25        Q.    Where would you record that?
```

Page 119

CONFIDENTIAL

1       A.    On Datafaction.

2       Q.    On a Datafaction ledger?

3       A.    Yes.

4       Q.    And that would be done when in relation

5    to when that payment was made?

6       A.    Whenever I got the notification.

7       Q.    So right after the notification?

8       A.    Correct.

9            MS. WILLIS:   Objection; vague and

10   ambiguous.

11   BY MR. KAPLAN:

12       Q.    Immediately?

13       A.    As fast as I could.

14       Q.    Okay.   And after -- and when you would

15   deposit the checks that were received from Earl

16   Bryant, what sort of record would you keep of that?

17            MS. WILLIS:   Objection; vague and

18   ambiguous.

19            THE WITNESS:   Same thing, record it on

20   the Datafaction ledger.

21   BY MR. KAPLAN:

22       Q.    All right.   So you would record both of

23   these payments on the Datafaction ledger?

24       A.    Correct.

25       Q.    So you would essentially be inputting

Page 120

1   data that would be electronically stored in the

2   Datafaction ledger?

3           MS. WILLIS:  Objection; leading.

4           THE WITNESS:  Yes.

5   BY MR. KAPLAN:

6       Q.   And could anyone who had access to Smokey

7   Robinson's Datafaction account or the software look

8   at these ledgers?

9           MS. WILLIS:  Objection; calls for

10  speculation.

11          THE WITNESS:  Eventually Gary Iskowitz's

12  office did.

13  BY MS. WILLIS:

14      Q.   Is that when you would mail them to him?

15      A.   No, at the end of the year when he got

16  the full general ledger.

17      Q.   You would e-mail -- I'm sorry.  You were

18  telling me before you would e-mail him each year

19  the full general ledger?

20      A.   Yes.

21      Q.   Okay.

22          MR. KAPLAN:  Let's take a quick break.

23          (A brief lunch recess was taken.)

24          ^lunch?^

25  / / /

Page 121

CONFIDENTIAL

1    BY MR. KAPLAN:
2        Q.    Before we took a quick break, you were
3    telling me about recording payments in the
4    Datafaction ledger.  Was it your general procedure
5    to make those recordings in the Datafaction ledger
6    upon receipt of the payments?
7        A.    Yes.
8            MS. WILLIS:  Objection; vague and
9    ambiguous.
10   BY MR. KAPLAN:
11       Q.    Now, Datafaction, I take it, if you want
12   to you could print out the entire ledger?
13       A.    Yes.
14       Q.    Could you also print out portions of the
15   ledger?
16       A.    Yes.
17       Q.    How would you do that?
18       A.    You go into the computer to whatever you
19   have to, you know, go to print and you start with
20   what -- let's say you only wanted the expenses.
21   Well, whatever that 6,001 through whatever it was,
22   that's what you would request.
23       Q.    So it sounds like you could sort the
24   ledger by different type of transactions?
25       A.    Not transactions, accounts.

Page 122

1        Q.    So if you wanted it to sort by payments

2    received on shows, could you do that in

3    Datafaction?

4             MS. WILLIS:  Objection; vague and

5    ambiguous, calls for speculation.

6    BY MR. KAPLAN:

7        Q.    And could you create ledger reports by

8    sorting that way?

9        A.    Yes.

10        Q.    And you're pointing to something here.

11    What are you pointing to?

12        A.    Here, here is a printout of a particular

13    show.

14        Q.    So let's -- is Exhibit 4 an example of a

15    ledger report from Datafaction?

16        A.    Yeah.

17             MS. WILLIS:  May I see Exhibit 4 so I can

18    know which one is Exhibit 4?

19             MR. KAPLAN:  It has -- starts with

20    page 74 at the top or the number on the right-hand

21    corner is 4895.

22             MS. WILLIS:  Okay.

23    BY MR. KAPLAN:

24        Q.    Would Exhibit 3 be an example of a

25    Datafaction ledger report?  Ms. Stern, can I direct

Page 123

CONFIDENTIAL

1    your attention to Exhibit 3?

2         A.    Yeah.

3         Q.    Is that an example of a Datafaction

4    ledger report?

5         A.    Yes.

6         Q.    And same with Exhibit 5, 6, and 7.  Are

7    those all Datafaction ledger reports?

8         A.    Yes.

9              MS. WILLIS:  If I could just offer them

10   now.  Exhibit 5, what's the first number in the

11   corner of Exhibit 5?

12             MR. KAPLAN:  In the top right-hand

13   corner?

14             MS. WILLIS:  Correct.

15             MR. KAPLAN:  4045-3.

16             MS. WILLIS:  And what about Exhibit 6?

17             MR. KAPLAN:  Ms. Stern, will you just

18   confirm with me just so we're on the same page

19   here.

20             THE WITNESS:  This number you're talking

21   about?

22             MR. KAPLAN:  Yes, please.

23             THE WITNESS:  That's a show number.

24             MR. KAPLAN:  Rhonda just wants to know

25   what the number is.  Is it 4045?

Page 124

1              THE WITNESS:  4043-3 -- 4045-3.

2              MS. WILLIS:  And then on Exhibit 6, what

3     is the show number at the top of that page of

4     Exhibit 6?

5              THE WITNESS:  5243-01.

6              MS. WILLIS:  And what's the show number

7     at the top of the first page of Exhibit 7?

8              THE WITNESS:  Which number?

9              MS. WILLIS:  Exhibit 7.

10             THE WITNESS:  5283-01.

11    BY MR. KAPLAN:

12        Q.   So if someone wanted to run a ledger

13    report showing Mr. Robinson's -- well, could one

14    also use Datafaction to sort the payments by time

15    period?

16        A.   No, you would have to -- well, yes, if

17    you go into the bank accounts, then you could do

18    the time period.

19        Q.   If someone wanted to just pull out the

20    payments Smokey Robinson received in 2014, for an

21    example, is that something you could do on

22    Datafaction?

23        A.   I'm sorry?

24        Q.   If you just wanted to look at certain

25    payments within a certain year, say 2014, could you

                                          Page 125

CONFIDENTIAL

```
 1    use Datafaction to do that?

 2         A.    Yes.

 3         Q.    Okay.  So if you wanted to create a

 4    ledger report for all payments or certain payments

 5    that Smokey Robinson received in a given year on

 6    live performances, you could use Datafaction to run

 7    that ledger report?

 8         A.    Everything is on the Datafaction, yeah.

 9              MS. WILLIS:  Objection; calls for

10    speculation, leading.

11    BY MR. KAPLAN:

12         Q.    And that's based on your experience using

13    Datafaction?

14         A.    Yes.

15         Q.    All right.  So I think you may have

16    already done this earlier on in the deposition.

17    But Exhibits 3 through 7, what are these

18    documents -- or let me withdraw that question and

19    ask it this way.  You recognize these documents?

20         A.    Yes.

21         Q.    What are they?

22         A.    They're all the shows that he did in that

23    particular period and the moneys that came in for

24    those shows.

25         Q.    Are these ledgers from Datafaction?
```

Page 126

CONFIDENTIAL

1          A.    Yes.

2          Q.    And are these the ledgers that you helped

3     populate and create?

4          A.    Yes.

5          Q.    Okay.   In other words, you -- on Exhibits

6     3 through 7, you inputted the recorded -- let me

7     reask it.

8               In Exhibits 3 through 7, were you the one

9     who recorded the information in these documents?

10         A.    Correct.

11         Q.    Okay.   And in particular, these ledger

12    reports, Exhibits 3 through 7, what type of

13    information did you input into Datafaction to

14    populate these ledgers?

15              MS. WILLIS:   Objection; vague and

16    ambiguous.

17              THE WITNESS:   The monies that came in for

18    those particular shows.

19    BY MR. KAPLAN:

20         Q.    So the procedure that you were previously

21    testifying about where you would record the moneys

22    that came in from particular shows, these are

23    examples of the Datafaction ledgers, Exhibits 3

24    through 7 that you -- you recorded?

25         A.    Yes, yes.

Page 127

CONFIDENTIAL

1          MS. WILLIS:  Objection; vague and

2    ambiguous, calls for speculation, leading.

3    BY MR. KAPLAN:

4          Q.   You would have done these recordings

5    around the time that each show occurred?

6          MS. WILLIS:  Objection; calls for

7    speculation, vague and ambiguous, leading.

8          THE WITNESS:  Yes, as the shows occurred.

9    BY MR. KAPLAN:

10          Q.   Okay.  So on these ledgers, these

11   Datafaction ledgers -- and if you want to use

12   Exhibit 3 as an example -- would these ledgers --

13   where would those ledgers record payment

14   information?

15          MS. WILLIS:  Objection; vague and

16   ambiguous.

17          THE WITNESS:  Well, if you notice on the

18   top of the page, there is debits and credits.  The

19   credit is giving the money to that particular show.

20   The debit would have been recorded in the bank

21   account.

22          Q.   Okay.  So on these documents -- on these

23   Datafaction ledgers that you recorded where it has

24   the money amounts, for example, on the first

25   page -- I think you were looking at what exhibit?

Page 128

CONFIDENTIAL

1        A.    On number 4.

2        Q.    So Exhibit 4, where it has two payments

3   of $20,000 totaling 40, are those the payments that

4   were received?

5        A.    Yes.  If you read the first one, it says,

6   Record wire transfer from William Morris.  And the

7   second one is just a check that was recorded.  And

8   that's what came in from Earl.

9        Q.    And you would record those amounts?

10       A.    Correct.

11            MS. WILLIS:  Objection; leading, calls

12   for speculation, vague and ambiguous.

13   BY MR. KAPLAN:

14       Q.    And those recordings -- if you look at --

15   the recordings that you just identified, when would

16   you record those in relation to your knowledge that

17   the payments had come in?

18            MS. WILLIS:  Objection; vague and

19   ambiguous.

20            THE WITNESS:  Well, if you notice, the

21   show was July 20th.  The payments were received the

22   22nd and the 23rd.

23   BY MR. KAPLAN:

24       Q.    And you're looking at the first page of

25   Exhibit 4?

Page 129

CONFIDENTIAL

1          A.    Yes.   And the reason there is a

2     difference in the date is obviously most shows are

3     on weekends, so I don't get the money until Monday.

4          Q.    So those dates, the 7/22/13 date on the

5     first page of Exhibit 4, is that information --

6          A.    That's the date that I would have

7     recorded receiving that money from William Morris

8     into the bank.

9          Q.    So you would have put in that

10    information, meaning you would have inputted the

11    July 22nd, 2013 date?

12         A.    I'm sorry?

13         Q.    You would have been the one who recorded

14    the July 22nd, 2013 date on this ledger; correct?

15         A.    Right.

16         Q.    And that would have been the date you

17    received the $20,000 -- that would have been the

18    date that you verified the 20,000-dollar payment

19    from William Morris?

20         A.    Correct.

21              MS. WILLIS:   Objection; calls for

22    speculation.

23    BY MR. KAPLAN:

24         Q.    And on that same day you would have

25    recorded the $20,000 on the credit column?

Page 130

1          MS. WILLIS:  Objection; calls for

2    speculation, leading.

3          THE WITNESS:  Now, it was the day after

4    because it got FedExed to me.

5    BY MR. KAPLAN:

6        Q.   I see.  If that was the wire from William

7    Morris?

8        A.   The first one was a wire transfer.

9        Q.   So if you see -- that would be in the

10   amount of 20,000, that particular wire transfer?

11       A.   Correct.

12       Q.   And when would you have recorded that

13   20,000, on July 22nd?

14       A.   On the 22nd.

15       Q.   Let's look at the next entry, July 23rd,

16   2013.  What -- did you record that date?

17       A.   That's correct.

18       Q.   What was the significance of that date?

19       A.   That's the 20,000 that Earl would have

20   sent me.

21       Q.   Would that have been the date you

22   received the 20,000 check from Earl?

23       A.   That's the date I recorded it and

24   deposited it.

25          MS. WILLIS:  Objection; calls for

Page 131

CONFIDENTIAL

1    speculation, vague and ambiguous, leading.

2    BY MR. KAPLAN:

3        Q.    Would you have received it the same day

4    or the prior day?

5            MS. WILLIS:   Objection; calls for

6    speculation.

7            THE WITNESS:   I can answer that.

8    BY MR. KAPLAN:

9        Q.    It would have been shortly around the

10   time of July 23rd, though; correct?

11           MS. WILLIS:   Objection; calls for

12   speculation, leading.

13           THE WITNESS:   No.   The 23rd is when I

14   deposited it.   I may have gotten it the day before

15   or I got it on the 23rd, I don't know.

16   BY MR. KAPLAN:

17       Q.    You would have gotten it, though, the

18   check around the 23rd, though; correct?

19       A.    Yeah.

20           MS. WILLIS:   Objection; calls for

21   speculation, leading.

22   BY MR. KAPLAN:

23       Q.    And then you would have recorded the

24   20,000 that's in the credit column; correct?

25       A.    Correct.

Page 132

```
 1              MS. WILLIS:  Objection; calls for
 2   speculation, leading.
 3   BY MR. KAPLAN:
 4         Q.   Let's look at this as an example.  Would
 5   you have recorded all this information?
 6         A.   Yeah.
 7              MS. WILLIS:  Objection; vague and
 8   ambiguous, leading.
 9   BY MR. KAPLAN:
10         Q.   Okay.  We will go through that a little
11   more in a second.
12              Now, these records, Exhibit 3 through 7,
13   which are the Datafaction ledgers, that you made
14   the recordings in, did you do so in the course of
15   your regularly conducted business for Smokey
16   Robinson?
17         A.   What was the question?
18         Q.   These recordings in the Datafaction
19   ledgers which are Exhibits 3 through 7, you made
20   those records in the course of your regular
21   conducted business for Smokey Robinson?
22         A.   Correct.
23              MS. WILLIS:  Objection; vague and
24   ambiguous, calls for, leading, no foundation.
25   / / /
```

<div align="right">Page 133</div>

1    BY MR. KAPLAN:

2          Q.    And Smokey Robinson's business, I think

3    you've told me about this, he was performer

4    entertainer as well as musician?

5               Smokey Robinson's business in the 2013 to

6    2016 time frame, what was his business?

7          A.    He was a performer.

8          Q.    A musician entertainer?

9          A.    Yes.

10         Q.    And he would frequently during that time

11   frame do live performances?

12         A.    Yes.

13         Q.    And would frequently get paid for those

14   performances?

15         A.    Correct.

16              MS. WILLIS:   Objection; leading,

17   speculation, vague and ambiguous.

18   BY MR. KAPLAN:

19         Q.    How long -- has Mr. Robinson since you

20   started acting or working as his bookkeeper been

21   performing live?

22         A.    He has been performing since 1960.

23              MS. WILLIS:   Objection; calls for --

24   BY MR. KAPLAN:

25         Q.    Okay.   And you have been preparing these

                                          Page 134

CONFIDENTIAL

```
 1    ledger reports -- withdrawn.
 2              You have been preparing ledgers for
 3    Mr. Robinson like Exhibit 3 through 7, since you
 4    have been working for him as a bookkeeper; correct?
 5         A.    Correct.
 6         Q.    And you have been preparing -- withdrawn.
 7              You have been recording ledgers like
 8    Exhibits 3 through 7 for Mr. Robinson showing
 9    receipt of earnings from live performances since
10    you began working for him as a bookkeeper?
11         A.    Correct.
12         Q.    And it was part of the typical business
13    practice for William Morris to book these
14    performances?
15              MS. WILLIS:  Objection; calls for
16    speculation, no foundation, leading, vague and
17    ambiguous.
18              THE WITNESS:  Repeat it, please.
19    BY MR. KAPLAN:
20         Q.    It was a typical business practice for
21    William Morris to -- to inform you of the -- the
22    contracts and send you those?
23              MS. WILLIS:  Objection; calls for
24    speculation, vague and ambiguous, leading, calls
25    for hearsay, no foundation.
```

Page 135

1              THE WITNESS:  Yes.

2    BY MR. KAPLAN:

3        Q.   Let me be more specific.  It was part of

4    the normal business practice you had with William

5    Morris for William Morris to send you Smokey

6    Robinson's show contracts in advance of the shows;

7    correct?

8              MS. WILLIS:  Objection; vague and

9    ambiguous, calls for speculation, no foundation,

10   leading.

11             THE WITNESS:  Yes.

12   BY MR. KAPLAN:

13       Q.   Do you know how long William Morris was

14   affiliated with Smokey?

15             MS. WILLIS:  Calls for speculation.

16             THE WITNESS:  I couldn't answer that

17   question.  I'm sure it was prior to coming -- you

18   know, me being involved.

19   BY MR. KAPLAN:

20       Q.   Did they -- William Morris was the --

21   Smokey Robinson's talent agent for the time you

22   were involved; correct?

23       A.   Yes.

24       Q.   As a bookkeeper?

25       A.   Yes.

Page 136

CONFIDENTIAL

1          Q.    And it was William Morris' typical

2     business practice to transmit the information about

3     his shows, about Smokey's shows, to you, in

4     particular, the contracts?

5                MS. WILLIS:   Objection; calls for

6     speculation, vague and ambiguous, would rely on

7     hearsay, no foundation.

8                THE WITNESS:   Yes.

9     BY MR. KAPLAN:

10         Q.    But based on your experience of receiving

11    the contracts for each of Smokey's shows; correct?

12                MS. WILLIS:   Objection; vague and

13    ambiguous, no foundation, calls for hearsay,

14    leading.

15                THE WITNESS:   Yes.

16    BY MR. KAPLAN:

17         Q.    That was the normal protocol and practice

18    that you experienced with William Morris for each

19    and every of Smokey Robinson's show?

20         A.    Correct.

21                MS. WILLIS:   Objection; vague and

22    ambiguous, leading.

23    BY MR. KAPLAN:

24         Q.    And so at least based on your experience,

25    for each of Smokey Robinson's shows, you would

                                          Page 137

CONFIDENTIAL

1    receive the contract for the show; correct?

2              MS. WILLIS:  Objection; calls for

3    speculation, vague and ambiguous.

4              THE WITNESS:  Correct.

5    BY MR. KAPLAN:

6         Q.   And for each of the Smokey Robinson's

7    shows, at least when you were a bookkeeper for him,

8    you would always get confirmation from William

9    Morris that it had released the payments to Smokey

10   Robinson's accounts --

11             MS. WILLIS:  Objection --

12             MR. KAPLAN:  -- at least in the instances

13   where William Morris obtained a deposit?

14             MS. WILLIS:  Objection; calls for

15   speculation, vague and ambiguous.

16             THE WITNESS:  Yes.

17             MS. WILLIS:  Ma'am, you need to let me

18   get my objection in before you answer.

19             Objection; vague and ambiguous, calls for

20   speculation, leading.

21   BY MR. KAPLAN:

22        Q.   And was William Morris's typical business

23   practice, based on your experience with William

24   Morris on Smokey Robinson's account, that William

25   Morris would release payment to Smokey Robinson

Page 138

1   once the show was performed?

2           MS. WILLIS:  Objection; calls for

3   speculation, vague and ambiguous, leading.

4           THE WITNESS:  Correct.

5   BY MR. KAPLAN:

6       Q.   And was it your regular practice to

7   create the Datafaction ledgers, examples of which

8   are Exhibits 3 through 7, to -- to record

9   Smokey Robinson's payments and earnings from his

10  live performances.

11          MS. WILLIS:  Objection; leading, vague

12  and ambiguous.

13          THE WITNESS:  Sure.

14  BY MR. KAPLAN:

15      Q.   And that's a practice you adhered to from

16  the time you began as Smokey Robinson's bookkeeper

17  through the end of your time as his bookkeeper?

18          MS. WILLIS:  Objection; vague and

19  ambiguous, leading.

20          THE WITNESS:  Correct.

21  BY MR. KAPLAN:

22      Q.   And you would create these Datafaction

23  records that would -- well, withdrawn.

24          You would create -- you would make the

25  recordings in the Datafaction ledgers for each and

Page 139

1   every of Smokey Robinson's shows beginning from the

2   time you started as his bookkeeper until the end?

3           MS. WILLIS:  Objection; vague and

4   ambiguous, leading.

5           THE WITNESS:  Correct.

6   BY MR. KAPLAN:

7       Q.   And is it fair to say that you would

8   update the Datafaction ledgers each time

9   Mr. Robinson would have a show and receive payment?

10      A.   Yes.

11          MS. WILLIS:  Objection; vague and

12  ambiguous, leading.

13  BY MR. KAPLAN:

14      Q.   So it was done regularly?

15      A.   Yes.

16          MS. WILLIS:  Objection; vague and

17  ambiguous, leading.

18  BY MR. KAPLAN:

19      Q.   And this was a procedure you personally

20  typically followed for Smokey Robinson's business?

21          MS. WILLIS:  Objection; vague and

22  ambiguous, leading.

23          THE WITNESS:  Yes.

24  BY MR. KAPLAN:

25      Q.   So it was your regular practice to record

Page 140

1   payments that Smokey Robinson received from live

2   performances on the Datafaction financial ledgers?

3               MS. WILLIS:  Objection; vague and

4   ambiguous, leading.

5               THE WITNESS:  Correct.

6   BY MR. KAPLAN:

7        Q.   And the purpose of Exhibits 3 through 7,

8   was that to create an accurate and reliable

9   contemporaneous record of Mr. Robinson's earnings

10  from the live performances?

11              MS. WILLIS:  Objection; vague and

12  ambiguous, leading.

13              THE WITNESS:  Yes.

14  BY MR. KAPLAN:

15       Q.   What other purpose was there for Exhibits

16  3 through 7?

17       A.   Well, that it was part of the general

18  ledger for tax purposes.

19       Q.   And did you intend that Exhibits 3

20  through 7 that they would be accurate?

21       A.   They had to be accurate.

22       Q.   So that was you desire and intent, then;

23  correct?

24       A.   Yes.

25       Q.   Do you have any reason to believe that

1    they're not accurate?

2              MS. WILLIS:   Objection; calls for

3    speculation, vague and ambiguous.

4              THE WITNESS:   No.

5    BY MR. KAPLAN:

6         Q.   When you would receive notice that a wire

7    transfer was made by William Morris to Smokey

8    Robinson's account, did you ever doubt the voracity

9    or accuracy of those notifications?

10        A.   No, because that's why I went into the

11   bank account.

12             MS. WILLIS:   Objection; vague and

13   ambiguous.

14   BY MR. KAPLAN:

15        Q.   To verify them and make sure they were

16   correct?

17        A.   Uh-huh, yes.

18        Q.   And did you believe that

19   Smokey Robinson's accountant Gary Iskowitz would at

20   some point in time be relying on the these edgers,

21   Exhibit 3 through 7?

22             MS. WILLIS:   Objection; calls for

23   speculation.

24             THE WITNESS:   I lost you.

25   / / /

                                        Page 142

CONFIDENTIAL

1   BY MR. KAPLAN:

2        Q.   When you were creating -- withdrawn.

3             When you were making the recordings in

4   the Datafaction ledgers, for example, 3 through 7,

5   did you believe that Mr. Iskowitz, Smokey

6   Robinson's accountant, would be relying on your

7   ledgers?

8        A.   Yes.

9        Q.   To do what?

10       A.   For tax purposes at the end of the year.

11       Q.   Did you believe he was going to rely on

12   your ledgers, for example, Exhibits 3 through 7, to

13   prepare Smokey Robinson's tax returns?

14       A.   Yes.

15            MS. WILLIS:   Objection; calls for

16   speculation, vague and ambiguous, leading.

17   BY MR. KAPLAN:

18       Q.   That was your intent; correct?

19            MS. WILLIS:   Objection; vague and

20   ambiguous, calls for speculation, leading.

21            THE WITNESS:   Yes.

22   BY MR. KAPLAN:

23       Q.   Would you ever speak to Gary Iskowitz

24   about the preparation of Mr. Robinson's tax

25   returns?

                                        Page 143

1          A.   At the end of the year when I delivered

2     the general ledger to him, we would sit and discuss

3     anything that might be relevant.

4          Q.   Okay.  Now, let's take a look at Exhibit

5     1.  I'm sorry, I apologize, Ms. Stern, Exhibit 2.

6     Let me know when you are ready.

7          A.   I'm ready.

8          Q.   Have you ever seen this document before?

9          A.   No.

10         Q.   Do you recall receiving a subpoena in

11    August or September of 2018?

12         A.   I don't remember.

13         Q.   Okay.  Do you recall Eric Podwall calling

14    you up at some point in 2018 and saying that you

15    were going to be issued a subpoena for some

16    documents?

17         A.   I believe he did, yes.

18         Q.   Okay.  And do you remember receiving

19    anything like this in 2018 asking you for documents

20    in this lawsuit?

21              MS. WILLIS:  Objection; asked and

22    answered.  The witness has already said she doesn't

23    remember ever seeing Exhibit 2.

24              MR. KAPLAN:  She didn't say that.

25              THE WITNESS:  I really don't remember.

Page 144

CONFIDENTIAL

```
 1   BY MR. KAPLAN:
 2        Q.   Do you ever remember receiving any
 3   request for documents in this lawsuit in 2018?
 4             MS. WILLIS:  Objection.
 5             THE WITNESS:  I remember being aware that
 6   there was going to be a lawsuit, but I don't
 7   remember details.
 8   BY MR. KAPLAN:
 9        Q.   When Eric -- Eric called you up in August
10   or September of 2018 and said he was going to
11   need -- potentially need some documents from you.
12   Do you remember that conversation?
13        A.   No.
14        Q.   Okay.  At some point did -- are you
15   familiar -- let me ask it this way.  Are you
16   familiar with a company called Miller Kaplan?
17        A.   Miller Kaplan, I believe that's the new
18   accountants that Smokey went to.
19        Q.   Do you know someone by the name of
20   Justine Garofolo?
21        A.   She's the bookkeeper on the account.
22        Q.   At Miller Kaplan?
23        A.   Yes.
24        Q.   At some point did someone come into your
25   home and remove documents from your home?
```

Page 145

1      A.   She and her husband came and took my

2   four-drawer file cabinet, which had all of Smokey's

3   stuff.

4      Q.   Okay.  So just so I'm clear, Justine

5   Garofolo and Justine Garofolo's husband came into

6   your home?

7      A.   Yes.

8      Q.   And what did they remove?

9      A.   A four-drawer file cabinet.

10      Q.   What was in that file cabinet that was

11   removed?

12      A.   Everything that pertained to Smokey

13   Robinson.

14      Q.   Okay.  Would it have included all the

15   documents that you had printed out over the years

16   concerning Smokey Robinson?

17      A.   It would have been only the current year.

18   Everything prior went to storage.

19      Q.   Okay.  Where was that storage?

20      A.   It's in the valley someplace, but I don't

21   remember the name of it right offhand.

22      Q.   Do you know whether or not Miller Kaplan

23   or Justine Garofolo obtained access to the

24   documents in storage?

25      A.   I'm assuming they did.

Page 146

1          MS. WILLIS:  Objection; calls for

2     speculation.

3     BY MR. KAPLAN:

4          Q.   Why do you believe that?

5          MS. WILLIS:  Objection; calls for

6     speculation.

7          THE WITNESS:  Because they may have

8     needed anything that was recorded prior years.

9     BY MR. KAPLAN:

10         Q.   Okay.  Did you inform them about those

11    documents in storage?

12         A.   I told them that there were things in

13    storage and where it was, but I couldn't tell them

14    particular documents.

15         Q.   Okay.  But you informed Justine Garofolo

16    that there were documents in storage concerning

17    Smokey Robinson?

18         A.   Yes.

19         MS. WILLIS:  Objection; hearsay -- calls

20    for speculation and hearsay, leading.

21    BY MR. KAPLAN:

22         Q.   And you informed Justine Garofolo where

23    those documents were in storage?

24         A.   Yes.

25         Q.   In other words, you informed Justine

1    Garofolo as to the name of the storage facility?

2        A.   Yes.

3        Q.   Did you give her the address?

4        A.   Yes.

5        Q.   Okay.  Did you have a key to that storage

6    facility?

7        A.   I've never been there.

8        Q.   How did the documents get to storage?

9        A.   I would hire somebody to go to pick

10   things up after I had called the storage people

11   asking them to retrieve it for me out of storage.

12       Q.   Okay.  Did you give Ms. Garofolo access

13   to those storage facilities?

14       A.   They had the same access that I did.

15       Q.   Why was it Smokey Robinson's storage

16   facility?

17       A.   No, but his stuff was in storage at that

18   facility.

19       Q.   Okay.  How do you know, though, that they

20   had the same access that you did?

21            MS. WILLIS:  Objection; calls for

22   speculation.

23            THE WITNESS:  I don't know for sure; I'm

24   assuming.

25   / / /

                                        Page 148

CONFIDENTIAL

```
 1    BY MR. KAPLAN:
 2         Q.    Okay.   Did you have any -- when did
 3    Justine Garofolo and her husband come in to remove
 4    the documents from your home?
 5         A.    It had to be either the end of September
 6    or the beginning of October.
 7         Q.    Okay.   Do you know why they were removing
 8    the documents?
 9              MS. WILLIS:   Objection; calls for
10    speculation.
11              THE WITNESS:   Because Smokey had let me
12    go and hired them.
13    BY MR. KAPLAN:
14         Q.    How do you know -- well, did someone tell
15    you that Smokey was letting you go and hiring them?
16         A.    Smokey told me.
17         Q.    Okay.   And how many discussions did you
18    have with Mr. Robinson about that topic, that topic
19    being letting you go and hiring Miller Kaplan?
20         A.    I don't recall even having discussions.
21         Q.    Well, he told you, though?
22         A.    Yeah.
23         Q.    When did he tell you that?
24         A.    In September sometime.
25         Q.    What did he tell you?
```

Page 149

1        A.    I don't remember.  And I don't even

2   remember if he told me or if Mrs. Robinson told me.

3        Q.    What's Mrs. Robinson first name?

4        A.    Francis.

5        Q.    One of the two informed you, though?

6              MS. WILLIS:  Objection; hearsay.

7              THE WITNESS:  Yes.

8   BY MR. KAPLAN:

9        Q.    Did you have any discussions with anyone

10  about the removal of Smokey Robinson's documents

11  from your home?

12       A.    Just permission to be given to them.

13       Q.    Who gave that permission?

14       A.    Francis, I think.  I'm not sure.

15             MS. WILLIS:  Objection; calls for

16  speculation hearsay.

17  BY MR. KAPLAN:

18       Q.    But someone informed you -- someone

19  informed you that you had Smokey Robinson's

20  authority or permission to release the -- his

21  documents or his related documents in your home to

22  Miller Kaplan?

23       A.    Yeah.

24       Q.    In fact, weren't you informed that you

25  were instructed to do so?

Page 150

1          MS. WILLIS:  Objection; vague and

2    ambiguous.

3    BY MR. KAPLAN:

4          Q.   You were instructed to release those

5    documents to Miller Kaplan; correct?

6          A.   Yes.

7          MS. WILLIS:  Objection; vague and

8    ambiguous.

9    BY MR. KAPLAN:

10         Q.   In other words, Smokey Robinson was

11   ordering you to do so?

12         MS. WILLIS:  Objection.

13         THE WITNESS:  More or less.

14         MS. WILLIS:  Vague and ambiguous, calls

15   for speculation, leading.

16   BY MR. KAPLAN:

17         Q.   Why do you believe you were being ordered

18   to do so, based on what was said?

19         A.   I mean, somebody let's you go, you take

20   their word for it.

21         Q.   But you were told by either Smokey or

22   Francis that they wanted you to provide all of your

23   documents and records about Smokey Robinson to

24   Miller Kaplan?

25         A.   Correct.

1           MS. WILLIS:  Objection; hearsay.

2    BY MR. KAPLAN:

3        Q.    And Smokey Robinson told you that?

4        A.    I can't remember whether he said it or

5    Francis.

6        Q.    Okay.  And did they say anything else

7    about the release of records to Miller Kaplan?

8        A.    Not that I can recall.

9        Q.    Did you have any discussion with Smokey

10   Robinson or his wife Francis about the documents in

11   storage?

12       A.    No.

13       Q.    And how long did it take -- well, when

14   did Ms. Garofolo and -- or when did Justine

15   Garofolo and her husband come in, was during the

16   day, at night?

17       A.    No, it was one day.

18       Q.    How long did it take them to remove the

19   documents?

20       A.    As long as it took to put a filing

21   cabinet on a wheel -- or on a -- what do you call

22   those things?

23       Q.    All right.  Some sort of dolly?

24       A.    A dolly.  Thank you.

25       Q.    Okay.  Did you speak to Smokey Robinson's

                                        Page 152

1  attorney at all about the removal of documents?

2       A.   No.

3       Q.   Okay.  Did you speak to anyone else,

4  other than what you have already testified about,

5  as to the removal of documents?

6       A.   No.

7       Q.   Ultimately, you told me about it, though;

8  right?

9            Do you remember having a phone call with

10  me where you told me that -- that documents had

11  been removed?

12       A.   Yes, because if you were looking for

13  something, I had nothing; they had everything.

14       Q.   Okay.  And you told me that I should

15  maybe ask Miller Kaplan or Gary Iskowitz?

16       A.   Yes.

17       Q.   Now, did you provide Miller Kaplan with

18  access to any Datafaction electronic records?

19       A.   They had permission to go onto

20  Datafaction.  I instructed Datafaction to send

21  everything over to them.

22       Q.   And how did you do that?

23       A.   Electronically.

24       Q.   Did you have to call up Datafaction?

25       A.   No, I think just did it by e-mails.

Page 153

1      Q.    Okay.  So you instructed Datafaction to

2   make sure that Miller Kaplan had all of Smokey

3   Robinson's electronic Datafaction records?

4      A.    To remove it from my computer and put it

5   on theirs.

6      Q.    And was the Datafaction removed from your

7   computer?

8      A.    Yes.

9      Q.    Okay.  And when did that happen?

10     A.    Had to be the end of September.

11     Q.    Did Gary -- I'm sorry, not Gary.  Did

12  anyone at Miller Kaplan request those Datafaction

13  records from you?

14     A.    I don't remember whether they requested

15  it or I told them that everything was on

16  Datafaction.

17     Q.    One way or the other, whether they

18  requested it or not, you informed Miller Kaplan

19  that you had Datafaction records?

20     A.    Correct.

21     Q.    And as a result, they wanted those

22  records?

23     A.    They needed those records.

24     Q.    And you provided them to -- to Miller

25  Kaplan?

Page 154

CONFIDENTIAL

1          A.    Datafaction provided it.

2          Q.    Fair enough.  Did you ever have a

3    discussion with Smokey Robinson or Francis Robinson

4    about the Datafaction records being provided to

5    Miller Kaplan?

6          A.    No.

7          Q.    When -- you were let go around the same

8    time that Miller Kaplan came in and took the Smokey

9    Robinson records; correct?

10              MS. WILLIS:  Objection; misstates the

11   witness' prior testimony.

12              THE WITNESS:  I guess so.

13   BY MR. KAPLAN:

14         Q.    Well, the -- and -- and -- did anyone

15   inform you ever why Mr. Robinson was letting you go

16   as his bookkeeper?

17         A.    Francis and I, I think, had some

18   conversation, but it was -- didn't matter.

19         Q.    Okay.  Did you have a conversation with

20   anyone other than Francis as to why you had been

21   let go?

22         A.    No.

23         Q.    What was discussed with Francis as to why

24   you were being let go?

25         A.    I don't remember.

Page 155

CONFIDENTIAL

1          Q.    Okay.  All right.  Let's take a look at

2     Exhibit 3, and if you'd prefer to look at Exhibit 4

3     or 5, 6 or 7, similar information, that's fine.

4     But let's take a look at the second page of the

5     document.  So second page of Exhibit 3.  It's Bates

6     stamped MKA2.  Let me know when you're there.

7          A.    I'm there.

8          Q.    Now, these -- did you see the different

9     columns on the ledger?

10         A.    Yeah.

11         Q.    Were those columns that you decided to

12    add to the -- the Datafaction ledger or were those

13    columns that were sort of automatically there?

14         A.    I believe they were all there.

15         Q.    Okay.  And then you would, then, have the

16    opportunity to populate those columns with

17    different information?

18         A.    Yes.

19         Q.    Okay.  And would you have populated all

20    the information on this page?

21         A.    Yes.

22         Q.    Below the columns, I guess?

23         A.    Yes.

24         Q.    And would that be true of all of these

25    ledgers for all the payments in Exhibit 3?

Page 156

CONFIDENTIAL

1     A.    Correct.

2     Q.    And also the same in Exhibit 4 through 7?

3     A.    Yes, yes.

4     Q.    Just so the record is clear, in

5  Exhibits 4 through 7, you were the one who

6  populated and recorded all the data and information

7  below the column names; correct?

8     A.    Without going through page by page, yes.

9     Q.    Do you want to go through some pages just

10  to confirm that's accurate?

11     A.    No, no, I looked through different -- but

12  I didn't look at every page, but, yes, I would have

13  put the information in.

14     Q.    So again, let's look at the second page

15  of Exhibit 3.  So the first column, which is CK

16  number backslash ACC2, do you see that?

17     A.    Yeah.

18     Q.    Okay.  What does that stand for or mean?

19     A.    Well, the checking account number, that's

20  the number that I give to each show.

21     Q.    So the -- let's go below there.  Do you

22  see numbers **5160-01**?

23     A.    Where are you looking?

24         That's the show number for Buffalo Bill.

25     Q.    Okay.  So -- and for each show, then, you

Page 157

CONFIDENTIAL

1   would assign a show number?

2        A.   Correct.

3        Q.   So below that 5161-01, that would be the

4   next show number that you assigned to the show in

5   Grand Rapids, Michigan?

6        A.   Correct.

7        Q.   And you would do that so on and so forth

8   for each show?

9        A.   Yeah.

10        Q.   That would be information you would input

11   into the ledger?

12        A.   Correct.

13        Q.   Now, below that -- again, this -- on page

14   two of Exhibit 3, there's a number 117348.  Do you

15   see that?

16        A.   Yeah, I see it.  But I don't remember

17   what those numbers are.

18        Q.   Okay.  So you don't know what that number

19   reflects?

20        A.   I can't remember, no.

21        Q.   Would that have been information that you

22   inputted into the Datafaction ledger?

23             MS. WILLIS:  Objection; calls for

24   speculation.  The witness just said she can't

25   remember.

Page 158

1                MR. KAPLAN:  She said she didn't know

2    what it was.

3                MS. WILLIS:  You can answer.

4                THE WITNESS:  Since nobody else entered

5    things in this ledger, it had to be.  But I can't

6    remember what it is.

7    BY MR. KAPLAN:

8         Q.   You inputted everything in the ledger?

9         A.   Yes.

10        Q.   All right.  Let's look at the second

11   column entitled GJ-REF.

12        A.   GJ is general journal.

13        Q.   Okay.

14        A.   Where I put the names of the shows.

15        Q.   Okay.  So where it says Buffalo Bill's

16   RES and CAS, Primm, Nevada, 2/15/14 concert income,

17   do you see that?

18        A.   Yeah.

19        Q.   You entered that information?

20        A.   Correct.

21                MS. WILLIS:  Objection; calls for

22   speculation.

23   BY MR. KAPLAN:

24        Q.   And what is your understanding of what

25   that information is referencing?

                                        Page 159

1          A.    That's telling me where the show is and

2     what date it's going to be.

3          Q.    And that's information you would have

4     obtained from -- from your review of Smokey

5     Robinson's show contract for --

6          A.    Correct.

7          Q.    -- the Primm, Nevada show?

8          A.    Yes.

9          Q.    All right.  And so for each of these

10    ledger entries in Exhibit 3, for each of the shows,

11    you would record the venue and location and date

12    for the show?

13         A.    Correct.

14         Q.    And you would do that -- use the

15    information you obtained from Smokey Robinson's

16    contract with the promoter to obtain that

17    information?

18         A.    Correct.

19              MS. WILLIS:  Objection; calls for

20    speculation, vague and ambiguous --

21    BY MR. KAPLAN:

22         Q.    And you would --

23              MS. WILLIS:  -- leading.

24              MR. KAPLAN:  Sorry.

25    / / /

1    BY MR. KAPLAN:

2         Q.   And you would obtain those contracts from

3    William Morris; correct?

4         A.   Correct.

5              MS. WILLIS:  Objection; vague and

6    ambiguous, leading.

7    BY MR. KAPLAN:

8         Q.   All right.  Why was it important to have

9    the venue name, the venue location and date of the

10   concert performance in your ledger?

11             MS. WILLIS:  Objection; assumes facts not

12   evidence.

13             THE WITNESS:  I'm sorry.

14   BY MR. KAPLAN:

15        Q.   Why was it important for you to have the

16   venue location and date of each performance

17   recorded in the ledger?

18             MS. WILLIS:  Objection; calls for

19   speculation.

20             THE WITNESS:  In case we had to look

21   back.

22   BY MR. KAPLAN:

23        Q.   All right.  Now, below that information,

24   there is another number 14557 and below that there

25   is another number 1:975*2.  Do you see those?

Page 161

1      A.    Yeah.  Okay.  The -- the 1975 may have

2   been the check number.

3      Q.    Okay.

4            MS. WILLIS:  I'm just -- so we're clear,

5   is the witness referring to the 1:975?  I don't

6   understand -- I want to make sure we're looking at

7   the same thing because she referenced something

8   different.

9   BY MR. KAPLAN:

10     Q.    You're referring to the 1:975*2 as

11  potentially being the check number?

12     A.    I think that was the check number and

13  then the star two meant it went into the number two

14  checking account.

15     Q.    Were there two checking accounts at --

16     A.    Well, there was a personal account and

17  there was a Bertam account.

18     Q.    Okay.  So the colon -- sorry, not colon.

19  Strike that.

20           The asterisk two would represent the

21  checking account at City National?

22     A.    Yes.

23     Q.    And that was the same as the Bertam

24  account?

25     A.    It's -- yeah, that's the Bertam account.

Personal Court Reporters, A Veritext Company
818-988-1900

1          You see over here where it says 1020.

2      Q.   With the asterisk to left of it?

3      A.   Yeah.   That's the account number for City

4  National Bertam.

5          If you had a printout of those accounts,

6  you would see under debit a 20,000.

7      Q.   Okay.   All right.

8          MS. WILLIS:   I'm sorry, a debit of

9  20,000.   Where is it?

10          THE WITNESS:   You see up on top there's

11  debts and credits.

12          MS. WILLIS:   Are we on the page?

13          THE WITNESS:   The second page.

14          MS. WILLIS:   Okay.

15          THE WITNESS:   You see up on the top above

16  the black line, to the right it says debit and

17  credit.

18  BY MR. KAPLAN:

19      Q.   All right.   Jan, we'll get there in

20  second and Rhonda will have a chance to follow-up

21  with that.

22          MS. WILLIS:   She said 20,000.   I'm just

23  trying to make sure we're looking at the same

24  thing.

25          MR. KAPLAN:   I see.   Rhonda, you just

Page 163

1    wanted to know what the 1020 was?

2           MS. WILLIS:  You can move on.  I don't

3    want to interrupt.

4           MR. KAPLAN:  Okay.

5           MS. WILLIS:  But before we do go on, I do

6    need to say something for the record.  Exhibits 2

7    through 7 have been marked as "highly confidential,

8    attorney's eyes only."  Given this witness' close

9    knowledge of those documents, we have no issue with

10   this witness being shown these documents before the

11   record.  They must be marked as "highly

12   confidential, attorney's eyes only" and they will

13   need to be designated in that fashion for the

14   deposition.

15          MR. KAPLAN:  And Madam Court Reporter,

16   what I'll do either on a break or at the end of the

17   deposition, I will give you a copy of the

18   protective order in this case.  I think it would

19   probably be something good for you to have.

20          MS. WILLIS:  And I think the witness

21   needs to sign it, doesn't she?

22          MR. KAPLAN:  Probably the witness does.

23          MS. WILLIS:  There's nothing on that for

24   you to --

25          MR. KAPLAN:  I have it here.  So you can

Page 164

1    read it, Rhonda.  So she'll sign it.  If not, no.

2    BY MR. KAPLAN:

3        Q.    Ms. Sterns, going back to the GF REF --

4    I'm sorry, let me start over.

5        A.    Yeah.

6        Q.    The general journal reference column, the

7    number 14557, do you know what that number is

8    referring to?

9        A.    I don't remember.

10        Q.    Would that have been some sort of

11    transaction number associated with the wire

12    transfer?

13            MS. WILLIS:  Objection; calls for

14    speculation.  The witness just said she doesn't

15    remember.

16            MR. KAPLAN:  I'm trying to refresh her

17    memory.

18            MS. WILLIS:  Leading.

19            THE WITNESS:  I don't remember.

20    BY MR. KAPLAN:

21        Q.    Okay.  But you inputted that information;

22    correct?

23        A.    Obviously.

24        Q.    All right.  I think you told me about

25    this earlier, but the column date, what information

Page 165

CONFIDENTIAL

1    is that referring to?

2         A.   Which one are you talking about?

3         Q.   So this column date, it has some --

4         A.   Well, that's the date.  That's the date I

5    inputted it into the ledger.

6         Q.   All right.  And you would have created --

7    for all of Exhibits 3 through 7, you would have

8    inputted that information?

9         A.   Correct.

10        Q.   And obviously you had knowledge of when

11   you inputted the information; correct?

12             MS. WILLIS:  Objection; vague and

13   ambiguous, calls for speculation, leading.

14             THE WITNESS:  Obviously what?

15   BY MR. KAPLAN:

16        Q.   You knew when you were inputting the

17   information?

18        A.   Well, it's the date that I did it.

19             MS. WILLIS:  Objection.

20   BY MR. KAPLAN:

21        Q.   Let's look at the next column

22   Payee/Payor.  Do you see that?

23        A.   Yeah.

24        Q.   What's that referencing, Payee/Payor.

25        A.   That's the name of who I got the check

Page 166

1    from, whatever name was on the check.

2         Q.   All right.   And would you also obtain

3    that information from the performance contracts

4    that you would receive from WME?

5         A.   Would I what?

6         Q.   So here it says Primm Valley Casino

7    Resorts.   You indicated you got that name from the

8    check that you received?

9         A.   Right.

10        Q.   That would have been the check that was

11   FedExed to you by Earl Bryant?

12        A.   Correct.

13        Q.   Would you also get that information from

14   the show contract that you previously received from

15   WME?

16            MS. WILLIS:   Objection; leading, calls

17   for speculation.

18            THE WITNESS:   Yeah, sometimes --

19   sometimes the venue is not who is paying.   It's the

20   production company.   So they may be different at

21   different times.

22   BY MR. KAPLAN:

23        Q.   All right.   And you would input the payor

24   data on these ledgers?

25        A.   Right.

                                          Page 167

CONFIDENTIAL

1        Q.    Correct?

2        A.    Yes.

3        Q.    Let's look at the -- let's look at the

4   next column description.

5        A.    Well, that's where it came from.  If you

6   notice, the first one was from William Morris and

7   the second one was the final payment, which was the

8   one I get from Earl Bryant.

9        Q.    All right.  So record W/T from WME

10  settlement, you inputted that -- those words;

11  correct?

12       A.    Right.

13       Q.    It may have said for 2/15/14.  I'm sorry,

14  I didn't read it all.  What does that mean?

15       A.    What does what mean?

16       Q.    Record or record --

17       A.    Record.

18       Q.    I'm sorry, record W.

19       A.    Wire transfer.

20       Q.    From WME settlement for 2/15/14.

21       A.    Well, it's the payment for that

22  particular show.

23       Q.    Okay.  And to the right of that would be

24  the account number?

25       A.    That's the bank account number.

Page 168

CONFIDENTIAL

1    Q.    Smokey's bank account?

2    A.    The ledger for the bank account.

3    Q.    Okay.

4    A.    Yeah.

5    Q.    The ledger number that you would use for

6  Datafaction?

7    A.    That's correct.

8    Q.    All right.  And to the right of that even

9  further down in the credit column, it says $50,000.

10  Do you see that?

11    A.    Yes.

12    Q.    So you inputted all this data.

13         Does that mean that on February 18th,

14  2014, you recorded in the ledger that Smokey

15  Robinson received $50,000 from a WME wire transfer?

16    A.    Correct.

17    Q.    Okay.  And those are recordings that you

18  would make throughout this Exhibit 3 and Exhibit 4

19  through 7?

20         MS. WILLIS:  Objection; vague and

21  ambiguous, calls for speculation, leading.

22         THE WITNESS:  Yes.

23  BY MR. KAPLAN:

24    Q.    So whenever you made a recording in these

25  ledgers, record WT from WME settlement with a date,

Page 169

1    that would be based on your knowledge that a wire

2    transfer had been sent to Smokey Robinson's City

3    National bank account from William Morris?

4         MS. WILLIS:  Objection; calls for

5    speculation, leading.

6         THE WITNESS:  Correct.

7    BY MR. KAPLAN:

8         Q.   And you would then take the amount of

9    that payment and record that in the credit column?

10        A.   Correct.

11        MS. WILLIS:  Objection; calls for

12    speculation, leading.

13   BY MR. KAPLAN:

14        Q.   And this would all be recorded around the

15   time that you learned of the payment?

16        MS. WILLIS:  Objection; vague and

17   ambiguous, leading.

18        THE WITNESS:  Yes.

19   BY MR. KAPLAN:

20        Q.   Okay.  And then the next -- below the

21   recorded WT from WMA settlement for 2/15/14 is

22   another entry you made.  This looks like on 2/18/14

23   final payment - 2/15/13, and it has the 1020 number

24   and a $50,000 number?

25        A.   Correct.

Page 170

CONFIDENTIAL

1          Q.    You inputted all that information?

2          A.    Yes.

3          Q.    And you input it all on February 18th,

4     2014?

5          A.    Yes.

6          Q.    And that would have been around the time

7     you received the check from Earl Bryant?

8          A.    Correct.

9               MS. WILLIS:   Objection; calls for

10     speculation, leading.

11     BY MR. KAPLAN:

12          Q.    So tell me what final payment

13     2/15/13 means.

14          A.    If you add the two together, it's

15     $100,000.   It means we had been paid in full.

16          Q.    But the final payment was the 50,000

17     that's the second $50,000 that's identified in the

18     credit column?

19          A.    Right.

20          Q.    Okay.   So for this show, Buffalo Bills,

21     for example, there was a total of two payments,

22     50,000 each, totaling 100,000?

23          A.    Correct.

24          Q.    So Smokey Robinson received $100,000 for

25     the show in Primm, Nevada that is recorded here?

<div align="right">Page 171</div>

CONFIDENTIAL

1          MS. WILLIS:  Objection; calls for

2     speculation, leading.

3          THE WITNESS:  Let me explain something to

4     you.  That's what they pay for the -- his

5     performance.  He didn't receive that 50,000 because

6     William Morris took their commission.

7     BY MR. KAPLAN:

8          Q.   But the 100,000 would be the gross amount

9     paid?

10         MS. WILLIS:  Objection; calls for

11    speculation.

12         THE WITNESS:  That's what he has to

13    report on his taxes.

14         MS. WILLIS:  Calls for speculation.

15         THE WITNESS:  He gets to take off the --

16         MR. KAPLAN:  Hold on a second.

17         MS. WILLIS:  Calls for speculation,

18    leading, no foundation.

19         Go ahead.

20         THE WITNESS:  He gets to reduce that

21    100,000 by the amount that William Morris takes as

22    a commission.

23    BY MR. KAPLAN:

24         Q.   But I'm correct, though, that the

25    $100,000 represents the gross amount that was paid

                                        Page 172

1    to Smokey Robinson for the Primm, Nevada show?

2            MS. WILLIS:  Objection; misstates the

3    witness' prior testimony, leading, calls for

4    speculation, vague and ambiguous.

5            THE WITNESS:  Yes.

6    BY MR. KAPLAN:

7        Q.   Okay.  And these two $50,000 numbers,

8    those were recorded based on information that you

9    previously testified about.  One was your

10   confirmation of the wire transfer into Smokey

11   Robinson's account, and, two, your receipt and

12   deposit of the check from Earl Bryant?

13       A.   Right.

14           MS. WILLIS:  Objection; vague and

15   ambiguous, calls for speculation, leading, no

16   foundation.

17   BY MR. KAPLAN:

18       Q.   What's the answer?

19           MS. WILLIS:  Same objections.

20           THE WITNESS:  Correct.

21   BY MR. KAPLAN:

22       Q.   By the way -- let's see.  So next to the

23   top $50,000 number -- strike that.  I forgot if I

24   asked this.

25           You are the one who inputted these two

                                        Page 173

CONFIDENTIAL

1    50,000s; correct?

2         A.   Right.

3         Q.   Now, next to the first 50,000 or the top

4    50,000 is -- looks like it says JE.  Do you see

5    that?

6         A.   It's probably J-E for journal entry.

7         Q.   Okay.  What's that mean?

8         A.   Well, since I physically don't get the

9    money, I record it from a piece of paper that

10   William Morris sends me by a journal entry.

11        Q.   Okay.  What's -- then next to the bottom

12   50,000 --

13        A.   CR.

14        Q.   CR, what's that mean?

15        A.   That's money, just credit, cash,

16   whatever.

17        Q.   Why do you use the CR as opposed to the

18   JE?

19        A.   Because it's recorded two different ways.

20   The CR, I have to actually issue a deposit slip.

21        Q.   I see.  So whenever there is a CR,

22   that -- that means that you actually issued a

23   deposit slip and deposited the check in the bank?

24        A.   Correct.

25        Q.   And that would be true for anytime there

Page 174

CONFIDENTIAL

1    is a CR on this document?

2         A.    Yes.

3         Q.    And that would be true of anytime there

4    is a CR on Exhibits 4 through 7?

5         A.    Correct.

6         Q.    And whenever -- well, okay.  So let's

7    just go quickly through a few of these.  Turn the

8    page to page MKA3.

9         A.    Page 3?

10        Q.    Yeah.

11        A.    All right.

12        Q.    So do you see he show that's recorded

13   here of Okmulgee, Oklahoma, June 22nd, 2013?

14        A.    You're talking about this one?  Yeah,

15   what about it?

16        Q.    All right.  So am I correct that -- that

17   Mr. Robinson earned $80,000 in gross income from

18   that show?

19             MS. WILLIS:   Objection; calls for

20   speculation, leading.

21             THE WITNESS:   Yes.

22   BY MR. KAPLAN:

23        Q.    And below the Toronto Star Stage Show in

24   Toronto, Canada, do you see that?

25        A.    Yeah.

Page 175

1      Q.   All right.  Mr. Robinson earned $100,000

2  for that show or he earned 100 gross on that show?

3           MS. WILLIS:  Objection; calls for

4  speculation, leading.

5           THE WITNESS:  Correct.

6  BY MR. KAPLAN:

7      Q.   So if I was to go through the entire

8  document with you, including Exhibits 4, 5, 6, 7

9  and, of course, Exhibit 3, the -- I would be able

10  to look at the gross amount that was earned or see

11  the gross amount that was earned for each show that

12  Mr. Robinson performed and it's reflected on these

13  ledgers?

14           MS. WILLIS:  Objection; calls for

15  speculation, leading.

16           THE WITNESS:  Correct.

17  BY MR. KAPLAN:

18      Q.   And those gross amounts would be based on

19  the procedure that you previously testified about

20  in terms of recording the information from WME and

21  confirming it in the bank account as well as your

22  deposit of checks that were given to you by Earl

23  Bryant?

24           MS. WILLIS:  Objection; calls for

25  speculation, leading, no foundations.

Page 176

CONFIDENTIAL

```
 1            THE WITNESS:  Yes.
 2     BY MR. KAPLAN:
 3         Q.   All right.  And take a look at Exhibit 4
 4     real quickly.
 5         A.   Okay.
 6         Q.   All right.  Unfortunately, these aren't
 7     Bates stamped.  But if you turn to the page, which
 8     is --
 9         A.   Well, tell me what's on top.
10         Q.   5172-05.
11         A.   5172?
12         Q.   Correct.
13         A.   5172-05?
14         Q.   That's it.
15         A.   Okay.
16         Q.   All right.  Do you see -- so there's a
17     recording here for the Seaside Summer Concert,
18     Coney Island, you see that?
19         A.   Yes.
20         Q.   You recorded all this information; right?
21         A.   Correct.
22         Q.   What was Mr. Robinson's gross income for
23     -- withdrawn.
24              What was Mr. Robinson's gross earnings on
25     this particular show?
```

Page 177

CONFIDENTIAL

```
 1              MS. WILLIS:   Objection; calls for
 2    speculation.
 3              THE WITNESS:   80,000.
 4    BY MR. KAPLAN:
 5        Q.   Okay.  All right.  Let me take a quick
 6    break.
 7              (A brief lunch^ recess was taken.)
 8    BY MR. KAPLAN:
 9        Q.   Before we took a quick break, we were
10    talking about Exhibit 4, page 5172-05.  We're
11    talking about the Coney Island show.
12              Can you tell me what the gross earnings
13    was on that show based on this?
14              MS. WILLIS:   Objection; calls for
15    speculation.
16              THE WITNESS:   5172?
17    BY MR. KAPLAN:
18        Q.   Correct.
19        A.   We were in four?
20        Q.   Correct.
21        A.   I thought we were finished.  I turned it
22    over.
23        Q.   Sorry, that was my fault.
24        A.   80,000.
25        Q.   Okay.  Were there some debits on this
```

Page 178

CONFIDENTIAL

1    one?

2              MS. WILLIS:   I'm sorry, which page are

3    you looking at, Counsel?

4              MR. KAPLAN:   5172.

5              THE WITNESS:   We had to return money to

6    the buyer for $10,000.

7    BY MR. KAPLAN:

8        Q.   Okay.   So was the gross, then, 70,000 not

9    80?

10             MS. WILLIS:   Objection.

11             THE WITNESS:   Yeah, he was supposed to be

12   paid 80,000.   But we gave them 10,000 back.   I

13   can't --

14             MS. WILLIS:   So my objection to the

15   question was calls for speculation, vague and

16   ambiguous.

17             MS. WILLIS:   So, Ms. Stern, if you could

18   just pause for a bit --

19             THE WITNESS:   I couldn't hear either one

20   of them.

21             MS. WILLIS:   If you can just pause for a

22   moment and give me a chance to make my objection so

23   that the court reporter -- because she can't take

24   it down when I'm talking and you're talking and

25   Mr. Kaplan's talking.

1          THE WITNESS:  Okay.

2          MR. KAPLAN:  And, Jan, what I can do to

3    help this process is I can do a hand motion like

4    this, especially when it's your turn to give the

5    answer.  This way that will give an opportunity for

6    Rhonda to make any objections she may want to make.

7          Sound fair?

8          THE WITNESS:  Fine.  You should put your

9    objections on a record, you know, on a recording so

10   you don't have to keep saying them.

11         MS. WILLIS:  Well, it's just federal

12   court procedure.  I'm just following federal court

13   procedure.

14         THE WITNESS:  I'm only kidding.

15   BY MR. KAPLAN:

16      Q.   So is the total gross earnings, then, on

17   this show $70,000?

18      A.   Right.

19         MS. WILLIS:  Objection; calls for

20   speculation, vague and ambiguous.

21         THE WITNESS:  Right.

22   BY MR. KAPLAN:

23      Q.   Okay.  And the basis for your knowledge

24   is the procedure that you have been testifying

25   about today, that you have already told us about?

Page 180

1          MS. WILLIS:   Objection; vague and

2     ambiguous.

3     BY MR. KAPLAN:

4          Q.   And that procedure is your receipt of a

5     check and deposit of that check from Earl Bryant

6     and your notification of the receipt of money into

7     Mr. Robinson's account from WME and your

8     confirmation of that on an online bank account?

9          MS. WILLIS:   Objection; vague and

10    ambiguous, compound, calls for speculation,

11    leading.

12    BY MR. KAPLAN:

13         Q.   Is that correct?

14         A.   Yes.

15         MS. WILLIS:   Same objections.

16    BY MR. KAPLAN:

17         Q.   And just for ease, if I refer to that as

18    the procedure, you will understand what I am

19    talking about in this deposition?

20         A.   Yes.

21         Q.   For shorthand?

22         A.   Yes.

23         Q.   All right.   Okay.   Let's take look,

24    everyone, at -- on the top right-hand corner

25    5194/01.

CONFIDENTIAL

1          A.    Okay.

2          Q.    All right.    Are these records that you

3    created for Mr. Robinson's show in Laughlin,

4    Nevada?

5          A.    Yes.

6          Q.    Okay.    And what was Mr. Robinson's gross

7    earnings on the Laughlin show?

8          A.    80,000.

9          Q.    Where do you see 80,000?

10         A.    We're not looking at the same one.    What

11   did you say?    You said 5194?

12         Q.    I'm sorry, 5194-01.    So let the record

13   reflect the witness was on the wrong page.

14         A.    Okay.

15         Q.    Let me reask the question.

16               Is this the record for the Laughlin,

17   Nevada -- or Mr. Robinson's Laughlin, Nevada show?

18         A.    Yes.

19         Q.    And you prepared this?

20         A.    Uh-huh.

21         Q.    Yes?

22         A.    Yes.

23         Q.    And what was Mr. Robinson's gross

24   earnings from the Laughlin show?

25               MS. WILLIS:    Objection; calls for

1    speculation, vague and ambiguous, leading.

2          THE WITNESS:  95,000.

3    BY MR. KAPLAN:

4          Q.   And your basis for that answer is based

5    on a procedure you previously testified to?

6          A.   Correct.

7          MS. WILLIS:  Same objection; vague and

8    ambiguous, calls for speculation?

9    BY MR. KAPLAN:

10         Q.   Ms. Stern, if you will turn to, again,

11    same exhibit, Exhibit 4, to page 5197-24.

12         A.   Okay.

13         Q.   Okay.  Is this your -- the record you

14    prepared for the -- Mr. Robinson's Durant, Oklahoma

15    show?

16         A.   Yes.

17         Q.   Okay.

18         MS. WILLIS:  I'm sorry, what page are we

19    on, Counsel?

20         MR. KAPLAN:  Sure.  It's 51947-24.

21         THE WITNESS:  I believe it's the last

22    page.

23         MS. WILLIS:  Okay.

24    BY MR. KAPLAN:

25         Q.   That's correct.  And what was

```
 1    Mr. Robinson's gross earnings on the Durant,
 2    Oklahoma show?
 3              MS. WILLIS:   Objection; calls for
 4    speculation.
 5              THE WITNESS:   85,000.
 6    BY MR. KAPLAN:
 7         Q.   And is your basis for that answer the
 8    procedure you previously testified about?
 9              MS. WILLIS:   Same objection; calls for
10    speculation, no adequate foundation.
11              THE WITNESS:   Yes.
12    BY MR. KAPLAN:
13         Q.   Okay.   Let's take a look at Exhibit 5
14    very quickly.   Okay.   Take a look at page 5210-28
15    of Exhibit 5.   Let me know when you're there.
16         A.   5120-what?
17         Q.   Twenty-eight.
18         A.   Okay.
19         Q.   All right.   Is this your record for
20    Mr. Robinson's --
21              MS. WILLIS:   Which one are you saying?
22              THE WITNESS:   5210.
23              MR. KAPLAN:   Dash 28.
24              MS. WILLIS:   Okay.
25    / / /
```

Page 184

CONFIDENTIAL

1   BY MR. KAPLAN:

2        Q.   Ms. Stern, is this your record that you

3   prepared for Ms. -- Mr. Robinson's Rama, Ontario

4   performance?

5        A.   Yes.

6             MS. WILLIS:   I'm sorry, where?

7             MR. KAPLAN:   Rama, R-A-M-A.

8   BY MR. KAPLAN:

9        Q.   And what was Mr. Robinson's earnings,

10  gross earnings, on that show?

11            MS. WILLIS:   Objection; calls for

12  speculation.

13            THE WITNESS:   80,000.

14  BY MR. KAPLAN:

15       Q.   And is your basis for that answer the

16  procedure that you previously testified about?

17            MS. WILLIS:   Same objection; vague and

18  ambiguous, calls for speculation, no foundation --

19  no proper foundation.

20            THE WITNESS:   Yes.

21  BY MR. KAPLAN:

22       Q.   Okay.   You can put that to the side.

23            Let's go back to Exhibit 3.

24       A.   To number three?

25       Q.   Correct.

Page 185

1          A.     Okay.

2          Q.     First page, MKA1.   At the top there, is

3    that your record for Mr. Robinson's San Ramon,

4    California performance?

5          A.     I can hardly read it.   Yeah.

6          Q.     Okay.   And what was Mr. Robinson's gross

7    earnings from the San Ramon performance?

8               MS. WILLIS:   Objection; calls for

9    speculation, vague and ambiguous.

10              THE WITNESS:   40,000.

11   BY MR. KAPLAN:

12         Q.     Okay.   And the basis for your answer is

13   the procedure you previously testified about?

14              MS. WILLIS:   Same objection; vague and

15   ambiguous, calls for speculation, no proper

16   foundation.

17              THE WITNESS:   Yes.

18              MR. KAPLAN:   So Rhonda, I'm going to be

19   asking the same three questions, I believe, for

20   these performances.

21              MS. WILLIS:   Can I have a running

22   objection?

23              MR. KAPLAN:   I was going to ask if you

24   prefer that.

25              MS. WILLIS:   Yeah.

Page 186

CONFIDENTIAL

```
 1              MR. KAPLAN:  And we don't have to do it
 2   this way.  But I'll ask if you want to do it for
 3   efficiency purposes, and if you say no, I
 4   understand.
 5              What I'd like to ask an answer is for
 6   each of these shows identified here whether or not
 7   it was her record of that show what the gross --
 8   what Mr. Robinson's gross earnings were for for
 9   that show and whether the basis for that answer is
10   the procedure she's testified about.
11              MS. WILLIS:  Right.  And our objection
12   will be that it's vague and ambiguous, calls for
13   speculation and that there's no proper foundation.
14              MR. KAPLAN:  So do we have an agreement
15   that you will have a running objection and we could
16   just have the witness answer those three questions
17   to each of these shows without me having to ask
18   each of those three questions and you having to
19   object?
20              MS. WILLIS:  Sure.  I have a stipulation
21   from you that my objection will apply to each of
22   those questions.  My objection of calls for
23   speculation, vague and ambiguous, no proper
24   foundation, and I would add leading as well.
25              MR. KAPLAN:  Right.  And we'll stimulate
```

Page 187

CONFIDENTIAL

1    that you will be making that objection to each of

2    those questions.  Obviously, I'm not agreeing --

3              MS. WILLIS:  I understand.  But I'm just

4    saying so I don't have to make the objection after

5    every question, we have a stipulation that you

6    would agree my objections apply to each and every

7    question.

8              MR. KAPLAN:  We have a stipulation on

9    that.

10             MS. WILLIS:  Okay.

11   BY MR. KAPLAN:

12        Q.   So Ms. Sterns, Ms. Wills and I have

13   entered into a stipulation for the purpose of this

14   part of this deposition at least to try to

15   efficiently get this part done.  What I want to do

16   is for the rest of Exhibit 3, I want to go -- you

17   to go through each show and tell me -- answer each

18   of the following three questions for each show.  Is

19   this your -- for example, is this your record for

20   the Vacaville, California show?  If the answer is,

21   yes, I want you to tell me what Mr. Robinson's

22   gross earnings were from that show and tell me if

23   the basis for that answer was the procedure that

24   you previously testified about?

25        A.   Which do you want first?

CONFIDENTIAL

1          Q.    Let's start with Vacaville --

2          A.    Okay.

3          Q.    -- on page one.

4          A.    $40,000.

5          Q.    Is his gross earnings?

6          A.    Is his gross earnings.

7          Q.    And the basis for your answer is the

8     procedure?

9          A.    The same procedure.

10         Q.    And this is your record for the Vacaville

11    show?

12         A.    Yes, it is.

13         Q.    Next page, this is your record on the top

14    for the Buffalo Bills, Primm, Nevada show?

15         A.    That's correct.

16         Q.    What's Mr. Robinson's gross earnings on

17    that show?

18         A.    100,000.

19         Q.    And the basis for that answer is the

20    procedure you testified about?

21         A.    Same procedure.

22         Q.    Next show, Meyer Gardens amphitheater,

23    Grand Rapids, this is your record on page 2 for

24    that show?

25         A.    Yes, it is.   $80,000.

                                        Page 189

1       Q.   Is Mr. Robinson's gross earnings on that

2   show?

3       A.   Yes.

4       Q.   And the basis?

5       A.   Same basis.

6       Q.   The procedure?

7       A.   Yeah.

8       Q.   Yes?

9       A.   Yes.

10      Q.   Okay.  All right.   On the top of page 2

11   going on to page 3 is the Yonkers, New York show.

12   Is this your record for the Yonkers, New York show?

13      A.   Yes, it is.

14      Q.   Mr. Robinson's gross earnings on that

15   show?

16      A.   85,000.

17      Q.   The basis is the procedure?

18      A.   Same procedure.

19      Q.   Next is the O-K-M-U-L-G-E-E, Oklahoma.

20      A.   Yes.

21      Q.   This is your record for that show?

22      A.   Yes, it is.

23      Q.   Gross earnings?

24      A.   Eighty thousand.

25      Q.   The basis is your procedure?

Page 190

CONFIDENTIAL

1        A.    Same procedure.

2        Q.    Toronto Star, is this your record on

3    page 3 for the Toronto Star performance?

4        A.    Yes, it is.

5        Q.    Gross earnings?

6        A.    100,000.

7        Q.    The basis is the procedure?

8        A.    Same basis.

9              Are we going to go through every show?

10             MR. KAPLAN:   Well, let me ask you this,

11   Rhonda, can we agree that for the rest of this

12   document that Ms. Stern's answer for each of the

13   shows would be the same?

14             MS. WILLIS:   Well, I think you should ask

15   her that question, not me.

16   BY MR. KAPLAN:

17       Q.    Ms. Stern, let me ask you this question:

18   We have gone through some of these shows already.

19             For each of the shows identified on this

20   document, these are your record for that show;

21   correct?

22       A.    That's correct.

23       Q.    And each record identifies the gross

24   earnings, correct, on that show?

25       A.    Correct.

Page 191

CONFIDENTIAL

1        Q.    And the basis for those gross earnings

2   was the procedure you testified about; correct?

3        A.    Correct.

4        Q.    All right.   So let me just run through

5   the gross earnings.

6              On Saratoga, what's the gross earnings?

7        A.    85,000.

8        Q.    On the Venetian, Las Vegas, gross

9   earnings?

10       A.    90,000.

11             MS. WILLIS:   And, of course, our running

12   objection.

13             MR. KAPLAN:   Of course.

14             MS. WILLIS:   Our stipulation.

15             MR. KAPLAN:   Agreed.

16   BY MR. KAPLAN:

17       Q.    On the Temecula, California show gross

18   earnings?

19       A.    80,000.

20       Q.    Turn the page to page 5.   On the Wolf

21   Lake, Hammond, Indiana show, what are the gross

22   earnings?

23       A.    85,000.

24       Q.    All right.   And the Sloan, Iowa show,

25   what were the gross earnings?

Page 192

CONFIDENTIAL

1          A.    85,000.

2          Q.    On -- turn the page, please, to page 6.

3    The Baton Rouge, Louisiana show, what were the

4    gross earnings?

5          A.    200,000.

6          Q.    Okay.  Niagara Falls show, what were the

7    gross earnings?

8          A.    100,000.

9          Q.    Page seven, please.  The Sterling Heights

10   Michigan show, what was the gross earnings?

11         A.    100,000.

12         Q.    The Carmel, Indiana show, what were the

13   gross earnings?

14         A.    80,000.

15         Q.    Chicago, Illinois show, what was the

16   gross earnings?

17         A.    100,000.

18         Q.    For the record we're on page 8 now.

19               Florence, Indiana, what was the gross

20   earnings on that show?

21         A.    85,000.

22         Q.    Cerritos, California, which is on

23   page eight and nine, what was the gross earnings on

24   that?

25         A.    Cerritos?

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1          Q.    It goes on to the next page.

2          A.    $83,183.25.

3          Q.    Okay.  On page 9, the Newark, New Jersey

4    show, what was the gross earnings on that?

5          A.    We are going through every show?

6          Q.    We are.

7          A.    Oh, God.

8          Q.    We are almost done, though.

9          A.    What did you say, Newark?

10         Q.    Correct.

11         A.    80,000.

12              MS. WILLIS:  You want to just ask her the

13   question of whether or not if she wants to look at

14   these and maybe tell you whether or not she would

15   state that that's what she thinks it is.  I mean,

16   you asked her the cumulative question for the other

17   one.  I thought you were going to --

18              MR. KAPLAN:  Yeah.  I wish I could, but

19   since the answer is different for -- the gross

20   earning is different for each show, I don't know

21   that I can get sort of a cumulative answer.

22              MS. WILLIS:  Well, I think your question

23   would be would it be the amounts that you have

24   listed here reflect what you think the gross

25   earnings are.

                                        Page 194

1           MR. KAPLAN:  But I want to make sure the

2    record's clear as to what those numbers are since

3    there's different stuff.  I think it will take five

4    minutes to go through these.

5           MS. WILLIS:  I mean, we have the same

6    objections.

7           MR. KAPLAN:  You do.  You do.

8    BY MR. KAPLAN:

9       Q.   Newark, what's the gross on that?

10      A.   80,000.

11      Q.   What's the gross on Pasadena?

12      A.   90,000.

13      Q.   Turn the page to page 10.

14           The gross on Tunica Mississippi?  I

15    missed one, sorry.

16           So on pages 9 and 10, Bethlehem,

17    Pennsylvania, what's the gross on that?

18      A.   100,000.

19      Q.   Okay.  Tunica, Mississippi on page ten,

20    what's the gross on that?

21      A.   100,000.

22      Q.   Okay.  Chicago, Illinois on page 10,

23    what's the gross --

24      A.   115,000.

25      Q.   On pages 10 and 11, Highland, California

Page 195

CONFIDENTIAL

1    show, what was the gross on that?

2         A.    80,000.

3              MS. WILLIS:   Which page are we on?

4              MR. KAPLAN:   Eleven.

5    BY MR. KAPLAN:

6         Q.    The Las Vegas, Nevada show on page 11,

7    what was the gross on that?

8         A.    825.

9         Q.    The Lake Buena Vista, Florida show on

10   page 11, what's the gross on that?

11        A.    100,000.

12        Q.    Page 12, Tacoma, Washington show, what

13   was the gross?

14        A.    100,000.

15        Q.    The Windsor, Ontario show on page 12?

16        A.    85,000.

17        Q.    On pages 12 and 13, what's the gross on

18   on the Anniston, Alabama show?

19        A.    80,000.

20        Q.    On page 13, what's the gross on the West

21   Palm Beach show?

22        A.    80,000.

23        Q.    On page 13, the Miami, Florida show, what

24   was the gross on that?

25        A.    775.

Page 196

CONFIDENTIAL

1          Q.    On pages 13 and 14, what's the gross on

2     the Dallas, Texas show?

3          A.    110,000.

4          Q.    Okay.  Phoenix, Arizona, what was the

5     gross on that show on page 14?

6          A.    100,000.

7          Q.    The Morongo Casino show on page 14?

8          A.    85,000.

9          Q.    And pages 14 and 15, you see the Atlantic

10    City, New Jersey show?

11         A.    100,000.

12         Q.    On page 15, the Bethesda, Maryland show?

13         A.    80,000.

14         Q.    On page 15, what's the gross on the

15    New York, New York show?

16         A.    Hundred and -- I can't even read it.

17         Q.    It's approximately $111,574.56.  That's

18    correct?

19         A.    Yes.

20         Q.    Turn the page to page 16, Mashantucket,

21    Connecticut, what was the gross on that.

22         A.    80,000.

23         Q.    Meadowlands, Pennsylvania?

24         A.    175.

25         Q.    Greek Theater in L.A.?

Page 197

CONFIDENTIAL

```
1          A.   125,000.

2          Q.   Page 17, what's the gross on San Antonio,

3    Texas?

4          A.   82,177.34.

5          Q.   Okay.  Biloxi, Mississippi?

6          A.   80,000.

7          Q.   On pages 17 and 18, Montgomery, Alabama?

8          A.   895,000.

9          Q.   Newkirk, Oklahoma on page 18?

10         A.   80,000.

11         Q.   San Diego?

12         A.   80,000.

13         Q.   San Francisco?

14         A.   100,000.

15         Q.   Let the record reflect that's on 18 and

16    19.

17              Tucson, Arizona on page 19?

18         A.   85,000.

19         Q.   Littleton, Colorado?

20         A.   85,000.

21         Q.   Niagara Falls, New York on page 19 and

22    20?

23         A.   100,000.

24         Q.   Toledo, Ohio on page 20?

25         A.   85,000.
```

Page 198

CONFIDENTIAL

1      Q.    Milwaukee, Wisconsin?

2      A.    79,000.

3      Q.    On page 21, Valley Center, California?

4      A.    80,000.

5      Q.    Las Vegas, Nevada on page 21?

6      A.    85,000.

7      Q.    Virginia Beach, Virginia?

8      A.    80,000.

9      Q.    Morristown, New Jersey on page 22?

10     A.    85,000.

11     Q.    Bethlehem, Pennsylvania?

12     A.    100,000.

13     Q.    And on page 22 and 23 Temecula,

14  California?

15     A.    80,000.

16     Q.    On Page 23, Willemstad, Curacao?

17     A.    150,000.

18     Q.    Newport Beach, California?

19     A.    100,000.

20     Q.    On pages 23 and 24, Albuquerque, New

21  Mexico?

22     A.    90,000.

23     Q.    Okay.  On page 24 the Genesee Theater?

24     A.    Ninety.

25     Q.    On page 24 and 25, Brooklyn, New York?

Page 199

CONFIDENTIAL

1          A.   100,000.

2          Q.   On page 25, Baltimore, Maryland.

3          A.   Eighty.

4          Q.   On King of Prussia, Pennsylvania?

5          A.   85.

6          Q.   On pages 25 and 26, Niagara Falls,

7    Canada?

8          A.   170,000.

9          Q.   On page 26, Calgary, Canada?

10         A.   80,000.

11         Q.   On pages 26 and 27, Richmond, Canada?

12         A.   80,000.

13         Q.   On page 27, Bossier City, Louisiana?

14         A.   85,000.

15         Q.   Saint Petersburg, Florida?

16         A.   Eighty.

17         Q.   On page 27 and 28, Fort Myers, Florida?

18         A.   Eighty.

19         Q.   On page 28, Crown Theater, Fayetteville,

20   North Carolina?

21         A.   Eighty.

22         Q.   Columbus, Ohio?

23         A.   250,000.

24         Q.   Columbus on page 28?

25         A.   I'm sorry, I skipped it.   Eighty.

CONFIDENTIAL

1      Q.    All right.   And then on page 28, 29, the
2    Carnival Crews Line show?
3      A.    250,000.
4      Q.    Hollywood Bowl on page 29?
5      A.    300,000.
6      Q.    Austin, Texas?
7      A.    80,000.
8      Q.    All right.   On page 29 and 30, Tacoma,
9    Washington?
10     A.    100,000.
11     Q.    On page 30, Indio, California?
12     A.    100,000.
13     Q.    Okay.   Atlantic City, New Jersey?
14     A.    100,000.
15     Q.    Page 31, New Buffalo, Michigan?
16     A.    85.
17     Q.    Pittsburgh, Pennsylvania?
18     A.    100.
19     Q.    Page 31 and 32, Park City, Utah?
20     A.    85.
21     Q.    Lafayette, California on 32?
22     A.    100 -- Jesus, I can't read it.
23     Q.    104?
24     A.    I see 110.   I can't read that, I'm sorry.
25     Q.    My version says 110, approximately that

Page 201

CONFIDENTIAL

1    amount, though?

2              MS. WILLIS:   I'm going to object to

3    counsel testifying.

4    BY MR. KAPLAN:

5         Q.   I apologize, Ms. Stern, what do you think

6    it says?

7         A.   I am trying to read it, but it's so -- it

8    looks like 110, yeah.

9         Q.   Okay.  Livermore, California?

10        A.   100.

11        Q.   All right.  On page 32 and 33, Roanoke

12   Park, California?

13        A.   100.

14        Q.   On page 33, Downstream Casino?

15        A.   100.

16        Q.   Hollywood, Florida?

17        A.   105.

18        Q.   On page 33 and 34, Bethlehem,

19   Pennsylvania?

20        A.   100.

21        Q.   Desert Diamond Casino on page 34?

22        A.   100.

23        Q.   Ridgefield, Connecticut?

24        A.   100.

25        Q.   Rama Casino, Rama, Canada on page --

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

1         A.   100.

2         Q.   -- on page 35?

3              Page 36, Nashville, Tennessee?

4         A.   200.

5         Q.   Page 37, Westbury, New York?

6         A.   100.

7         Q.   Chandler, Arizona?

8         A.   175.

9         Q.   On page 37 and 38, the Thackerville,

10   Oklahoma show?

11        A.   100.

12        Q.   The River Creek -- or I'm sorry.

13        A.   100.

14        Q.   River Creek Resort and Casino?

15        A.   100.

16        Q.   Hard Rock in Tulsa, Oklahoma --

17        A.   100.

18        Q.   -- on page 39.

19             Newkirk, Oklahoma on 39 and 40?

20        A.   100.

21        Q.   Okay.

22        A.   Thank God.  We're not going to go through

23   the others, are we?

24        Q.   No, we're done with these.

25             Was there ever a time that you had any

Page 203

CONFIDENTIAL

```
 1   conversation with Smokey Robinson where he
 2   instructed you not to make any payments to Eric
 3   Podwall?
 4        A.   I cannot remember whether it was Smokey
 5   or Francis.
 6        Q.   Did one of them have a conversation with
 7   you about not paying Eric Podwall?
 8        A.   Well, I would get a -- an invoice from
 9   Eric which I would show to them and they would say,
10   oh, yeah, pay this, don't pay that.
11        Q.   Do you remember having any conversations
12   where Smokey told you not to pay Eric?
13        A.   I don't remember.
14        Q.   Do you remember any conversations with
15   Francis where she told you not to pay Eric
16   anything?
17        A.   I don't remember.
18        Q.   Do you remember any conversations you had
19   with Eric about not receiving payment?
20        A.   I might have.
21        Q.   What do you recall?
22        A.   I don't remember.  But if anything was
23   questioned where he didn't get paid, yes, I would
24   have a conversation with him.
25        Q.   All right.  In other words, you remember
```

Page 204

CONFIDENTIAL

1    that you -- or you may have had conversation, you

2    just don't remember the substance of them?

3         A.   I might.  I don't remember.

4         Q.   Okay.  Let's just quickly look at this

5    document.

6              (Exhibit 9 and Exhibit 10 was marked

7              for identification.)

8    BY MS. WILLIS:

9         Q.   Ms. Stern, I placed before you two

10   documents Exhibit 9 and Exhibit 10.  I will

11   represent Mr. Robinson has produced both of these

12   documents in this litigation.

13             Do you recognize Exhibit 9?

14        A.   Yes, because I recognize my handwriting.

15        Q.   Is that your handwriting on the --

16        A.   Yes, that's the way I write numbers.

17        Q.   Just so the record is clear, in the

18   amount column, that's your handwritten notations?

19             MS. WILLIS:  On Exhibit 9.

20             THE WITNESS:  $78,500.

21   BY MR. KAPLAN:

22        Q.   And that column, though, there's some

23   handwritten notes that you wrote that?

24        A.   Yes, those -- these were commissions that

25   Eric was requesting and those were the shows that

Page 205

CONFIDENTIAL

```
 1   he was requesting it for.
 2        Q.   So you wrote handwritten the numbers for
 3   each showing he was requesting?
 4        A.   That's right.
 5        Q.   Okay.  Why were you doing that?
 6        A.   Because that's how I have to enter it in
 7   the ledger.
 8        Q.   Okay.  Did you ever have any
 9   conversations with Smokey Robinson about this
10   invoice?
11        A.   Well, obviously I must have because
12   somebody wrote "void" on this check, and that's not
13   my handwriting.
14        Q.   You're referring to Exhibit 10?
15        A.   Pardon me?
16        Q.   You're referring to Exhibit 10?
17        A.   Yes.
18        Q.   Okay.  Well, do you recall having any
19   conversations with Smokey Robinson about Exhibit 9?
20        A.   No.
21        Q.   Do you recall writing a check for the
22   invoice, which is Exhibit 9?
23        A.   Yes, I cut the check for the invoice and
24   they voided it.
25        Q.   Who voided it?
```

Page 206

CONFIDENTIAL

1          A.    Either Francis or Smokey.   But I would

2    have to say Francis because she signed the checks.

3          Q.    Okay.  You didn't void it, though, did

4    you?

5          A.    No, that's not -- well, I did after she

6    sent this back voided.

7          Q.    Okay.  Let me ask it a little

8    differently.

9                On Exhibit 10, there is a handwritten

10   note that says "void."  You see that?

11         A.    Yes.

12         Q.    Is that your writing?

13         A.    No.

14         Q.    Do you recognize that writing?

15         A.    I think its Francis'.

16         Q.    Do you remember having any conversations

17   with anyone about this check being voided?

18         A.    A conversation, no.

19         Q.    And after seeing Exhibit 9 or 10, do

20   these refresh your memory at all as to whether or

21   not you had any conversations with anyone about

22   paying Eric or not?

23         A.    No, I wouldn't have questioned it.  It's

24   their money.

25         Q.    Okay.  Have you had any discussions with

                                          Page 207

```
 1    Mr. Robinson about this lawsuit?
 2         A.    The lawsuit?
 3         Q.    Eric's lawsuit.
 4         A.    No.
 5         Q.    Have you had any discussions with
 6    Mr. Robinson about any dispute he's had with Eric
 7    Podwall about payment of commissions?
 8         A.    No.
 9         Q.    Have you had any discussion with any
10    attorneys for Mr. Robinson about either the lawsuit
11    with Eric or Eric's dispute with Smokey Robinson?
12         A.    No.
13         Q.    Did anyone ever ask you to look for
14    documents related to this lawsuit?
15         A.    To what?
16         Q.    Look for documents.  Let me ask it a
17    little differently.
18              Did Mr. Robinson or someone on his behalf
19    ever ask you to look for documents for this
20    lawsuit?
21         A.    No.
22         Q.    Exhibit 9 and 10, do you remember
23    providing these documents to Mr. Robinson or his
24    counsel in connection with this lawsuit?
25         A.    I would have provided it to Francis
```

Page 208

 1   Robinson because she signed all the checks.

 2        Q.   Okay.  Do you know if you provided these

 3   documents, though, Exhibits 9 and 10, to Francis or

 4   anyone else for purposes of this litigation?

 5        A.   For purposes --

 6             MS. WILLIS:  Objection; calls for

 7   speculation.

 8             But go ahead.

 9             THE WITNESS:  For purposes of the

10   litigation, no.

11   BY MR. KAPLAN:

12        Q.   Okay.  Let's take a look at Exhibit 8,

13   which I think it's in the pile already.

14             All right.  Do you recognize Exhibit 8?

15        A.   Eight?

16        Q.   Yes.

17        A.   Yes.

18        Q.   What is Exhibit 8?

19        A.   It's a printout of moneys that we did pay

20   to Eric.

21        Q.   Okay.  The handwritten notes on here, is

22   that your handwriting?

23        A.   Yes, it is.

24        Q.   Okay.  Do you remember when you made

25   these annotations approximately?

Page 209

```
 1         A.   I'm sorry?
 2         Q.   Let me ask -- actually, strike that
 3    question.
 4              So let's take a look at the top.  It
 5    says -- do you see the as at 1648 hours March 2nd,
 6    2017.  Do you see that?
 7         A.   I see it.
 8         Q.   Does that signify that you ran this
 9    report from Datafaction --
10         A.   May I make a correction?  That's not
11    60mm.  That's commission, comm.
12         Q.   I guess what I'm asking, though, is do
13    you see the date of March 2nd of 2017?
14         A.   What are you pointing to?  Oh,
15    March 2017.  Okay.  I see that.
16         Q.   Would that have been the date you ran
17    this report?
18         A.   That's correct.
19         Q.   You used Datafaction to do so?
20         A.   Yes.  That's when I ran it, yes.
21         Q.   Do you know why you ran this report in
22    March 2017?
23         A.   I would assume somebody requested it.
24         Q.   Do you recall someone requesting it from
25    you?
```

                                          Page 210

CONFIDENTIAL

1       A.   No, I don't.

2       Q.   Do you recall providing this to anyone?

3       A.   Well, I must have provided it to

4   somebody.

5       Q.   Okay.  Does this refresh your memory at

6   all whether somebody asked you for documents

7   related to any dispute with Eric Podwall?

8       A.   Can't remember.

9       Q.   But you believe somebody asked you for

10  this?

11      A.   Somebody must have.  I wouldn't have done

12  it on my own.

13      Q.   Okay.  Did you provide -- do you recall

14  who you provided this document to around that time?

15      A.   No.

16      Q.   Now, let's go through your annotations

17  quickly.

18           So there's a one -- you see the one in

19  the circle next to 10,000?

20      A.   Yeah.

21      Q.   And then below, it says Cushman+Wakefield

22  Theater, Brooklyn, New York.

23      A.   That was commission.

24      Q.   You wrote that; right?

25      A.   Yes.

Page 211

1      Q.   What did you mean by that notation?

2      A.   By which notation?

3      Q.   The Cushman & Wakefield Theater,

4  Brooklyn, New York.

5      A.   I'm sorry, I didn't hear you.

6      Q.   This notation here.

7      A.   It's just telling you who he got paid on,

8  which show.

9      Q.   Okay.  And number two, those are just for

10  commissions?

11     A.   Number two were commissions, yes.

12     Q.   Do you know what those were for?

13     A.   I'd have to go back into the books for

14  2013 to find out.

15     Q.   You handled -- let me start this.

16          Did Mr. Robinson make revenue or earnings

17  on the sale of merchandise at his shows?

18          MS. WILLIS:  Objection; calls for

19  speculation.

20          THE WITNESS:  I'm not going to answer

21  that.

22  BY MR. KAPLAN:

23     Q.   Okay.  I appreciate it.  Do you want to

24  tell me why you don't want to answer that?

25     A.   Off the record can we do that?

CONFIDENTIAL

1           MS. WILLIS:  Objection; calls for

2    speculation.

3           No, everything's on the record.

4    BY MR. KAPLAN:

5       Q.   It has to be on the record unless

6    everyone agrees otherwise.

7       A.   Then I will not answer.

8       Q.   Could you tell us -- could you tell us

9    without getting into details just why you don't

10   want to answer?

11          MS. WILLIS:  I will state again, as I

12   told you from beginning, you have a right to not

13   answer questions if you choose not to.

14          THE WITNESS:  Then I choose not to answer

15   that question.

16   BY MR. KAPLAN:

17      Q.   And I appreciate that, Ms. Stern.  But

18   there also has to be some reason why I have to have

19   some understanding.

20          MS. WILLIS:  Ms. Stern, if you want to

21   say you'd like to invoke your Fifth Amendment

22   privilege and not answer, you may state that.

23          THE WITNESS:  Well, but the Fifth

24   Amendment is to protect me; correct?

25   / / /

1           MS. WILLIS:  You can state it for any

2    reason that you want.

3           THE WITNESS:  Then I invoke the Fifth

4    Amendment.

5    BY MR. KAPLAN:

6       Q.   Okay.  I will ask a few more questions.

7           Was Smokey -- was Smokey Robinson paid in

8    cash for merchandise that was sold at his shows?

9           MS. WILLIS:  Same objection.

10          THE WITNESS:  In invoke the Fifth

11   Amendment.

12   BY MR. KAPLAN:

13      Q.   Did Smokey Robinson receive cash for

14   shows that were -- that for his shows in the 2013

15   to 2016 time period for merchandise sold at those

16   shows?

17      A.   I invoke the Fifth Amendment.

18      Q.   All right.  If Mr. Robinson was paid in

19   cash for merchandise at his shows in the 2013 to

20   2016 time period, were those cash proceeds recorded

21   anywhere?

22      A.   I refuse to answer.

23      Q.   On the Fifth?

24      A.   Fifth Amendment.

25      Q.   Were those recorded on your ledgers?

                                        Page 214

1      A.   Fifth Amendment.

2      Q.   Did Mr. Robinson not record his receipt

3  of cash payments from the sale of merchandise at

4  his shows?

5      A.   Fifth Amendment.

6      Q.   Were those -- were Mr. Robinson's receipt

7  of cash payments for merchandise sold at his shows

8  in 2013 to '16 time period, were those reported to

9  Mr. Gary Iskowitz, the individual who prepared

10 Mr. Robinson's tax returns?

11     A.   Fifth Amendment.

12     Q.   Were -- did Mr. Iskowitz report on

13 Mr. Robinson's tax returns whether Mr. Robinson

14 earned revenue from the sale of merchandise at his

15 shows?

16     A.   You would have to ask Mr. Iskowitz what

17 he reported.

18     Q.   Was that information, meaning

19 Mr. Robinson's merchandise cash revenue, told to

20 Mr. Iskowitz?

21     A.   Fifth Amendment.

22     Q.   Did you ever have any conversations with

23 Smokey Robinson about his merchandise sales at his

24 shows during --

25     A.   I never had a conversation about it.

Page 215

CONFIDENTIAL

1      Q.    Okay.  Do you know whether or not

2  Mr. Robinson would pay tax on cash payments he

3  received for merchandise sales at his shows?

4      A.    I have no knowledge of that.

5      Q.    Okay.  Did anyone ever instruct you not

6  to record cash payments from merchandise sales in

7  your records?

8      A.    Fifth Amendment.

9      Q.    Who instructed you, if any, to not make

10 recordings in your ledgers of cash payments made to

11 Smokey Robinson for merchandise sales at his shows?

12          MS. WILLIS:  I am going to object that

13 there's -- that assumes facts not in evidence.

14 There is no evidence of any of this, but you can --

15          THE WITNESS:  Fifth Amendment.

16 BY MR. KAPLAN:

17     Q.    Did someone instruct you of that?

18          MS. WILLIS:  Objection; calls for

19 speculation.

20          THE WITNESS:  Someone instruct me for

21 what?

22 BY MR. KAPLAN:

23     Q.    Not to make recordings in your ledgers of

24 Smokey Robinson's cash receipts or cash payments

25 for merchandise sales at his shows.

Page 216

1          MS. WILLIS:  Same objections.

2          THE WITNESS:  Fifth Amendment.

3     BY MR. KAPLAN:

4          Q.   Was that person Smokey Robinson who

5     provided you those instructions?

6          A.   Fifth Amendment.

7          If I'm saying nobody -- that I have no

8     knowledge of that, how can there be any answers to

9     those questions?

10         Q.   Well, you can tell me that.

11         You also were responsible for -- for

12    paying some of Smokey Robinson's bills; correct?

13         A.   Correct.

14         Q.   Such as to Eric Podwall.  That's an

15    example; right?

16         MS. WILLIS:  Objection; vague and

17    ambiguous, assumes fact not in evidence.

18    BY MR. KAPLAN:

19         Q.   That would be an example of a person or

20    vendor that you would pay bills for on Smokey

21    Robinson's behalf; correct?

22         MS. WILLIS:  Objection; vague and

23    ambiguous, calls for speculation.

24         THE WITNESS:  I don't understand the

25    question.

Page 217

CONFIDENTIAL

1    BY MR. KAPLAN:

2        Q.   I will withdraw it.

3             What are the type of bills you would pay

4    on Smokey Robinson's behalf, some examples?

5        A.   Personal or business.

6        Q.   Let's do business.

7        A.   They would be paid out of Bertam for any

8    expenses that had to do with his performances.

9        Q.   Okay.  Sorry, one other question.  Was it

10   Earl Bryant who instructed you not to record cash

11   payments on your ledgers that were received from

12   sale of merchandise at shows?

13       A.   I never took --

14            MS. WILLIS:  Objection.

15            THE WITNESS:  I'm sorry.

16            MS. WILLIS:  Go ahead.

17            THE WITNESS:  I never took any

18   instructions from Earl Bryant.

19   BY MR. KAPLAN:

20       Q.   Did Earl Bryant, is he the one who would,

21   I guess, take any cash that was made from the sale

22   of merchandise at Smokey's show?

23       A.   You'd have to ask Earl.

24            MS. WILLIS:  Objection; calls for

25   speculation.

Page 218

```
 1              THE WITNESS:  I'm sorry.

 2              MS. WILLIS:  No, you're fine.

 3    BY MR. KAPLAN:

 4         Q.   It's fine.  It doesn't matter.

 5              All right.  So in terms of business

 6    expenses that you would pay, did Smokey Robinson

 7    ever have any issues or problems with anyone in

 8    terms of paying his bills?

 9         A.   Not to my knowledge.

10         Q.   Okay.

11              MR. KAPLAN:  I don't have any further

12    questions.

13              MS. WILLIS:  I just have a few questions.

14              THE WITNESS:  Are we finished?

15              MR. KAPLAN:  Rhonda gets to ask you a few

16    questions.

17              MS. WILLIS:  I get to ask you a few

18    questions.  I will try to make it as quick as

19    possible.

20

21                    EXAMINATION

22    BY MS. WILLIS:

23         Q.   Ms. Stern, when you came in, you

24    mentioned that these days you are kind of having

25    some difficulty with your memory.  Is that fair,
```

Page 219

CONFIDENTIAL

1   you can't remember things as well now as you used

2   to be able to remember?

3        A.   Well, I'm 84 years old.   If they weren't

4   important to me, I guess they didn't stay in my

5   memory.

6        Q.   So it's fair to say, then, that you do

7   have some memory problems; is that fair?

8        A.   Yes.

9             MR. KAPLAN:   Objection; argumentative.

10  BY MS. WILLIS:

11       Q.   And is it also fair to say, Ms. Stern,

12  that you have difficulty hearing; is that fair?

13       A.   Yes, I do.   But that's only recent.

14       Q.   Okay.   When did that start where you had

15  difficulty hearing?

16       A.   Maybe about a year ago.

17       Q.   Is it also fair to say -- because I

18  notice you were having difficulty with reading some

19  of the documents that your sight is -- it's not

20  that good when it comes to small print; is that

21  fair?

22       A.   That's fair.

23       Q.   Okay.   So you could look at things and

24  inadvertently think a one is four or something of

25  that nature?

                                        Page 220

```
 1        A.    Yeah.  But I'm usually -- I would usually

 2   check something to come up with an answer.

 3        Q.    I understand.  But, for example, when you

 4   were looking at that document, you had difficulty,

 5   the one looked like a four to you, I think?

 6        A.    Because it was very, you know.

 7        Q.    Small print?

 8        A.    Yeah.

 9        Q.    So it's fair to say, then, with small

10   print sometimes you might have difficulty with

11   small numbers and small print?

12        A.    I might have now.

13        Q.    When did you think your eyesight --

14   because you mentioned you are 84 years old.  You

15   don't look 84, but I understand you are 84 years

16   old.  So my question is this:  When did you start,

17   I guess, having difficulty seeing smaller print?

18        A.    That's only recent because I need to get

19   new glasses.

20        Q.    So would that have been in the last

21   couple of years?

22        A.    The last year.

23        Q.    Okay.  And before that, were you wearing

24   glasses?

25        A.    Yes.  For close-up work, yes.
```

                                        Page 221

```
 1        Q.    And when did you fart wearing glasses for
 2   close-up work?
 3        A.    I don't remember.
 4        Q.    Would it have been in the last ten years
 5   you ever been wearing glasses for close-up work?
 6        A.    Probably, yeah.
 7        Q.    So in the last ten years, your
 8   eyesight -- in your 70s into your 80s, your
 9   eyesight has been such that you needed glasses in
10   order to see close-up things in small print; is
11   that fair.
12        A.    In my late 70s, yeah.
13        Q.    Okay.  You also -- just so that I'm
14   clear.  You have been talking to Mr. Kaplan; is
15   that correct?  Mr. Kaplan has been calling you and
16   talking to you?
17        A.    Yes.
18        Q.    He has been asking you questions and
19   talking to you and trying to get you to voluntarily
20   come up here and give your testimony; is that fair?
21        A.    Well, I had no qualms about coming to
22   give testimony.
23        Q.    I understand.  But I'm just trying to
24   establish that Mr. Kaplan or somebody in
25   Mr. Kaplan's office, they have been talking to you
```

Page 222

CONFIDENTIAL

1    to get you to come and give testimony; is that

2    right?

3           A.    The only one I spoke to was Mr. Kaplan,

4    and he kind of made me aware that I was going to be

5    subpoenaed and -- yeah.

6           Q.    Okay.  Did he ask you any questions when

7    he talked to you?

8           A.    A few.

9           Q.    Okay.  And what sorts of questions did he

10   ask you?

11          A.    I can't even remember the questions.

12          Q.    Sure.  But he did talk to you on multiple

13   occasions before -- Mr. Kaplan talked to you on

14   multiple occasions before you showed up?

15          A.    Two or three occasions, yes.

16          Q.    And he talked to you about this lawsuit

17   before you showed up here today to give this

18   testimony?

19          A.    Yes.

20          Q.    Did you go to Mr. Robinson's

21   performances -- from 2013 to 2016, did you go to

22   any of his live performances?

23          A.    Not really, no, because I had been to so

24   many already.

25          Q.    So is it fair to say, then --

Page 223

CONFIDENTIAL

1      A.    There may have been one or two, you know.

2      Q.    So if we could look at Exhibit 3, the one

3   you spent so much time going through.  Did you

4   actually go to any of those concerts that are

5   listed in Exhibit 3?  Why don't you just take a

6   second and tell me if you remember going to any of

7   those live performances?

8      A.    I know I went to a couple when he

9   appeared here in Vegas.

10      Q.    Can you take look at this, please, and

11   tell me if you recognize any of these concerts that

12   you actually attended?

13      A.    I went to -- when he appeared here in

14   Hollywood.  But you are only talking about --

15      Q.    Yes, ma'am.

16      A.    -- that year?

17      Q.    I'm talking about the ones that are

18   listed in Exhibit 3, if you actually attended any

19   of those concerts.

20      A.    I can't remember.

21      Q.    You don't remember going to any of those

22   concerts?

23      A.    I know I went to one in Hollywood.

24      Q.    But you don't remember --

25      A.    But I don't know if that was the year.

1   I've been to the one in Temecula.

2        Q.   Do you know if you went to the one that's

3   listed there?

4        A.   I don't remember when I went, but I

5   remember places that I went.

6        Q.   Is it fair to say that Mr. Robinson year

7   after year would basically perform at the same

8   places?

9        A.   Pretty much so, yeah.

10       Q.   Yeah.  So it's just over all the years he

11   was basically doing live performances and live

12   shows at the same places.  But you don't know

13   whether it was back in 2005 --

14       A.   Right.

15       Q.   -- when you went or 2013?

16       A.   Right.  Exactly, yes.

17       Q.   But in looking at Exhibit 3, you can't

18   identify for us any of those specific concerts in

19   Exhibit 3 that you know you went to?

20       A.   Are you forcing me to go through the

21   whole thing of three again?

22       Q.   I'm just asking you -- I'm just asking

23   you because you've kind of gone through every page,

24   and so going through those pages, you recognize any

25   specific concerts?

Page 225

CONFIDENTIAL

1        A.    I can't remember.

2        Q.    You don't remember going to any of the

3   concerts listed on Exhibit 3?

4        A.    No. I know I never went to the Canadian

5   ones.  I can't remember.  Like I said, I've been to

6   the Temecula, but I couldn't say it was that

7   particular one.  No, I'm sorry.

8        Q.    Can you spell Datafaction for us, the

9   software program you have been talking about?  Can

10   you spell that for us?

11        A.    D-A-T-A-F-A-C-T-I-O-N.

12        Q.    Okay.  And Datafaction, did you have to

13   get on the Internet to use Datafaction?

14        A.    Not the Internet.  They were on my

15   personal computer.

16        Q.    So, then, you really don't know whether

17   or not -- the Datafaction, because it was on your

18   personal computer, your hard drive, you don't know

19   whether that was being backed up or not?

20        A.    I know that they backed it up.

21        Q.    How did they back it up?

22        A.    That, I don't know.

23        Q.    Did they come to your home and back it

24   up?

25        A.    No.

Page 226

Personal Court Reporters, A Veritext Company
818-988-1900

1          Q.    Okay.

2          A.    But I'm connected to them or I was on my

3     computer.

4          Q.    Okay.  But do you know for -- do you know

5     when they backed it up?

6          A.    I have no idea.

7          Q.    Okay.  So you just believe in your mind

8     that they probably did back it up; is that fair?

9          A.    No, I know they did, because when I left

10    them or when Smokey let me go, they were able to

11    give all the information to the new accountants.

12         Q.    Do you know how they did that?

13         A.    Electronically, I assume.

14         Q.    Okay.  I guess I'm trying to figure out

15    if with Datafaction you were connected to the

16    Internet with your Datafaction or it was just on

17    your hard drive?

18         A.    It was just on that -- I had my own

19    computer for that.

20         Q.    Okay.  Is it fair to say that with the

21    Datafaction ledgers and the ledgers that we have

22    been talking about, the information put into

23    Datafaction, that was all based on you; is that

24    fair?

25         A.    Based on what was given to me, yes.

Page 227

1          Q.    But the actual input --

2          A.    Yes.

3          Q.    -- those were things that only you did?

4          A.    That's correct.

5          Q.    You didn't have an assistant or anyone

6     else that did that?

7          A.    Not when I was on my own.  When I worked

8     for firms, yes, I did have an assistant.

9          Q.    But from 2011 forward when you were on

10    your own, you didn't have an assistant?

11         A.    No.

12         Q.    For example, everything in Exhibit 3,

13    Exhibit 4, Exhibit 5 --

14         A.    All came from me.

15         Q.    -- all came from you.  You did the input

16    on that?

17         A.    Absolutely.

18         Q.    So is it fair to say that all of that

19    input, that's all based on your accuracy; correct?

20         A.    Hopefully.

21         Q.    And it's all based on your credibility;

22    correct?

23         A.    Yes.

24         Q.    It's all based on your accounting

25    ability; correct?

Page 228

CONFIDENTIAL

```
 1        A.    Yes.

 2        Q.    It's all based on your memory; correct?

 3        A.    Yes.

 4        Q.    It's all based on your honesty; correct?

 5        A.    Yes.

 6        Q.    It's all based on your reliability;

 7   correct?

 8        A.    Yes.

 9        Q.    It's all based on your expertise;

10   correct?

11        A.    Yes.

12        Q.    It's all based on your experience;

13   correct?

14        A.    Yes.

15        Q.    It's all based on your competence;

16   correct?  It's all based on your competence;

17   correct?

18        A.    Yes.

19        Q.    And it's all based on your truthfulness;

20   correct?

21        A.    Also my knowledge, yes.

22        Q.    Okay.  Your truthfulness and your

23   knowledge; correct?

24        A.    Yeah.

25        Q.    So if any of those things were called
```

Page 229

```
 1    into question, that would cause the data itself to
 2    be called into question, wouldn't it?
 3              MR. KAPLAN:  Objection; argumentative.
 4              THE WITNESS:  Pardon me?
 5    BY MS. WILLIS:
 6         Q.   He just made an objection, but you can
 7    answer.
 8         A.   I can't answer that because I don't know
 9    what you're referring to.
10         Q.   Sure.  Have you made any bookkeeping
11    errors as a bookkeeper for Mr. Robinson?
12         A.   I'm sure I did, but they were found later
13    on because the accountants went through the books.
14         Q.   Okay.  So you have been told that you did
15    make bookkeeping errors in maintaining the books
16    for Mr. Robinson?
17         A.   No, I wasn't told.  I've caught my own
18    errors and corrected them.
19         Q.   But are there other errors that you may
20    have made in keeping the books for Mr. Robinson
21    that maybe you didn't catch?
22         A.   Anything's possible.
23         Q.   So you are not disputing it's possible
24    that you did make some bookkeeping errors?
25         A.   I'm not going to dispute it because I
```

Page 230

CONFIDENTIAL

```
 1    don't know.
 2         Q.    I would like to direct you to Exhibit 3,
 3    if I could, and just look at page 2.
 4         A.    Which page?
 5         Q.    Page 2, it's MK0002.  I don't want to
 6    yell.  I'm trying to talk loud enough for you but I
 7    don't want you to say why is this woman yelling at
 8    me.
 9         A.    Okay.
10         Q.    Looking at page two --
11         A.    Yeah.
12         Q.    -- look at the first performance there,
13    the Buffalo Bills performance.
14         A.    Yes.
15         Q.    If you look under the description, it
16    says final payment 2/15/13.  Do you see that?
17         A.    Yes.
18         Q.    That's an example of an error that you
19    made in inputting the data, isn't it?
20         A.    No.
21         Q.    Well, the final payment could not have
22    been received on 2/15/13, could it?  That has to be
23    wrong.
24              MR. KAPLAN:  Objection; argumentative,
25    misstates the document, lacks foundation.
```

Page 231

```
 1              THE WITNESS:  Why would it be wrong?  He
 2    performed on the 15th, which was probably a
 3    weekend, and then I deposited the money on the
 4    18th.
 5    BY MS. WILLIS:
 6         Q.   Ma'am, it could not have been on 2/15/13,
 7    though; correct?
 8              MR. KAPLAN:  Objection.
 9              THE WITNESS:  That's not 13 that's 2/18.
10    BY MS. WILLIS:
11         Q.   No, ma'am.  I'd like if you can look
12    under the Description column, please.
13              And under the payee payor column, it says
14    Primm Valley Casino Resorts.  Do you see that?
15         A.   It says final payment 2/15.
16         Q.   Thirteen.
17         A.   Oh, the year you're talking about?
18         Q.   Yes, ma'am.  That's an error, that's an
19    example of an error that you made; correct?
20         A.   Yes.
21         Q.   So it's fair to say there may be errors
22    that you made?
23         A.   Yes, but it didn't affect the
24    bookkeeping.
25              MS. WILLIS:  I'm going to have to object
```

Page 232

CONFIDENTIAL

```
 1    to that as non responsive.
 2    BY MS. WILLIS:
 3         Q.    I'm simply saying is that an example of
 4    an error that you made?
 5         A.    Yes, I hit the wrong key.
 6         Q.    Correct.   And you sometimes did hit the
 7    wrong key; is that fair?
 8         A.    Of course it's fair.
 9         Q.    Okay.   So then some of your records may
10    be -- may be wrong in certain places?
11              MR. KAPLAN:   Objection; calls for
12    speculation, lacks foundation, assumes facts.
13              THE WITNESS:   Yeah.
14    BY MS. WILLIS:
15         Q.    Well, for example, we just pointed out
16    something that's wrong with your records; correct?
17         A.    Yes, but that didn't affect anything.
18         Q.    I understand.
19              MS. WILLIS:   And I'm going to have to
20    object to that as being non responsive.
21    BY MS. WILLIS:
22         Q.    I'm simply trying to point out that is an
23    example of something that's not correct, it's not
24    accurate.
25              MR. KAPLAN:   Objection; asked and
```

Page 233

CONFIDENTIAL

```
 1    answered, badgering.

 2              THE WITNESS:  I can't hear both of you.

 3    BY MS. WILLIS:

 4         Q.   I said that was an example of something

 5    that is not accurate in your --

 6         A.   That is an example of a mistake, yes.

 7         Q.   And my point is, there may be other

 8    mistakes.  You are not disputing that; correct?

 9              MR. KAPLAN:  Objection; argumentative,

10    lacks foundation, calls for speculation.

11              THE WITNESS:  I am going to object

12    because any mistake that I made did not affect

13    financial end.

14              MS. WILLIS:  I'm going to object to that

15    as being non responsive.

16    BY MS. WILLIS:

17         Q.   I'm simply trying to establish that there

18    may be mistakes, that that my only question is you

19    would agree with me that there may be mistakes.

20              MR. KAPLAN:  Objection; calls for

21    speculation, lacks foundation.

22    BY MS. WILLIS:

23         Q.   That's okay.  You can answer.

24              MR. KAPLAN:  You can answer.

25    / / /
```

Page 234

CONFIDENTIAL

1    BY MS. WILLIS:

2        Q.   My only question is there may be

3    mistakes.

4        A.   There may be a mistake, but --

5        Q.   I am going to -- okay.  Did you -- as

6    part of your job with Mr. Robinson, did you issue

7    1099s?

8        A.   Yes.

9        Q.   And you made some mistakes in issuing

10   1099s; correct?

11       A.   Not to my knowledge.

12       Q.   Well, are you sure about that?  Are you

13   sure you didn't make any mistakes issuing 1099s?

14       A.   I'm not sure about anything at this

15   point, honey.

16           MR. KAPLAN:  Objection; asked and

17   answered, badgering.

18   BY MS. WILLIS:

19       Q.   Do you remember issuing a 1099 to

20   Courtney Barnes that was not accurate?

21       A.   Yes.

22       Q.   In fact, that 1099 that you issued to

23   Courtney Barnes was more than a million dollars

24   off, wasn't it?

25           MR. KAPLAN:  Objection.

Page 235

1          THE WITNESS:  I believe there was

2     something about that.

3     BY MS. WILLIS:

4          Q.   Right.

5          A.   However, I have to say I did have help on

6     the 1099s.

7          Q.   Okay.  But you issued the 1099; correct?

8          A.   Yes.  But somebody helped me prepare it,

9     yeah.

10          Q.   Right.  And Courtney Barnes is

11     Mr. Robinson's publicist, I believe?

12          A.   Yes.

13          Q.   And you issued a 1099 to Mr. Barnes that

14     was more then a million dollars inaccurate;

15     correct?

16          MR. KAPLAN:  Objection.

17          THE WITNESS:  I don't remember the figure

18     but, yes, there was something wrong with it.

19          MR. KAPLAN:  Objection; lacks foundation,

20     assumes evidence not in the record, lacks

21     relevance.

22     BY MS. WILLIS:

23          Q.   It was a large sum that was off?

24          A.   Yes.

25          Q.   In fact, you tried to correct to --

Page 236

1    because you had attributed more -- far more income,

2    over a million dollars more income to Mr. Barnes

3    than he was actually paid by Mr. Robinson; correct?

4         A.   I don't remember exactly, but, yes, I

5    remember there was something wrong with a 1099 to

6    Courtney.

7         Q.   Right.  And so that would be another

8    example of a mistake you made in handling

9    bookkeeping for Mr. Robinson; correct?

10        A.   Yes.

11        Q.   Did you also make a mistake on the 1099

12   that you sent to Claudette Robinson, Mr. Robinson's

13   former wife?

14        A.   I don't remember.

15        Q.   Okay.  But that was -- you handled that

16   1099 for the former Mrs. Robinson, Mrs. Claudette

17   Robinson; correct?

18        A.   Yes, yes.

19        Q.   As you sit here right now, you can't

20   remember that you also made a very large mistake on

21   the 1099 to her?

22        A.   I don't remember.

23        Q.   Okay.  I guess what I'm trying to

24   establish is during your tenure of working for

25   Mr. Robinson when you took over from 2011

                                        Page 237

1    forward --

2         A.    Uh-huh.

3         Q.    -- there were times when you did make

4    mistakes in your bookkeeping; is that fair?

5         A.    Yes.

6         Q.    Would you say that Mr. Robinson trusted

7    you?

8         A.    I think so.

9         Q.    And you were with him a very long time,

10   weren't you?

11        A.    Almost 20 years.

12        Q.    And he relied on you to handle his

13   bookkeeping?

14        A.    Yes.

15        Q.    And he trusted you to handle his

16   bookkeeping?

17        A.    Yes.

18        Q.    I'm now going to ask you a couple of

19   questions.  And if you choose not to answer those

20   questions, I'd like to again tell you you have the

21   absolute right not to do so.

22        A.    Okay.

23        Q.    Was there an incident involving your

24   daughter Donna where she attempted to cash a check

25   at City National where the signature on the check

Page 238

1    of Francis Robinson was forged?

2         A.   I don't remember.

3              MR. KAPLAN:   Objection.   Go ahead.

4    BY MS. WILLIS:

5         Q.   You don't remember that?

6         A.   I refuse to answer.

7         Q.   On the basis of Fifth Amendment.   I'm

8    sorry, just to get the record straight, I want to

9    tell you again you have the right -- I want to be

10   very clear.

11        A.   I refuse to answer on the basis of the

12   Fifth Amendment.

13        Q.   Let me just get my question out and then

14   you can answer so the record is clear.

15             Ms. Stern, do you recall that there was

16   an incident in which your daughter Donna went to

17   City National Bank and attempted to cash a rather

18   large check where the name of Francis Robinson had

19   been forged on the check?

20             MR. KAPLAN:   Objection; irrelevant,

21   harassing, badgering.

22             THE WITNESS:   I refuse to answer.   I take

23   the Fifth Amendment.

24   BY MS. WILLIS:

25        Q.   And if I were to ask you any additional

Page 239

CONFIDENTIAL

1    questions concerning that incident, would you also

2    refuse to answer on the basis of the Fifth

3    Amendment?

4         A.   Yes.

5         Q.   Was there an incident in which

6    Mr. Robinson's home here in Las Vegas was robbed

7    while your daughter Donna was the person who was in

8    charge of housesitting for them?

9              MR. KAPLAN:  Objection; relevance,

10   badgering, harassing.

11             THE WITNESS:  Same refusal.

12   BY MS. WILLIS:

13        Q.   On the basis of the Fifth Amendment?

14        A.   Yes.

15        Q.   Okay.  And is it fair to say if I were to

16   ask you any more questions along that line, you

17   would also refuse to answer on the basis of the

18   Fifth Amendment?

19        A.   Yes.

20        Q.   When Mr. Robinson -- when you worked for

21   Mr. Robinson, did he always pay you?

22        A.   Did he always pay me?

23        Q.   Yes, ma'am.

24        A.   Well, I cut the checks myself.

25        Q.   But you didn't have any problems getting

Page 240

1    paid by Mr. Robinson, did you?

2        A.    Never.

3        Q.    Never.  What kind of a guy is Smokey

4    Robinson?  You worked for him for so long, how

5    would you describe him?

6        A.    Very easygoing.  I don't think he likes

7    to address anything that's controversial.  And I

8    don't know what else to say.

9        Q.    Would you say he is a trusting guy?

10       A.    Trusting?

11       Q.    Yes.

12       A.    As far as I know, yes.

13            MS. WILLIS:  I will pass the witness.

14            THE WITNESS:  But I'm not married to him.

15            MR. KAPLAN:  It's getting late in the

16   day.  I just have a very few follow-ups, Ms. Stern.

17

                    FURTHER EXAMINATION

18   BY MR. KAPLAN:

19       Q.    Again, Exhibits 3 --

20       A.    When did I become Ms. Stern?  I was Jan

21   for a while.

22            MS. WILLIS:  I only called you Ms. Stern

23   because we are in federal court.

24            THE WITNESS:  I understand.

25            MS. WILLIS:  And federal court tends to

                                        Page 241

```
 1    be a little more formal.  I try to be respectful of
 2    the venue that we're in.
 3              MR. KAPLAN:  I will tell you a story off
 4    the record, but you're right.
 5    BY MR. KAPLAN:
 6         Q.   Jan, Exhibits 3 through 7, we have gone
 7    through them in some detail today.
 8         A.   Yeah.
 9         Q.   Do you believe that you prepared those
10    documents in an incompetent manner?
11              MS. WILLIS:  Objection; vague and
12    ambiguous.
13              THE WITNESS:  I believe so.
14    BY MR. KAPLAN:
15         Q.   Incompetent?
16         A.   No, no.  No everything was competent.
17         Q.   Okay.  So you believe Exhibits 3 through
18    7 were prepared in a competent manner?
19         A.   Yes.
20              MS. WILLIS:  Objection; leading.
21    BY MR. KAPLAN:
22         Q.   All right.  Do you think there is
23    anything other than the typographical error counsel
24    pointed out in Exhibit 3, are you aware of any
25    inaccuracies in Exhibits 3 through 7?
```

Page 242

CONFIDENTIAL

1          MS. WILLIS:  Objection; calls for
2   speculation.  And I also object to the use of the
3   words "typographical error."
4          THE WITNESS:  Anything that had to do
5   financially, no, because everything had to check.
6   I balanced a bank account; everything had to
7   balance.  So if I had made a mistake, I would have
8   found it before I even went on.
9   BY MR. KAPLAN:
10         Q.   So you don't believe that there's any
11  inaccuracies in the actual financial numbers in
12  Exhibit 3 through 7?
13         A.   None.
14         Q.   Do you believe that Exhibits 3 through 7
15  are truthful?
16         A.   Yes.
17         MS. WILLIS:  Objection; vague and
18  ambiguous.
19  BY MR. KAPLAN:
20         Q.   There is some questions about your sight.
21         In the 2013 to 2016 time frame, do you
22  believe that you would have problems seeing if you
23  were not -- if you were using your glasses?
24         A.   No, my sight was fine using my glasses,
25  yeah.

                                        Page 243

CONFIDENTIAL

```
 1          MS. WILLIS:  Objection; calls for
 2   speculation.
 3   BY MR. KAPLAN:
 4      Q.   I forgot if I asked this.  I apologize if
 5   I did.
 6          After you were let go by Mr. Robinson,
 7   was your Datafaction access disabled?
 8      A.   Was my what?
 9      Q.   Access to Datafaction disabled.
10      A.   Yes, I had them take it off my computer.
11          MR. KAPLAN:  No more questions.
12          MS. WILLIS:  Just one question.
13
                 FURTHER EXAMINATION
14   BY MS. WILLIS:
15      Q.   Ms. Stern, when you made a mistake on
16   Courtney Barnes' 1099, you didn't catch that
17   financial mistake, did you?
18      A.   No, it was pointed out to me.
19          MS. WILLIS:  I'll pass the witness.
20          You are done.  Thank you, Ms. Sterns.
21          THE REPORTER:  Would you like a copy?
22          MS. WILLIS:  I would.  And I will give
23   you -- if you give me the form, I'll sign it.
24          MR. KAPLAN:  Just real quickly, some
25   admonitions on the record in terms of how we're
```

Page 244

CONFIDENTIAL

1    going to handle the transcript.

2              MS. WILLIS:  You get the original.

3              MR. KAPLAN:  No, I know that part.

4              Ms. Stern, would you like the ability to

5    review your transcript and sign it?

6              MS. WILLIS:  Or are you fine with it?

7              THE WITNESS:  No, I don't think so.  I'd

8    never remember what I said anyway.

9              (Thereupon, the taking of the deposition

10             was concluded at 4:15 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  245

CONFIDENTIAL

```
 1              REPORTER'S DECLARATION

    STATE OF NEVADA)
 2  COUNTY OF CLARK)

         I, Lisa Makowski, CCR No. 345, declare as
 3  follows:

 4       That I reported the taking of the deposition of

 5  the witness, JAN STERN, commencing on Saturday,

 6  April 27, 2019, at the hour of 11:59 a.m.

 7       That prior to being examined, the witness was by

 8  me duly sworn to testify to the truth, the whole

 9  truth, and nothing but the truth; that, before the

10  proceedings' completion, the reading and signing of

11  the deposition has not been requested by the deponent

12  or a party.

13       That I thereafter transcribed said shorthand

14  notes into typewriting and that the typewritten

15  transcript of said deposition is a complete, true and

16  accurate transcription of said shorthand notes taken

17  down at said time.

18       I further declare that I am not a relative or

19  employee of any party involved in said action, nor a

20  person financially interested in the action.

21       Dated at Las Vegas, Nevada this 16th day of

22  May, 2019.

23

24

25       Lisa Makowski, CCR 345
```

Page 246

**[& - 2016]**

| & | |
|---|---|
| **&** 212:3 | |

**0**

**06088** 1:6
**082013** 3:23

**1**

**1** 3:9 4:4 12:13
16:13 20:1,4
144:5
**1,000** 39:13
**1-246** 1:25
**1/1/13** 3:13
**1/1/14** 3:15
**1/1/15** 3:17
**1/1/16** 3:19
**10** 3:4,24 195:13
195:16,22,25
205:6,10 206:14
206:16 207:9,19
208:22 209:3
**10,000** 179:6,12
211:19
**100** 176:2 201:18
201:22 202:10,13
202:15,20,22,24
203:1,6,11,13,15
203:17,20
**100,000** 171:15,22
171:24 172:8,21
172:25 176:1
189:18 191:6
193:8,11,17
195:18,21 196:11
196:14 197:6,11
198:14,23 199:12
199:19 200:1
201:10,12,14
**1020** 163:1 164:1
170:23

**104** 201:23
**105** 202:17
**1099** 40:12 235:19
235:22 236:7,13
237:5,11,16,21
244:16
**1099s** 235:7,10,13
236:6
**11** 195:25 196:6,10
**110** 201:24,25
202:8
**110,000** 197:3
**111,574.56.** 197:17
**115,000** 195:24
**117348** 158:14
**11:59** 1:17 4:2
246:6
**12** 12:12 196:12,15
196:17
**12/31/13** 3:13
**12/31/14** 3:15
**12/31/15** 3:17
**12/31/16** 3:19
**125,000** 198:1
**13** 196:17,20,23
197:1 232:9
**1328** 14:22
**13400** 1:24
**14** 197:1,5,7,9
**14557** 161:24
165:7
**15** 22:4 197:9,12
197:14
**150,000** 199:17
**15th** 232:2
**16** 197:20 215:8
**1648** 210:5
**16490** 246:24
**16th** 246:21
**17** 198:2,7

**170,000** 200:8
**175** 197:24 203:8
**1776** 2:9
**18** 57:22 61:14
198:7,9,15
**18th** 169:13 171:3
232:4
**19** 198:16,17,21
**1901** 2:4
**1935** 14:19
**1956** 22:14
**1960** 21:12,20
22:17,22 23:20
49:18 134:22
**1968** 49:20
**1975** 162:1
**1978** 22:16 25:5,19
26:24 27:19 49:22
50:7,14,20
**1990** 25:20 26:24
49:22
**1999** 25:24 26:1
30:15 33:6,8,15,18
66:8
**1:975** 161:25
162:5,10
**1st** 15:12

**2**

**2** 3:10 4:4 12:13
14:2 144:5,23
161:25 162:10
164:6 189:23
190:10 231:3,5
**2/15** 232:15
**2/15/13** 170:23
171:13 231:16,22
232:6
**2/15/14** 159:16
168:13,20 170:21
**2/18** 232:9

**2/18/14** 170:22
**20** 198:22,24
238:11
**20,000** 129:3
130:17,18,25
131:10,13,19,22
132:24 163:6,9,22
**200** 203:4
**200,000** 193:5
**2000s** 27:20
**2005** 225:13
**201-0005** 2:5
**2011** 29:15,22 30:2
30:9,16,19 32:10
35:3,10,12,21
36:12 37:4,8 38:7
38:14 40:3,18
41:5 42:4 47:17
49:6 57:22 59:24
71:1,14 76:1
228:9 237:25
**2012** 70:23 80:19
**2013** 43:7,14 44:6
44:21 45:14,21
46:5,12 51:15
54:8 61:14 76:16
89:13 90:3,16
91:18 92:16 98:19
102:1 111:16
112:8,23 115:19
130:11,14 131:16
134:5 175:13
212:14 214:14,19
215:8 223:21
225:15 243:21
**2014** 125:20,25
169:14 171:4
**2016** 43:7,14 44:7
44:22 45:14,21
46:5,12 51:15
54:8 76:16 89:13

Page 1

[2016 - 7]

90:3,16 91:18
92:16 98:19 102:1
111:17 112:9,24
134:6 214:15,20
223:21 243:21
**2017**  210:6,13,15
210:22
**2018**  12:14 21:15
21:17,20 22:23
23:20 29:22 30:3
30:10,19 32:10,12
32:13 33:9,19
35:3,22 36:12
37:4,8 38:7,15
40:3,18 41:6 42:4
47:18 49:6 59:24
66:8 70:23 71:1
76:1 80:19 113:12
115:20 144:11,14
144:19 145:3,10
**2019**  1:16 4:1
12:12 246:6,22
**205**  3:22,24
**20th**  129:21
**21**  199:3,5
**219**  3:4
**21st**  12:14
**22**  199:9,13
**22nd**  129:22
130:11,14 131:13
131:14 175:13
**23**  199:13,16,20
**23rd**  129:22
131:15 132:10,13
132:15,18
**24**  199:20,23,25
**241**  3:5
**244**  3:5
**25**  199:25 200:2,6
**250,000**  200:23
201:3

**26**  200:6,9,11
**27**  1:16 4:1 200:11
200:13,17 246:6
**28**  184:23 200:17
200:19,24 201:1
**29**  201:1,4,8
**2:16**  1:6
**2nd**  210:5,13

**3**

**3**  3:11 4:4 12:15
13:1 39:3 123:24
124:1 126:17
127:6,8,12,23
128:12 133:12,19
135:3,8 139:8
141:7,16,19
142:21 143:4,12
156:2,5,25 157:15
158:14 160:10
166:7 169:18
175:9 176:9
185:23 188:16
190:11 191:3
224:2,5,18 225:17
225:19 226:3
228:12 231:2
241:19 242:6,17
242:24,25 243:12
243:14
**30**  201:8,11
**300,000**  201:5
**31**  201:15,19
**310**  2:5
**32**  201:19,21
202:11
**3294513**  1:21
**33**  202:11,14,18
**34**  202:18,21
**345**  1:24 246:2,25
**35**  203:2

**36**  203:3
**37**  203:5,9
**38**  203:9
**39**  203:18,19

**4**

**4**  3:9,10,11,12,12
3:14,16,18,20 4:4
13:8 123:14,17,18
129:1,2,25 130:5
156:2 157:2,5
169:18 175:4
176:8 177:3
178:10 183:11
228:13
**40**  12:16 13:2
129:3 203:19
**40,000**  186:10
189:4
**4043-3**  125:1
**4045**  124:25
**4045-3**  124:15
125:1
**45**  17:3,12 18:22
20:6
**4895**  123:21
**4:15**  245:10

**5**

**5**  3:14 4:5 13:13
124:6,10,11 156:3
176:8 184:13,15
192:20 228:13
**50**  66:17
**50,000**  169:9,15
170:24 171:16,17
171:22 172:5
173:7,23 174:3,4
174:12
**50,000s**  174:1
**500**  2:4

**5120**  184:16
**5160-01**  157:22
**5161-01**  158:3
**5172**  177:11
178:16 179:4
**5172-05**  177:10,13
178:10
**5194**  182:11
**5194-01**  182:12
**5194/01**  181:25
**51947-24**  183:20
**5197-24**  183:11
**5210**  184:22
**5210-28**  184:14
**5243-01**  125:5
**528-4455**  2:11
**5283-01**  125:10
**570**  2:10

**6**

**6**  3:16 4:5 13:16
13:19 124:6,16
125:2,4 156:3
176:8 193:2
**6,001**  122:21
**60**  66:18
**60mm**  210:11
**626**  14:3
**6267**  13:18,22 39:5
39:17
**627**  13:3

**7**

**7**  3:18 4:5 13:21
124:6 125:7,9
126:17 127:6,8,12
127:24 133:12,19
135:3,8 139:8
141:7,16,20
142:21 143:4,12
156:3 157:2,5
164:7 166:7

Page 2

[7 - advise]

169:19 175:4
176:8 242:6,18,25
243:12,14
**7/22/13** 130:4
**70,000** 179:8
180:17
**70s** 222:8,12
**713** 2:11
**74** 123:20
**77056** 2:10
**775** 196:25
**78** 49:23
**78,500** 205:20
**79,000** 199:2

**8**

**8** 3:20 4:6 14:1,1
39:3 193:18
209:12,14,18
**80** 179:9
**80,000** 175:17
178:3,24 179:12
182:8,9 185:13
189:25 192:19
193:14 194:11
195:10 196:2,19
196:22 197:13,22
198:6,10,12 199:4
199:8,15 200:10
200:12 201:7
**80s** 222:8
**82,177.34.** 198:4
**825** 196:8
**83,183.25.** 194:2
**84** 220:3 221:14,15
221:15
**85** 200:5 201:16,20
**85,000** 184:5
190:16 192:7,23
193:1,21 196:16
197:8 198:18,20
198:25 199:6,10

200:14
**89106** 14:23
**895,000** 198:8

**9**

**9** 3:22 194:3
195:16 205:6,10
205:13,19 206:19
206:22 207:19
208:22 209:3
**9,000** 39:13
**90** 26:5
**90,000** 192:10
195:12 199:22
**90067** 2:5
**95,000** 183:2
**99** 26:2,6 66:5

**a**

**a.m.** 1:17 4:2
246:6
**ability** 228:25
245:4
**able** 114:14,17
115:11 176:9
220:2 227:10
**absolute** 6:25
238:21
**absolutely** 7:3 8:7
8:7,12 38:10
67:14 228:17
**acc2** 157:16
**access** 55:3,8,24
56:24 57:1,6,8,10
98:21 111:16
113:14,17 115:25
116:5 121:6
146:23 148:12,14
148:20 153:18
244:7,9
**accommodate**
10:20

**account** 53:17,22
54:6 56:25 59:16
95:15 98:13,16,20
98:22 99:4,7
101:6,16 104:7,19
111:17,23 112:3,9
112:11,20,22
113:6,8,9,12,15,21
113:22 114:11,21
115:3,5,9,15,25
116:6 118:1,2,10
118:16 119:10,18
121:7 128:21
138:24 142:8,11
145:21 157:19
162:14,16,17,21
162:24,25 163:3
168:24,25 169:1,2
170:3 173:11
176:21 181:7,8
243:6
**accountant** 20:10
20:14 24:4 142:19
143:6
**accountants**
145:18 227:11
230:13
**accounting** 45:6
46:17 59:6 80:15
106:8 107:12
228:24
**accounts** 3:21 14:3
28:5 39:7,12 52:5
52:10 53:4 98:11
105:25 111:14,15
111:18,25 122:25
125:17 138:10
162:15 163:5
**accuracy** 142:9
228:19

**accurate** 42:15,20
42:23 94:4 102:10
102:14 110:2
141:8,20,21 142:1
157:10 233:24
234:5 235:20
246:16
**accurately** 117:8
**acted** 21:8
**acting** 71:3 84:8
134:20
**action** 246:19,20
**active** 112:23
**activities** 6:5
**activity** 5:21
**actors** 26:19 27:3
36:8 77:9
**actresses** 27:3
77:9
**actual** 228:1
243:11
**add** 156:12 171:14
187:24
**addicted** 31:7
**additional** 239:25
**additionally** 115:8
**additions** 86:24
**address** 15:14,14
64:10 148:3 241:7
**adequate** 184:10
**adhered** 76:15
139:15
**admitted** 5:8
**admonition** 4:10
7:17
**admonitions**
244:25
**advance** 136:6
**advice** 21:2
**advise** 64:8 65:5
95:13

[advised - approximately]

advised 67:25 81:3
affect 232:23
 233:17 234:12
affiliated 35:22
 36:19 136:14
agency 62:10 77:1
 77:3 80:23 81:2
agent 37:14,15
 61:21 62:8,22
 80:22 81:22
 136:21
agents 99:24
ago 15:11,23 19:7
 19:10 220:16
agree 188:6
 191:11 234:19
agreed 8:10
 192:15
agreeing 188:2
agreement 187:14
agrees 213:6
ahead 39:10 47:8
 67:23 79:24 90:21
 106:6 172:19
 209:8 218:16
 239:3
ajwx 1:6
alabama 196:18
 198:7
albuquerque
 199:20
allow 18:12 48:23
allowed 8:5
allows 49:2
ambiguous 20:22
 35:16,25 44:9
 45:3,12,16,23
 46:25 47:7 49:1
 50:17,25 51:6,20
 51:25 52:18,24
 53:6,13,25 54:14

56:7,16 58:25
61:20 66:16 67:6
67:16 68:21 69:3
72:16,21 73:1,10
74:12 75:11 76:19
78:18 79:4,17
84:12 85:24 86:13
87:12,19 88:6
89:15 90:5,20
91:21 92:22 93:3
93:10,18 94:7,15
94:25 96:5,18
97:2 98:4 99:13
100:15,20 101:10
102:3,13,19 103:8
104:1,10,16,25
105:18 106:4,15
106:21 107:4,10
107:23 108:8,15
108:21 109:2,15
109:23 110:7
111:11 114:6,25
115:22 116:16
117:3,18 118:5
119:14 120:10,18
122:9 123:5
127:16 128:2,7,16
129:12,19 132:1
133:8,24 134:17
135:17,24 136:9
137:6,13,22 138:3
138:15,19 139:3
139:12,19 140:4
140:12,17,22
141:4,12 142:3,13
143:16,20 151:2,8
151:14 160:20
161:6 166:13
169:21 170:17
173:4,15 179:16
180:20 181:2,10

183:1,8 185:18
186:9,15 187:12
187:23 217:17,23
242:12 243:18
amendment 5:19
 5:24 6:9,23 7:2,10
 213:21,24 214:4
 214:11,17,24
 215:1,5,11,21
 216:8,15 217:2,6
 239:7,12,23 240:3
 240:13,18
amount 37:19
 74:25 87:24
 119:20 131:10
 170:8 172:8,21,25
 176:10,11 202:1
 205:18
amounts 40:1,6
 75:4 128:24 129:9
 176:18 194:23
amphitheater
 189:22
analyzed 41:18
angeles 2:5 16:2
 16:10
anniston 196:18
annotations
 209:25 211:16
answer 6:8 7:4,9
 9:19 14:12 18:13
 18:23 20:24,25
 22:24 45:5 63:11
 68:8 73:14 78:8
 82:12,14 95:25
 96:3 118:23 132:7
 136:16 138:18
 159:3 173:18
 180:5 183:4 184:7
 185:15 186:12
 187:5,9,16 188:17

188:20,23 189:7
189:19 191:12
194:19,21 212:20
212:24 213:7,10
213:13,14,22
214:22 221:2
230:7,8 234:23,24
238:19 239:6,11
239:14,22 240:2
240:17
answered 144:22
 234:1 235:17
answering 5:25
answers 6:2,21
 7:11 8:15,15,20
 9:2,10,11,13 14:13
 217:8
antonio 198:2
anymore 15:18
anything's 230:22
anytime 174:25
 175:3
anyway 245:8
apologize 43:23
 49:15 144:5 202:5
 244:4
appearances 2:1
appeared 4:10
 224:9,13
appearing 4:12
 19:25
applied 22:20
applies 6:24
apply 187:21
 188:6
appreciate 10:9
 212:23 213:17
approved 94:1
approximately
 14:25 15:11 18:2
 19:8 21:15 22:12

[approximately - believe]

25:4 28:19 29:7
29:13 30:11,24
31:19 33:8,19
35:3 66:6,7 71:14
197:17 201:25
209:25
**april** 1:16 4:1
12:12 246:6
**area** 15:10 16:2,7
16:10
**argumentative**
220:9 230:3
231:24 234:9
**arizona** 197:4
198:17 203:7
**artists** 77:12
**asked** 49:14 57:9
144:21 173:24
194:16 211:6,9
233:25 235:16
244:4
**asking** 11:5 14:9,9
14:15 36:6 46:15
144:19 148:11
186:19 210:12
222:18 225:22,22
**aspect** 62:25
**assign** 158:1
**assigned** 158:4
**assistant** 83:22
228:5,8,10
**associated** 165:11
**assume** 56:17
97:10 210:23
227:13
**assumes** 57:15
117:1 161:11
216:13 217:17
233:12 236:20
**assuming** 146:25
148:24

**asterisk** 162:20
163:2
**atlantic** 197:9
201:13
**attachment** 3:10
**attempted** 238:24
239:17
**attended** 22:3
224:12,18
**attention** 124:1
**attorney** 4:11 5:17
153:1
**attorney's** 164:8
164:12
**attorneys** 11:22
208:10
**attributed** 237:1
**august** 12:14
144:11 145:9
**austin** 201:6
**authority** 150:20
**automatically**
156:13
**available** 10:10
**avenue** 2:4 14:22
**aware** 118:14
145:5 223:4
242:24

**b**

**b** 36:15 112:7
**back** 16:2 17:15
17:19 25:24 26:23
37:9 47:14 56:4
65:15 96:21
161:21 165:3
179:12 185:23
207:6 212:13
225:13 226:21,23
227:8
**backed** 56:13,18
226:19,20 227:5

**backslash** 157:16
**bad** 49:21
**badgering** 8:19
234:1 235:17
239:21 240:10
**balance** 37:18
67:21 68:11 95:15
96:22,24 117:21
119:17 243:7
**balanced** 243:6
**balancing** 28:4
**baltimore** 200:2
**bands** 27:8
**bank** 28:4 72:5
74:15 75:21,23
76:3,6,14 78:21
97:4,7 98:11,16
99:4,7 101:6,16
104:6,19,23 105:5
105:25 106:18
111:14,15,17,18
112:9,21,23 113:3
113:6,12,15,21,22
114:11 115:3,5,9
115:15,25 116:1,2
116:5 118:1
125:17 128:20
130:8 142:11
168:25 169:1,2
170:3 174:23
176:21 181:8
239:17 243:6
**barnes** 235:20,23
236:10,13 237:2
244:16
**based** 50:4 67:2
82:3 95:5 114:2
115:2,12 126:12
137:10,24 138:23
151:18 170:1
173:8 176:18

178:13 183:4
227:23,25 228:19
228:21,24 229:2,4
229:6,9,12,15,16
229:19
**basically** 28:4
225:7,11
**basis** 6:8 17:8 83:3
180:23 183:4
184:7 185:15
186:12 187:9
188:23 189:7,19
190:4,5,17,25
191:7,8 192:1
239:7,11 240:2,13
240:17
**bates** 12:16 13:9
14:2 156:5 177:7
**baton** 193:3
**beach** 196:21
199:7,18
**began** 50:5,13
78:12,15 135:10
139:16
**beginning** 26:1
78:24 140:1 149:6
213:12
**behalf** 107:15
208:18 217:21
218:4
**believe** 11:4 13:12
17:9,9 19:18
22:14 32:21 57:24
58:21 59:2 102:8
102:16 141:25
142:18 143:5,11
144:17 145:17
147:4 151:17
156:14 183:21
186:19 211:9
227:7 236:1,11

Page 5

[believe - calls]

242:9,13,17
243:10,14,22
**believes** 6:16
**bertam** 73:17
111:23 112:3,4,5,6
112:11,20,22
113:21 162:17,23
162:25 163:4
218:7
**bertram** 36:15,25
73:21
**best** 10:24 11:2,18
12:4
**bethesda** 197:12
**bethlehem** 195:16
199:11 202:18
**better** 44:14
**biggest** 43:5
**bill** 157:24
**bill's** 159:15
**bills** 28:5 34:4
38:3 72:10 171:20
189:14 217:12,20
218:3 219:8
231:13
**biloxi** 198:5
**bit** 20:9 43:6 77:16
179:18
**black** 163:16
**bodyguard** 63:24
100:4
**book** 37:14 64:11
64:18,22 77:9,20
81:23 135:13
**booked** 63:24
72:24 84:17
116:12,23
**booking** 63:6,12
82:20
**bookkeeper** 20:17
21:8,14,21 22:19

23:21 28:8,14
29:8 30:4 38:7
43:20 44:2 54:8
61:16 68:25 71:4
82:4,19 84:9
102:10 134:20
135:4,10 136:24
138:7 139:16,17
140:2 145:21
155:16 230:11
**bookkeepers**
40:24
**bookkeeping** 5:22
22:21 24:2,10,14
24:20,24 26:10,12
26:25 27:10,22
29:10 30:12,16
32:8 33:2,13,16,19
34:1,13,22,23 35:5
35:18 36:24 37:2
37:12,24 40:2,17
41:15 43:9 47:17
48:14,20 50:13,19
78:16 230:10,15
230:24 232:24
237:9 238:4,13,16
**books** 27:16
212:13 230:13,15
230:20
**born** 14:18
**boss** 28:22,23
**bossier** 200:13
**bottom** 174:11
**bowl** 201:4
**box** 71:10,17,19
71:20,23
**branch** 116:5
**break** 10:16,19,20
61:10 86:18
121:22 122:2
164:16 178:6,9

**brick** 116:1
**brief** 61:12 121:23
178:7
**broke** 39:14
**bronx** 22:7
**brooklyn** 199:25
211:22 212:4
**brown** 31:3,19,25
**bryant** 37:22 62:4
62:5 63:19,20
64:3,6,11,23 65:1
65:4,12,21 66:9,12
67:4,13,20 68:6,8
68:10 69:11,23
70:13,17 71:7,23
72:1,13 73:20
75:16 76:11 84:17
100:2,5 101:14
105:23 106:24
113:3 116:11,22
118:19 120:16
167:11 168:8
171:7 173:12
176:23 181:5
218:10,18,20
**buena** 196:9
**buffalo** 157:24
159:15 171:20
189:14 201:15
231:13
**buren** 14:22 15:13
**bus** 88:8
**business** 20:10,20
21:1,4,5 24:18,25
25:2,10,15 27:23
30:17 38:22 41:2
43:11,11,16,18,19
43:21 44:4,6,10
46:4,11 49:7
61:18 62:25 65:22
68:24 69:1 77:4

94:2 102:23
107:20 108:3,12
109:13,21 110:5
133:15,21 134:2,5
134:6 135:12,20
136:4 137:2
138:22 140:20
218:5,6 219:5
**buyer** 179:6

**c**

**c** 226:11
**ca** 1:24
**cabinet** 110:21,23
110:25 146:2,9,10
152:21
**cabinets** 111:8
**calgary** 200:9
**california** 1:2 2:5
15:8,10,17,20
16:10 22:10 29:20
186:4 188:20
192:17 193:22
195:25 199:3,14
199:18 201:11,21
202:9,12
**call** 31:6 152:21
153:9,24
**called** 21:4,5 36:8
36:14 45:7 145:9
145:16 148:10
229:25 230:2
241:22
**calling** 12:12
144:13 222:15
**calls** 16:20,25
17:10 18:18 23:1
23:6 44:9 57:3,14
58:10,25 59:10
60:1 63:1,8,21
66:23 67:6,15
68:13,20 69:13

Page 6

[calls - client]

70:5 73:1 76:19
77:18,25 79:4,10
81:9,13 82:1,6,22
82:23 84:4,18
86:3 87:19 89:4
93:2 94:7,7,15
95:10,24 96:4
97:8,17 98:4
99:12,20 100:6,22
101:10,17 102:3
102:18,25 103:7
104:10 108:8,14
109:1 110:7
111:21 112:13
114:25 115:21
116:15,16,25
117:1,11 118:22
121:9 123:5 126:9
128:2,6 129:11
130:21 131:1,25
132:5,11,20 133:1
133:24 134:23
135:15,23,24
136:9,15 137:5,13
138:2,14,19 139:2
142:2,22 143:15
143:20 147:1,5,19
148:21 149:9
150:15 151:14
158:23 159:21
160:19 161:18
165:13 166:13
167:16 169:21
170:4,11 171:9
172:1,10,14,17
173:3,15 175:19
176:3,14,24 178:1
178:14 179:15
180:19 181:10
182:25 183:8
184:3,9 185:11,18

186:8,15 187:12
187:22 209:6
212:18 213:1
216:18 217:23
218:24 233:11
234:10,20 243:1
244:1
**canada**  175:24
200:7,9,11 202:25
**canadian**  226:4
**capacity**  23:21
**care**  31:6,25 89:6
**career**  50:13
**carmel**  193:12
**carnival**  201:2
**carolina**  200:20
**cas**  159:16
**case**  1:5 56:18
161:20 164:18
**cash**  174:15 214:8
214:13,19,20
215:3,7,19 216:2,6
216:10,24,24
218:10,21 238:24
239:17
**casino**  24:13,15,16
167:6 197:7
202:14,21,25
203:14 232:14
**casinos**  24:11
**catch**  230:21
244:16
**categories**  53:8,10
53:17,22 54:3
**categorized**  53:15
**category**  13:18
**caught**  230:17
**cause**  230:1
**ccr**  1:24 246:2,25
**celebrities**  26:17

**center**  199:3
**central**  1:2
**cerritos**  193:22,25
**certain**  38:22
39:16,17 58:3
125:24,25 126:4
233:10
**certainly**  43:4
**chance**  163:20
179:22
**chandler**  203:7
**change**  38:16
**characterize**  51:23
**charge**  240:8
**charges**  6:13
**chart**  39:7,12
**cheaper**  15:18
**check**  24:11 69:12
70:8 73:5,5,25
74:2,14,19 75:8,16
94:22 98:12
101:13 104:18,22
105:4 106:11,17
106:18 113:6
114:20,22 118:18
119:5 129:7
131:22 132:18
162:2,11,12
166:25 167:1,8,10
171:7 173:12
174:23 181:5,5
206:12,21,23
207:17 221:2
238:24,25 239:18
239:19 243:5
**checking**  95:15
98:15,21 119:17
157:19 162:14,15
162:21
**checks**  3:24 69:19
69:24 70:3,13,17

72:10,12,14 73:19
74:9 75:4 76:2,9
76:12,13 105:22
105:24 106:23
113:2 115:5
120:15 176:22
207:2 209:1
240:24
**chicago**  193:15
195:22
**choose**  4:17 7:8,8
9:18 213:13,14
238:19
**chose**  4:16,19
**chosen**  5:14
**circle**  211:19
**city**  112:21,23
113:3,8,14,21
114:11,21 115:9
116:1,4 118:1
119:9 162:21
163:3 170:2
197:10 200:13
201:13,19 238:25
239:17
**civil**  17:2,12 18:21
20:5
**ck**  157:15
**clarify**  40:14
**clark**  246:2
**claudette**  237:12
237:16
**clear**  4:20 9:3,5,11
11:6 18:16 21:20
28:13 34:22 41:5
47:12 146:4 157:4
162:4 195:2
205:17 222:14
239:10,14
**client**  21:2 31:8,16
32:20 39:18,21,23

[client - conversation]

48:22,24
**clients** 23:10 24:13
24:15 26:15,21
27:1,2 28:15
30:21,23
**close** 164:8 221:25
222:2,5,10
**closed** 113:12
**closer** 84:23
**collect** 69:19
**colon** 162:18,18
**colorado** 198:19
**columbus** 200:22
200:24
**column** 130:25
132:24 157:7,15
159:11 165:6,25
166:3,21 168:4
169:9 170:9
171:18 205:18,22
232:12,13
**columns** 156:9,11
156:13,16,22
**combination** 52:6
**come** 5:11 8:10
19:17 71:9,10
129:17 145:24
149:3 152:15
221:2 222:20
223:1 226:23
**comes** 220:20
**comfortable** 10:12
50:22 51:3
**coming** 5:11 36:3
42:12 72:4 83:1
136:17 222:21
**comm** 210:11
**commencing**
246:5
**commission** 40:8
95:14 96:21

119:16 172:6,22
210:11 211:23
**commissions**
205:24 208:7
212:10,11
**committed** 6:17
**common** 110:4
**commonplace**
59:5
**communication**
79:14,20 80:12
92:1,6,19 95:19
98:17,24 104:21
105:3
**communications**
80:10 96:7 98:9
**companies** 23:10
23:13,20 24:24
25:1 27:10 35:23
37:3 38:24 59:12
**company** 23:23
25:23 26:7,9 28:9
28:18,23 29:8,11
30:14 34:16 35:23
36:4,9,12,19,22,24
145:16 167:20
**compensate** 40:2
**compensation**
40:7
**competence**
229:15,16
**competent** 242:16
242:18
**complete** 42:15,20
42:24 246:15
**completed** 70:20
92:6 95:25
**completion** 246:10
**compound** 44:9
61:4 76:19 82:24
90:11,20 101:18

102:3 181:10
**computer** 48:13
55:3,9,19 58:4
60:16 80:13 86:10
98:15,22 119:12
122:18 154:4,7
226:15,18 227:3
227:19 244:10
**concerned** 46:18
**concerning** 82:20
94:4 102:10 114:3
117:15 146:16
147:16 240:1
**concerns** 11:25
**concert** 86:21
159:16 161:10
177:17
**concerts** 76:12
224:4,11,19,22
225:18,25 226:3
**concluded** 245:10
**conclusion** 16:21
17:1,10 18:19
**conducted** 133:15
133:21
**coney** 177:18
178:11
**confidential** 1:12
164:7,12
**confirm** 12:15
64:15 124:18
157:10
**confirmation**
138:8 173:10
181:8
**confirmed** 118:9
**confirming** 176:21
**conform** 94:1
**connected** 227:2
227:15

**connecticut**
197:21 202:23
**connection** 39:22
61:18 65:12,21
91:17 103:22
104:14 105:15
208:24
**consider** 35:12
51:11 109:10,18
**consistent** 38:18
**consistently** 38:11
50:12 76:15 79:1
89:10
**constitute** 20:4
**contain** 1:12
**contemporaneous**
141:9
**context** 109:11,19
110:3
**continued** 33:22
34:16,19
**contract** 37:15,19
46:14 73:6,7,12
83:8 85:13,21
86:6,8,9 87:5 88:2
92:13,18 138:1
160:5,16 167:14
**contracts** 54:4
63:14 73:17,21
83:25 86:15,20
87:3,14 88:2
89:10,20,25 90:1
91:7,14 93:6
94:13 111:1
135:22 136:6
137:4,11 161:2
167:3
**controversial**
241:7
**conversation**
145:12 155:18,19

Page 8

CONFIDENTIAL

[conversation - datafaction]

204:1,6,24 205:1
207:18 215:25
**conversations**
204:11,14,18
206:9,19 207:16
207:21 215:22
**copies**  83:8,25
94:12
**copy**  16:18 19:3
85:20 92:17
114:22 164:17
244:21
**corner**  123:21
124:11,13 181:24
**corporation**  36:2
**correct**  13:4 14:20
15:15 16:8,11,12
16:15 19:4 21:13
21:22 26:3 27:24
28:16 30:5,12
32:4,11 33:21
34:20 37:1 40:1
40:19,21 41:8
42:16,21,22 43:10
44:23 55:4 57:12
62:10 73:3 74:6
75:17 76:8 77:14
84:20 85:22 86:23
89:9,22 92:23
95:21 96:25 99:1
99:2,5,8,23 100:3
100:21 101:7,8,20
102:5 106:13,19
107:16 110:11
111:4,9 112:12
113:4,10 114:22
114:23 115:3,4,6
115:12,13,17
116:2,6 118:11
120:8,24 124:14
127:10 129:10

130:14,20 131:11
131:17 132:10,18
132:24,25 133:22
134:15 135:4,5,11
136:7,22 137:11
137:20 138:1,4
139:4,20 140:5
141:5,23 142:16
143:18 151:5,25
154:20 155:9
157:1,7 158:2,6,12
159:20 160:6,13
160:18 161:3,4
165:22 166:9,11
167:12 168:1,11
169:7,16 170:6,10
170:25 171:8,23
172:24 173:20
174:1,24 175:5,16
176:5,16 177:12
177:21 178:18,20
181:13 183:6,25
185:25 189:15
191:21,22,24,25
192:2,3 194:10
197:18 210:18
213:24 217:12,13
217:21 222:15
228:4,19,22,25
229:2,4,7,10,13,16
229:17,20,23
232:7,19 233:6,16
233:23 234:8
235:10 236:7,15
236:25 237:3,9,17
**corrected**  230:18
**correction**  210:10
**correspondence**
96:12,16 97:13,15
97:23

**costs**  39:14
**counsel**  7:17,20
79:21 179:3
183:19 202:3
208:24 242:23
**county**  246:2
**couple**  24:10
30:22 31:14
221:21 224:8
238:18
**course**  24:6 69:15
74:23 96:10 108:2
108:11 133:14,20
176:9 192:11,13
233:8
**court**  1:1 4:18 5:9
11:12 17:23 18:13
18:15 80:6 82:16
96:1 164:15
179:23 180:12,12
241:23,25
**court's**  6:12
**courtney**  235:20
235:23 236:10
237:6 244:16
**coworkers**  35:4
**cpa**  20:10 24:4,19
25:8 41:8 58:9
**cpas**  30:18
**cr**  174:13,14,17,20
174:21 175:1,4
**create**  41:24 51:16
59:19 123:7 126:3
127:3 139:7,22,24
141:8
**created**  41:21,23
41:24 44:3,13,14
47:1 56:12 59:15
166:6 182:3
**creating**  42:9,14
61:3 143:2

**credentials**  55:18
**credibility**  228:21
**credit**  128:19
130:25 132:24
163:17 169:9
170:9 171:18
174:15
**credits**  128:18
163:11
**creek**  203:12,14
**crews**  201:2
**crime**  6:11
**crimes**  6:17
**criminal**  5:21 6:3
9:14
**crown**  200:19
**csr**  1:24
**cumulative**  194:16
194:21
**curacao**  199:16
**current**  16:2
146:17
**currently**  14:21
15:2 16:4
**cushman**  211:21
212:3
**cut**  206:23 240:24
**cv**  1:6

| **d** |
|---|

**d**  226:11
**dallas**  197:2
**daryl**  31:3,13,15
31:19,25
**dash**  184:23
**data**  42:4 121:1
157:6 167:24
169:12 230:1
231:19
**datafaction**  46:18
47:1,5,10,13,16,21
48:2,4,11,18 49:5

Page 9

[datafaction - documents]

49:16 50:5,10,12
50:20,23 51:3,12
51:16 54:20,22
55:2,8,18,20,22,25
56:3,4,5,12,18,22
56:25 57:12,18
58:5,19,22 59:5,16
60:13 106:25
107:11 120:1,2,20
120:23 121:2,7
122:4,5,11 123:3
123:15,25 124:3,7
125:14,22 126:1,6
126:8,13,25
127:13,23 128:11
128:23 133:13,18
139:7,22,25 140:8
141:2 143:4
153:18,20,20,24
154:1,3,6,12,16,19
155:1,4 156:12
158:22 169:6
210:9,19 226:8,12
226:13,17 227:15
227:16,21,23
244:7,9
**date** 18:3,10 74:13
84:24 87:7 88:11
130:2,4,6,11,14,16
130:18 131:16,18
131:21,23 160:2
160:11 161:9,16
165:25 166:3,4,4
166:18 169:25
210:13,16
**dated** 12:11,14
246:21
**dates** 74:10 130:4
**daughter** 6:4,14
6:16,22 7:12 8:21
9:15 19:18 238:24

239:16 240:7
**day** 67:9 71:24
105:7 130:24
131:3 132:3,4,14
152:16,17 241:16
246:21
**days** 19:10 65:15
219:24
**dba** 36:3 73:18
**dbas** 36:18 37:3
**dealing** 53:17
**dealt** 21:6 37:21
49:13
**debit** 128:20 163:6
163:8,16
**debits** 128:18
178:25
**debts** 163:11
**decade** 66:1,2
**decide** 15:16
**decided** 31:25
156:11
**declaration** 246:1
**declare** 246:2,18
**defendant** 1:9 2:7
**definition** 18:20
**delivered** 144:1
**depending** 90:22
**depends** 44:15
66:13
**deponent** 246:11
**deposed** 10:5
**deposit** 37:16 72:5
76:2,9 92:7,12
95:3,14 96:19
100:13,18 101:15
104:5 105:24
106:8,9,18 112:17
113:2 115:11
119:5 120:15
138:13 173:12

174:20,23 176:22
181:5
**deposited** 75:15
78:21 92:7 112:10
113:8 114:20
118:10,16,18
119:16 131:24
132:14 174:23
232:3
**depositing** 37:6
76:14 111:19
**deposition** 1:14
4:9 12:9,12
126:16 164:14,17
181:19 188:14
245:9 246:4,11,15
**deposits** 114:17
**describe** 37:11
241:5
**describing** 89:24
**description** 168:4
231:15 232:12
**desert** 202:21
**designated** 69:6
82:8 164:13
**designed** 7:19
**desire** 141:22
**detail** 3:21 14:4
242:7
**details** 145:7
213:9
**determine** 87:3,7
87:16
**diamond** 202:21
**died** 24:6
**diego** 198:11
**difference** 29:4
130:2
**differences** 65:6
**different** 22:21
23:13 39:23 53:4

53:7 114:15
122:24 156:8,17
157:11 162:8
167:20,21 174:19
194:19,20 195:3
**differently** 207:8
208:17
**difficulty** 219:25
220:12,15,18
221:4,10,17
**direct** 123:25
231:2
**directly** 64:2
**disabled** 244:7,9
**disclose** 40:5
**disclosing** 39:25
**discuss** 8:25 57:17
144:2
**discussed** 58:17
155:23
**discussion** 152:9
155:3 208:9
**discussions** 149:17
149:20 150:9
207:25 208:5
**dispute** 208:6,11
211:7 230:25
**disputing** 230:23
234:8
**distinction** 42:3
**district** 1:1,2
**document** 12:16
13:16 14:2,5
16:16,19,24 45:9
46:3,9,16 144:8
156:5 175:1 176:8
191:12,20 205:5
211:14 221:4
231:25
**documents** 13:9
13:10,14,20,23

Page 10

[documents - especially]

14:7,8,11 39:2,5
44:24 45:21 46:10
56:5,12 58:8,15
110:24 126:18,19
127:9 128:22
144:16,19 145:3
145:11,25 146:15
146:24 147:11,14
147:16,23 148:8
149:4,8 150:10,21
150:21 151:5,23
152:10,19 153:1,5
153:10 164:9,10
205:10,12 208:14
208:16,19,23
209:3 211:6
220:19 242:10
**doing**   21:10 24:23
25:3,6 27:16,21
28:25 29:1,5,14,17
30:16 34:9,23
35:11,18 40:20
67:12 70:19 78:15
78:23 104:12
206:5 225:11
**dollar**   130:18
**dollars**   235:23
236:14 237:2
**dolly**   152:23,24
**donna**   6:4,14,16
6:22 7:12 9:15
238:24 239:16
240:7
**doubt**   142:8
**downstream**
202:14
**drawer**   110:25
146:2,9
**drive**   226:18
227:17

**duly**   9:24 246:8
**durant**   183:14
184:1
**duties**   38:15

**e**

**e**   36:15 80:8 95:13
103:20 105:20
110:16 112:7
121:17,18 153:25
174:6 190:19,19
**earl**   37:22 62:4,5
63:19 64:17,23
65:1,12,20,25 66:9
67:4,13 68:5,10
69:11,15 71:23,25
72:10,13 73:20
75:16 76:11 81:6
82:25 84:16 100:2
100:5,8 101:14
105:23 106:24
113:2 116:11,22
118:19 120:15
129:8 131:19,22
167:11 168:8
171:7 173:12
176:22 181:5
218:10,18,20,23
**earlier**   113:5
126:16 165:25
**early**   27:20
**earn**   34:11
**earned**   34:3
175:17 176:1,2,10
176:11 215:14
**earning**   194:20
**earnings**   34:14
36:3 38:8 42:21
42:24 53:18,23
54:4,9 58:8
111:19 135:9
139:9 141:9

177:24 178:12
180:16 182:7,24
184:1 185:9,10
186:7 187:8
188:22 189:5,6,16
190:1,14,23 191:5
191:24 192:1,5,6,9
192:18,22,25
193:4,7,10,13,16
193:20,23 194:4
194:25 212:16
**ease**   181:17
**easygoing**   241:6
**edgers**   142:20
**education**   21:23
21:25 22:3
**efficiency**   187:3
**efficiently**   188:15
**eight**   184:17
193:23 209:15
**eighty**   190:24
200:3,16,18,21,25
**either**   90:9,17
149:5 151:21
164:16 179:19
207:1 208:10
**electronic**   46:19
48:13 55:3 78:20
79:6,14,19 80:10
80:12 92:1,19
96:7,16 97:12,15
98:9,17,24 103:20
115:10 117:25
119:4,8 153:18
154:3
**electronically**
94:19 97:10 121:1
153:23 227:13
**eleven**   196:4
**employee**   28:24
246:19

**employees**   35:4
**employer**   30:6
**employment**   5:23
6:17
**entail**   28:1
**enter**   206:6
**entered**   159:4,19
188:13
**enterprises**   3:22
**entertainer**   134:4
134:8
**entertainment**
24:25 25:1 26:14
26:15 27:10,17,22
28:14 31:8,15
36:7 62:25 68:25
82:4
**entire**   10:12
122:12 176:7
**entirely**   7:17
**entitled**   159:11
**entity**   36:14
**entourage**   37:17
**entries**   160:10
**entry**   131:15
170:22 174:6,10
**eric**   1:4 8:9 9:1,13
144:13 145:9,9
204:2,7,9,12,15,19
205:25 207:22
208:6,11 209:20
211:7 217:14
**eric's**   208:3,11
**error**   231:18
232:18,19 233:4
242:23 243:3
**errors**   230:11,15
230:18,19,24
232:21
**especially**   180:4

Page 11

[esq - fifth]

**esq** 2:3,9
**essentially** 120:25
**establish** 222:24
  234:17 237:24
**eventually** 121:11
**everything's** 213:3
**evidence** 57:15
  117:1 161:12
  216:13,14 217:17
  236:20
**exact** 15:12 47:15
  65:23
**exactly** 8:24 9:21
  67:8 225:16 237:4
**examination** 3:4,4
  3:5,5 10:1,4
  219:21 241:17
  244:13
**examined** 246:7
**example** 115:10
  123:14,24 124:3
  125:21 128:12,24
  133:4 143:4,12
  171:21 188:19
  217:15,19 221:3
  228:12 231:18
  232:19 233:3,15
  233:23 234:4,6
  237:8
**examples** 127:23
  139:7 218:4
**excellent** 11:13
**exhibit** 3:8,9,10,11
  3:12,14,16,18,20
  3:22,24 4:4,4,4,4,5
  4:5,5,6 12:13,13
  12:15 13:1,8,13,16
  13:19,21 14:1,1
  16:13 20:1,4 39:3
  123:14,17,18,24
  124:1,6,10,11,16

125:2,4,7,9 128:12
128:25 129:2,25
130:5 133:12
135:3 142:21
144:4,5,23 156:2,2
156:5,25 157:2,15
158:14 160:10
169:18,18 176:9
177:3 178:10
183:11,11 184:13
184:15 185:23
188:16 205:6,6,10
205:10,13,19
206:14,16,19,22
207:9,19 208:22
209:12,14,18
224:2,5,18 225:17
225:19 226:3
228:12,13,13
231:2 242:24
243:12
**exhibits** 3:7 12:7
126:17 127:5,8,12
127:23 133:19
135:8 139:8 141:7
141:15,19 143:12
157:5 164:6 166:7
175:4 176:8 209:3
241:19 242:6,17
242:25 243:14
**exist** 116:2
**existence** 32:25
**expense** 39:20
53:11
**expenses** 64:8 88:8
122:20 218:8
219:6
**experience** 58:21
68:24 82:3 108:24
114:2,10 115:2,12
126:12 137:10,24

138:23 229:12
**experienced**
137:18
**expert** 59:8 69:6
82:7,8
**expertise** 229:9
**explain** 5:13 14:13
48:12 70:1,2
172:3
**expression** 36:10
**extent** 81:8
**extra** 64:8 68:1
**eyes** 164:8,12
**eyesight** 221:13
222:8,9

**f**

**f** 226:11
**facilities** 148:13
**facility** 148:1,6,16
148:18
**fact** 7:20 115:14
150:24 217:17
235:22 236:25
**facts** 57:15 117:1
161:11 216:13
233:12
**fair** 15:24 16:6
23:12 30:2 33:7
33:15,18 38:5
40:16 42:13 44:3
44:19 47:16 52:7
59:4 67:2,11
70:15 80:7,7
85:19 91:2 92:15
107:17 112:8
140:7 155:2 180:7
219:25 220:6,7,11
220:12,17,21,22
221:9 222:11,20
223:25 225:6
227:8,20,24

228:18 232:21
233:7,8 238:4
240:15
**fairly** 38:18 50:22
51:2 105:9
**falls** 193:6 198:21
200:6
**familiar** 16:16
36:14 76:25 77:3
81:1 145:15,16
**far** 46:17 112:16
237:1 241:12
**fart** 222:1
**fashion** 164:13
**fast** 43:6 120:13
**fault** 178:23
**fayetteville** 200:19
**february** 169:13
171:3
**federal** 17:2,12
18:15,21 20:5
96:1 180:11,12
241:23,25
**fedex** 69:19,23
70:3,10,11 71:6
72:6,8 73:4 76:13
101:14 105:23
**fedexed** 131:4
167:11
**fedexes** 70:13,16
71:7,18,23,25 72:3
72:12
**fedexing** 76:12
**fee** 40:11,12,17
48:2,4,6,8,9 56:3,4
**feel** 9:12 14:14
50:22 51:2
**field** 20:10
**fifth** 5:18,24 6:9
6:23 7:2,9 213:21
213:23 214:3,10

Page 12

[fifth - general]

214:17,23,24
215:1,5,11,21
216:8,15 217:2,6
239:7,12,23 240:2
240:13,18
**figure**  227:14
236:17
**file**  89:12,17 97:20
103:21 110:19,20
110:21,23,25
111:3,5,6,7 146:2
146:9,10
**filed**  86:9 89:18
103:21 110:18
**files**  86:9
**filing**  152:20
**final**  168:7 170:23
171:12,16 231:16
231:21 232:15
**finances**  6:19
42:15 117:16
**financial**  38:23
43:11,13 44:3,6,21
45:8,20 46:4,11
49:7 57:22 94:10
112:19 117:5,9
141:2 234:13
243:11 244:17
**financially**  243:5
246:20
**find**  98:18 108:25
212:14
**fine**  9:17,21 10:15
10:21 11:20 156:3
180:8 219:2,4
243:24 245:6
**finish**  9:7
**finished**  27:20
178:21 219:14
**firm**  2:8 30:22
32:23 33:3,22

34:6 71:8,9 75:22
75:22
**firms**  228:8
**first**  9:24 10:8
12:10,11 18:7
19:3,6,16 22:13,14
23:23 24:2 26:23
76:25 100:11,17
104:18 118:17
124:10 125:7
128:24 129:5,24
130:5 131:8 150:3
157:15 168:6
174:3 186:2
188:25 231:12
**five**  23:15,19
195:3
**flat**  40:11,12
**florence**  193:19
**florida**  196:9,23
200:15,17 202:16
**focus**  35:9 37:8
51:14 61:14 62:24
**follow**  84:24
163:20 241:16
**followed**  94:18
140:20
**following**  1:12
83:6 98:23 180:12
188:18
**follows**  9:24 246:3
**forcing**  225:20
**forged**  239:1,19
**forget**  65:16
**forgot**  82:13
173:23 244:4
**forgotten**  71:12
**form**  40:6 57:25
94:21 244:23
**formal**  242:1

**former**  237:13,16
**fort**  200:17
**forth**  158:7
**forward**  43:6
228:9 238:1
**found**  109:5
230:12 243:8
**foundation**  63:2,9
63:22 67:7 68:21
69:14,21 77:19
78:1 79:11 82:23
87:20 88:6 91:11
94:7 95:6,11
99:22 102:4,19
108:8,15 109:2
110:7 133:24
135:16,25 136:9
137:7,13 172:18
173:16 184:10
185:18,19 186:16
187:13,24 231:25
233:12 234:10,21
236:19
**foundational**  15:6
20:13
**foundations**
176:25
**four**  13:17 110:25
146:2,9 178:19
220:24 221:5
**frame**  43:7 44:7
45:21 46:5,12
54:9 75:25 76:1
76:16 90:14,16
91:19 134:6,11
243:21
**francis**  150:4,14
151:22 152:5,10
155:3,17,20,23
204:5,15 207:1,2
207:15 208:25

209:3 239:1,18
**francisco**  198:13
**frankly**  82:8
**free**  14:14 40:20
**freedman**  2:3
**frequently**  34:7
90:8 92:11 134:10
134:13
**front**  12:7 14:11
14:15 39:2
**ftllp.com**  2:6
**full**  121:16,19
171:15
**funds**  95:9,13,21
108:5 113:7 118:3
118:9
**furnish**  94:3 102:9
108:4
**further**  3:5,5
169:9 219:11
241:17 244:13
246:18

**g**

**g**  190:19
**gardens**  189:22
**garofolo**  145:20
146:5,23 147:15
147:22 148:1,12
149:3 152:14,15
**garofolo's**  146:5
**gary**  13:10,14
41:12,13 121:11
142:19 143:23
153:15 154:11,11
215:9
**general**  12:20,23
41:19,20 51:17,23
52:1,6 121:16,19
122:4 141:17
144:2 159:12
165:6

[generally - hearsay]

**generally** 27:25
37:12 48:11 63:20
66:20 72:18 83:21
96:11
**generated** 106:9
**generically** 27:5
**genesee** 199:23
**gentleman** 19:17
**gentleman's** 26:7
**getting** 46:2 86:21
91:7 213:9 240:25
241:15
**gf** 165:3
**give** 4:9 5:12 6:2
6:21,21 7:11,14
8:10,15,16,20 9:3
9:10,11,13,16 12:4
82:9 90:14 148:3
148:12 157:20
164:17 179:22
180:4,5 222:20,22
223:1,17 227:11
244:22,23
**given** 7:17 8:17
54:5 87:25 101:14
110:20 126:5
150:12 164:8
176:22 227:25
**gives** 21:1 68:8
**giving** 5:25 128:19
**gj** 159:11,12
**glasses** 221:19,24
222:1,5,9 243:23
243:24
**go** 10:7 24:11
26:23 37:9 39:10
44:19 47:8 55:9
55:21,24,25 67:23
71:16,22 76:6,6
79:24 90:21 98:10
101:6 105:4 106:6

113:6,20 114:10
116:4 118:2
119:12 122:18,19
125:17 133:10
148:9 149:12,15
149:19 151:19
153:19 155:7,15
155:21,24 157:9
157:21 164:5
172:19 175:7
176:7 185:23
188:16,17 191:9
195:4 203:22
209:8 211:16
212:13 218:16
223:20,21 224:4
225:20 227:10
239:3 244:6
**goal** 110:4,5
**god** 194:7 203:22
**goes** 49:3 52:2
194:1
**going** 7:24 10:4,7
10:24 11:17,17
13:6,7 35:9 37:7,9
42:12 43:15 65:6
65:7,8,15 68:12
83:6 85:16 95:15
98:15 99:3 103:11
117:20 143:11
144:15 145:6,10
157:8 160:2 165:3
186:18,23 190:11
191:9 194:5,17
202:2 203:22
212:20 216:12
223:4 224:3,6,21
225:24 226:2
230:25 232:25
233:19 234:11,14
235:5 238:18

245:1
**good** 42:3 164:19
220:20
**gotten** 132:14,17
**grand** 158:5
189:23
**great** 11:5
**greek** 197:25
**gross** 172:8,25
175:17 176:2,10
176:11,18 177:22
177:24 178:12
179:8 180:16
182:6,23 184:1
185:10 186:6
187:7,8 188:22
189:5,6,16 190:1
190:14,23 191:5
191:23 192:1,5,6,8
192:17,21,25
193:4,7,10,13,16
193:19,23 194:4
194:19,24 195:9
195:11,14,17,20
195:23 196:1,7,10
196:13,17,20,24
197:1,5,14,21
198:2
**ground** 10:8
**guess** 41:19 69:12
94:21 118:15
119:2 155:12
156:22 210:12
218:21 220:4
221:17 227:14
237:23
**guy** 241:3,9

## h

**h** 2:9
**hammond** 192:21

**hand** 19:17,21
123:20 124:12
180:3 181:24
**handed** 19:3,9,18
**handle** 238:12,15
245:1
**handled** 24:10
27:1 34:3 38:1
212:15 237:15
**handling** 237:8
**handwriting**
205:14,15 206:13
209:22
**handwritten**
205:18,23 206:2
207:9 209:21
**hang** 18:11 45:2
79:21
**happen** 18:2 154:9
**happened** 108:12
108:18
**happy** 11:9
**harass** 7:19
**harassing** 8:19 9:8
239:21 240:10
**hard** 203:16
226:18 227:17
**hate** 14:17
**haut** 24:4,9,13
**heading** 13:2,22
14:3
**hear** 11:1 17:4,7
17:14 80:24
179:19 212:5
234:2
**heard** 8:23 36:7,10
62:17
**hearing** 10:23
220:12,15
**hearsay** 65:9 68:9
68:14 69:14,21

[hearsay - inputted]

81:9 82:1,23 83:3
83:10,15 84:19,21
85:2,7,15 94:7
95:16,22 108:9
116:16 117:2,2
135:25 137:7,13
147:19,20 150:6
150:16 152:1
**heights**  193:9
**held**  95:14
**heller**  62:18,22,24
90:9,17
**heller's**  83:22,23
91:3
**help**  14:12 24:14
180:3 236:5
**helped**  35:4 127:2
236:8
**high**  22:4
**highest**  22:2
**highland**  195:25
**highly**  8:18 164:7
164:11
**hire**  148:9
**hired**  63:3 149:12
**hiring**  149:15,19
**history**  3:21 14:4
20:9
**hit**  233:5,6
**hold**  24:7 95:3
172:16
**holding**  92:8 96:20
98:6 99:11
**hollywood**  201:4
202:16 224:14,23
**home**  19:19
145:25,25 146:6
149:4 150:11,21
226:23 240:6
**honesty**  229:4

**honey**  235:15
**hopefully**  228:20
**hotels**  88:8
**hour**  246:6
**hourly**  40:8
**hours**  10:19 210:5
**house**  15:1,18,20
19:17 111:8
**houses**  38:1
**housesitting**  240:8
**houston**  2:10
**huh**  142:17 182:20
238:2
**hundred**  197:16
**husband**  146:1,5
149:3 152:15

**i**

**idea**  227:6
**identification**  4:6
205:7
**identified**  129:15
171:17 187:6
191:19
**identifies**  191:23
**identify**  225:18
**illinois**  193:15
195:22
**immediately**  107:2
120:12
**important**  11:11
161:8,15 220:4
**impossible**  11:15
11:16
**impression**  8:8
**improper**  59:9
**inaccuracies**
242:25 243:11
**inaccurate**  236:14
**inadvertently**
220:24

**inappropriate**  5:6
7:18 8:18 18:18
**incident**  238:23
239:16 240:1,5
**include**  49:10
94:12
**included**  42:23
86:10 146:14
**including**  89:20
176:8
**income**  43:5
159:16 175:17
177:22 237:1,2
**incompetent**
242:10,15
**incriminate**  6:21
6:22
**incrimination**
5:19 6:10,24 7:3
7:10
**incur**  48:6
**incurred**  64:9
72:10
**index**  3:1,7
**indiana**  192:21
193:12,19
**indicated**  10:23
32:2 69:23 111:3
167:7
**indicating**  98:25
**indio**  201:11
**individual**  1:4,8
23:10,13 38:1
40:10 62:13,13
215:9
**individuals**  24:24
27:9,22
**industry**  25:11
27:17 36:7 59:6,8
69:7 82:4,9

**inform**  5:16,20
6:10,12,20 117:24
135:21 147:10
155:15
**information**  8:11
41:25 42:5 44:16
56:22 74:8,19
83:13,17 85:6,10
86:10 93:5,7,13,23
94:4 96:11 102:10
102:23 103:6,12
103:16,18,18
104:3 107:20
108:4 110:22
114:1,15 116:14
116:22,24 127:9
127:13 128:14
130:5,10 133:5
137:2 156:3,17,20
157:6,13 158:10
158:21 159:19,25
160:3,15,17
161:23 165:21,25
166:8,11,17 167:3
167:13 171:1
173:8 176:20
177:20 215:18
227:11,22
**informed**  147:15
147:22,25 150:5
150:18,19,24
154:18
**initially**  116:10,21
**input**  42:4 127:13
158:10 167:23
171:3 228:1,15,19
**inputted**  41:25
127:6 130:10
158:22 159:8
165:21 166:5,8,11
168:10 169:12

Page 15

[inputted - kaplan]

171:1 173:25
**inputting** 120:25
166:16 231:19
**inquiry** 83:20 85:4
85:20
**instance** 117:23
**instances** 118:8
138:12
**institution** 112:19
**instruct** 216:5,17
216:20
**instructed** 68:10
150:25 151:4
153:20 154:1
204:2 216:9
218:10
**instructions** 217:5
218:18
**intend** 16:4 141:19
**intent** 141:22
143:18
**interact** 64:2 66:9
66:11 67:4,19
90:9,17 91:3,6
**interacted** 65:4
**interacting** 65:11
67:13
**interactions** 64:6
**interested** 246:20
**interests** 110:5
**intermittent** 27:11
**internet** 55:24
226:13,14 227:16
**interrupt** 164:3
**interrupted** 39:10
67:24
**introduced** 80:21
**investigation** 5:20
**investments** 34:4
**invoice** 3:23 204:8
206:10,22,23

**invoke** 7:2,9
213:21 214:3,10
214:17
**involved** 39:14
81:22 88:9 97:25
98:1 136:18,22
246:19
**involvement**
101:23
**involving** 6:19
238:23
**iowa** 192:24
**irrelevant** 239:20
**irving** 24:4
**ish** 30:16
**iskowitz** 13:10,14
13:20 41:11,12,13
41:14 58:15,16
60:7,14,18 61:2
142:19 143:5,23
153:15 215:9,12
215:16,20
**iskowitz's** 121:11
**island** 177:18
178:11
**issue** 164:9 174:20
235:6
**issued** 12:13
144:15 174:22
235:22 236:7,13
**issues** 219:7
**issuing** 235:9,13
235:19
**item** 58:3

**j**

**j** 174:6
**jail** 6:1,3 7:13
**jan** 1:14 3:3 9:23
163:19 180:2
241:20 242:6
246:5

**je** 174:4,18
**jenkins** 26:8 29:2
**jersey** 194:3
197:10 199:9
201:13
**jesse** 2:3
**jesus** 201:22
**jkaplan** 2:6
**job** 1:21 22:20
24:2,7,21 26:10
28:6 29:10 102:9
102:16 235:6
**jobs** 22:22
**journal** 159:12
165:6 174:6,10
**jr** 1:8 3:11,12,14
3:16,18,20 13:3,18
13:22 14:3 73:18
**judge** 11:25
**july** 129:21 130:11
130:14 131:13,15
132:10
**june** 175:13
**justine** 145:20
146:4,5,23 147:15
147:22,25 149:3
152:14

**k**

**k** 190:19
**kaplan** 2:3 3:4,5
4:15,18 5:5,8 7:16
8:4,17 9:4,8 10:2
16:23 17:13 18:1
19:1 20:7,23 23:4
23:11 25:16 33:14
35:19 36:5 43:19
43:23,24 44:11
45:4,13,18 46:1
47:3,11 48:17
49:4 50:3,18 51:1
51:7,21 52:3,11,20

53:2,9,16,21 54:2
54:17 55:1,7
56:10,20 57:5,16
58:13 59:1,13,22
60:5 61:7,11,13,22
63:5,10 64:1,19,24
65:10,19 66:19
67:1,10,17 68:15
68:23 69:8,22
70:7 72:17,22
73:2,13,24 74:5,17
74:24 75:3,7,13
76:22 77:22 78:4
78:22 79:5,12,18
79:23 80:1,4,7,9
81:10,17 82:2,11
82:14,17 83:11,16
84:6,13,22 85:3,9
85:18 86:1,4,14
87:1,10,13,22
88:10,18,22 89:1,8
89:19 90:7,13
91:1,12,23 92:9,24
93:4,12,19 94:11
94:17 95:7,18
96:6,14,15,23 97:5
97:11,22 98:7
99:16 100:1,10,16
101:1,11,21 102:6
102:15,20 103:4
103:10 104:2,11
104:20 105:2,8,12
105:21 106:10,16
106:22 107:5,13
108:1,10,17,23
109:4,9,17 110:1
110:10,15 111:12
112:2,15 114:8
115:1,24 116:20
117:6,13,22 118:7
119:1,19,24

Page 16

CONFIDENTIAL

[kaplan - leading]

| | | | l |
|---|---|---|---|

120:11,21 121:5
121:22 122:1,10
123:6,19,23
124:12,15,17,22
124:24 125:11
126:11 127:19
128:3,9 129:13,23
130:23 131:5
132:2,8,16,22
133:3,9 134:1,18
134:24 135:19
136:2,12,19 137:9
137:16,23 138:5
138:12,21 139:5
139:14,21 140:6
140:13,18,24
141:6,14 142:5,14
143:1,17,22
144:24 145:1,8,16
145:17,22 146:22
147:3,9,21 149:1
149:13,19 150:8
150:17,22 151:3,5
151:9,16,24 152:2
152:7 153:15,17
154:2,12,18,25
155:5,8,13 159:1,7
159:23 160:21,24
161:1,7,14,22
162:9 163:18,25
164:4,15,22,25
165:2,16,20
166:15,20 167:22
169:23 170:7,13
170:19 171:11
172:7,16,23 173:6
173:17,21 175:22
176:6,17 177:2
178:4,8,17 179:4,7
180:2,15,22 181:3
181:12,16 183:3,9

183:20,24 184:6
184:12,23 185:1,7
185:8,14,21
186:11,18,23
187:1,14,25 188:8
188:11 191:10,16
192:13,15,16
194:18 195:1,7,8
196:4,5 202:4
205:21 209:11
212:22 213:4,16
214:5,12 216:16
216:22 217:3,18
218:1,19 219:3,11
219:15 220:9
222:14,15,24
223:3,13 230:3
231:24 232:8
233:11,25 234:9
234:20,24 235:16
235:25 236:16,19
239:3,20 240:9
241:15,18 242:3,5
242:14,21 243:19
243:19 244:3,11
244:24 245:3
**kaplan's**   17:8
  18:17 179:25
  222:25
**kathy**   80:16
**katie**   80:16
**keep**   13:6 38:8
  42:11 120:16
  180:10
**keeping**   6:18 28:2
  38:22 230:20
**kept**   64:17 110:21
**key**   148:5 233:5,7
**kidding**   180:14
**kind**   219:24 223:4
  225:23 241:3

**king**   200:4
**knew**   60:22 81:21
  166:16
**know**   10:14,17,20
  11:1,9 12:18 16:5
  17:5 18:24 23:8
  27:5,8 28:17 31:5
  31:11 37:10 38:2
  41:4 46:6 47:15
  48:12 51:8,9
  52:25 56:11 57:6
  58:2 59:4,11
  63:13 64:17 67:8
  68:16 72:11 74:15
  77:23 78:5 81:22
  83:19 111:15,25
  113:11,18 117:4
  122:19 123:18
  124:24 132:15
  136:13,18 144:6
  145:19 146:22
  148:19,23 149:7
  149:14 156:6
  158:18 159:1
  164:1 165:7 180:9
  184:15 194:20
  209:2 210:21
  212:12 216:1
  221:6 224:1,8,23
  224:25 225:2,12
  225:19 226:4,16
  226:18,20,22
  227:4,4,9,12 230:8
  231:1 241:8,12
  245:3
**knowledge**   41:1
  113:13 129:16
  164:9 166:10
  170:1 180:23
  216:4 217:8 219:9
  229:21,23 235:11

**l**   190:19
**l.a.**   197:25
**lacks**   231:25
  233:12 234:10,21
  236:19,20
**lafayette**   201:21
**lake**   192:21 196:9
**large**   236:23
  237:20 239:18
**las**   1:15 4:1 14:22
  15:10,14 16:7
  29:23 30:3 192:8
  196:6 199:5 240:6
  246:21
**late**   222:12 241:15
**laughlin**   182:3,7
  182:16,17,24
**law**   2:8
**lawful**   4:13 7:7
**lawsuit**   4:12 8:9
  8:13 9:1,12
  144:20 145:3,6
  208:1,2,3,10,14,20
  208:24 223:16
**lawyer**   7:15
**lead**   6:1,2,3 8:21
**leading**   46:23
  48:16 51:6 52:8
  53:5 54:23 55:5
  61:5 63:8 65:18
  66:24 67:16 68:7
  73:23 74:4,22
  75:2,5,10 76:19
  83:15 85:2,7,12
  86:22 87:9,18
  88:16,20,25 89:4
  90:5 91:11 93:2
  94:8,15 96:5 98:4
  99:13 100:23
  101:10,19 102:4

Page 17

[leading - louisiana]

105:6,10 106:15
106:20 108:21
110:8,13,14
115:21 117:3,11
119:22 121:3
126:10 128:2,7
129:11 131:2
132:1,12,21 133:2
133:8,24 134:16
135:16,24 136:10
137:14,22 138:20
139:3,11,19 140:4
140:12,17,22
141:4,12 143:16
143:20 147:20
151:15 160:23
161:6 165:18
166:13 167:16
169:21 170:5,12
170:17 171:10
172:2,18 173:3,15
175:20 176:4,15
176:25 181:11
183:1 187:24
242:20
**learn** 84:16
**learned** 170:15
**learning** 105:15
**leave** 7:6 8:1
**ledger** 3:11,13,15
3:17,19 12:20,23
13:3,4,18,23,24
41:19,20 45:6
51:23 52:1,6
54:22 103:23
104:7 105:14
106:12 107:1
120:2,20,23 121:2
121:16,19 122:4,5
122:12,15,24
123:7,15,25 124:4

124:7 125:12
126:4,7 127:11
130:14 135:1
141:18 144:2
156:9,12 158:11
158:22 159:5,8
160:10 161:10,17
166:5 169:2,5,14
206:7
**ledgers** 42:5,10,14
44:17,21,25 45:1
46:21 47:2,5
51:17 52:7,9,13
56:12 59:15,23,25
60:6,14 61:2
121:8 126:25
127:2,14,23
128:10,11,12,13
128:23 133:13,19
135:2,7 139:7,25
140:8 141:2 143:4
143:7,12 156:25
167:24 169:25
176:13 214:25
216:10,23 218:11
227:21,21
**leery** 20:25
**left** 22:4 28:21
29:11 30:22,23
62:20 163:2 227:9
**legal** 16:20,25
17:10 18:15,18,21
**letting** 149:15,19
155:15
**level** 22:3
**life** 49:3 52:2
**likes** 241:6
**likewise** 11:4
**limit** 61:8
**line** 163:16 201:2
240:16

**lisa** 1:23 11:12
246:2,25
**list** 83:5
**listed** 194:24
224:5,18 225:3
226:3
**litigation** 14:6
205:12 209:4,10
**little** 10:25 19:7
20:8,25 43:6 46:7
76:23 77:15
133:10 207:7
208:17 242:1
**littleton** 198:19
**live** 15:7,19 16:9
34:9,24 38:8
42:25 43:1,4 54:9
91:18 102:24
111:19 112:10
126:6 134:11,21
135:9 139:10
141:1,10 223:22
224:7 225:11,11
**lived** 14:24
**livermore** 202:9
**living** 29:24
**llp** 2:3
**loan** 35:23 36:8,11
**location** 87:16
88:14 160:11
161:9,16
**log** 55:11 114:12
**long** 14:24 24:7
25:17 26:1 28:18
31:10,13,18 49:14
49:15 77:23 105:3
105:13 134:19
136:13 152:13,18
152:20 238:9
241:4

**longer** 16:9
**look** 14:7,12 16:13
16:15 39:1 73:5
74:2 80:11 87:2,2
113:21 114:14
115:15 118:2
121:7 125:24
129:14 131:15
133:4 144:4 156:1
156:2,4 157:12,14
159:10 161:20
166:21 168:3,3
176:10 177:3
181:23 184:13,14
194:13 205:4
208:13,16,19
209:12 210:4
220:23 221:15
224:2,10 231:3,12
231:15 232:11
**looked** 57:18
64:25 157:11
221:5
**looking** 12:8 64:13
87:24 128:25
129:24 153:12
157:23 162:6
163:23 179:3
182:10 221:4
225:17 231:10
**looks** 170:22 174:4
202:8
**los** 2:5 16:2,10
**lose** 56:21
**lost** 56:19 142:24
**lot** 66:14
**loud** 231:6
**louder** 46:7
**loudly** 10:25
**louisiana** 193:3
200:13

[lunch - morongo]

| | | | |
|---|---|---|---|
| **lunch**  121:23,24 178:7 | **maryland**  197:12 200:2 | **mesnick**  25:7,24 25:25 26:24 27:13 | **mistake**  234:6,12 235:4 237:8,11,20 |

**m**

**m**  36:15 112:7 185:7 190:19
**ma'am**  8:17 9:8 95:25 138:17 224:15 232:6,11 232:18 240:23
**madam**  164:15
**mail**  70:9 71:17,24 80:8 95:13 103:20 105:20 121:14,17 121:18
**mailed**  70:4
**mails**  110:16 153:25
**maintained**  43:11 44:3,12 111:8,16
**maintaining** 107:14 230:15
**making**  10:10 11:22 17:17 143:3 188:1
**makowski**  1:23 246:2,25
**manager**  20:11,20 21:1,4,5 25:11,15 30:17 37:22 43:11 43:17,18,19,22 61:24 62:3 63:19 65:2 99:24 100:2
**managers**  41:2
**manner**  242:10,18
**marathon**  10:17
**march**  210:5,13,15 210:22
**marked**  4:6 20:1 164:7,11 205:6
**married**  241:14

**maryland**  197:12 200:2
**mashantucket** 197:20
**match**  73:6,19
**material**  1:13 7:20 29:4
**math**  29:14
**matter**  17:17 155:18 219:4
**matters**  6:19
**meadowlands** 197:23
**mean**  29:16 43:25 52:25 98:2 151:19 157:18 168:14,15 169:13 174:7,14 194:15 195:5 212:1
**meaning**  130:10 215:18
**means**  115:10 171:13,15 174:22
**meant**  162:13
**memorialized** 44:5
**memorializing** 43:12
**memory**  50:4 51:9 62:16 65:1 165:17 207:20 211:5 219:25 220:5,7 229:2
**mentioned**  62:7 219:24 221:14
**merchandise** 212:17 214:8,15 214:19 215:3,7,14 215:19,23 216:3,6 216:11,25 218:12 218:22

**mesnick**  25:7,24 25:25 26:24 27:13 27:21 28:7 29:1 32:17 33:4,5,12,13 34:6,13 47:14 49:17,20 50:2,14 65:15 66:3
**mesnick's**  25:18 32:20 33:25
**metnick**  33:3
**mexico**  199:21
**meyer**  189:22
**miami**  196:23
**michael**  25:7 32:17
**michigan**  158:5 193:10 201:15
**miller**  145:16,17 145:22 146:22 149:19 150:22 151:5,24 152:7 153:15,17 154:2 154:12,18,24 155:5,8
**million**  235:23 236:14 237:2
**milwaukee**  199:1
**mind**  227:7
**minutes**  195:4
**misleading**  17:9
**missed**  195:15
**mississippi**  195:14 195:19 198:5
**misstatements** 7:20
**misstates**  46:24 49:24 59:17 91:10 92:3 99:21 101:18 107:23 111:10 155:10 173:2 231:25

**mistake**  234:6,12 235:4 237:8,11,20 243:7 244:15,17
**mistakes**  234:8,18 234:19 235:3,9,13 238:4
**mk0002**  231:5
**mka1**  12:17 13:1 186:2
**mka2**  156:6
**mka3**  175:8
**mka40**  12:17
**moment**  179:22
**monday**  130:3
**money**  27:1 28:2 37:6 42:11,12 64:8 67:22 69:17 72:4 78:6,9,14,20 78:21 79:8 86:17 87:24 95:1 97:25 98:1,5,12 99:11 103:9,24 117:21 117:25 119:15 128:19,24 130:3,7 174:9,15 179:5 181:6 207:24 232:3
**moneys**  126:23 127:21 209:19
**monies**  12:21 24:11 34:3,12 99:6 112:10 127:17
**montgomery** 198:7
**month**  83:6,6
**monthly**  48:8,9
**months**  14:25 15:11
**morongo**  197:7

[morris - numbers]

**morris** 62:9,14,22
63:17 76:24 77:1
77:6,17,24 78:8,9
78:14 79:1,7
80:12,15,22 81:2
81:20 82:20,21
83:8,12,21 84:8,24
85:5,11,21 86:6
87:6,15 88:3
89:11,21,25 91:15
91:17 92:2,19
93:6,14,24 94:3,18
94:20 95:9,20
96:8,24 97:6,13,15
98:1,5,9,24 99:11
100:18 101:5
102:9,22 103:5,17
104:4,22 105:4,16
108:3,25 109:11
109:19 110:3,17
111:2 117:24
118:17 119:4,17
129:6 130:7,19
131:7 135:13,21
136:5,5,13,20
137:1,18 138:9,13
138:24,25 142:7
161:3 168:6 170:3
172:6,21 174:10
**morris's** 138:22
**morristown** 199:9
**mortar** 116:1
**mortgage** 39:16
**motion** 180:3
**move** 15:16,25
16:2 22:9 65:9
68:9,14 69:7,20
81:9 82:1,10 83:2
83:9 84:21 95:5
95:16 96:5 164:2

**moved** 15:5,9
25:22 29:23,25
30:3 32:23
**multiple** 223:12
223:14
**music** 31:17
**musician** 65:6
134:4,8
**musicians** 26:19
27:7 62:1 77:9
**myers** 200:17

**n**

**n** 226:11
**name** 4:8 24:4
25:23 26:8,9 27:3
28:10,17 31:12
32:24 33:23 34:17
45:8 46:3,9,15
62:4,6,10,12,15,17
64:13,16 75:8
80:16 145:19
146:21 148:1
150:3 161:9
166:25 167:1,7
239:18
**names** 31:1 36:4
37:6 157:7 159:14
**nashville** 203:3
**national** 112:21,23
113:3,9,15,21
114:11,21 115:9
116:2,4 118:1
119:10 162:21
163:4 170:3
238:25 239:17
**nature** 40:6 64:5
220:25
**necessarily** 111:14
**necessary** 113:25
**need** 5:16 10:16,18
11:8,23 17:14

55:3,10 96:2
138:17 145:11,11
164:6,13 221:18
**needed** 55:17 59:3
83:18,19 147:8
154:23 222:9
**needs** 164:21
**nevada** 1:15 4:1
159:16 160:7
171:25 173:1
182:4,17,17
189:14 196:6
199:5 246:1,21
**never** 16:5 57:9
58:17 118:6 148:7
215:25 218:13,17
226:4 241:2,3
245:8
**new** 22:5 145:17
190:11,12 194:3
197:10,15,15
198:21 199:9,20
199:25 201:13,15
203:5 211:22
212:4 221:19
227:11
**newark** 194:3,9
195:9
**newkirk** 198:9
203:19
**newport** 199:18
**niagara** 193:6
198:21 200:6
**night** 152:16
**nine** 193:23
**ninety** 199:24
**non** 4:11 81:25
233:1,20 234:15
**normal** 136:4
137:17

**north** 200:20
**notation** 212:1,2,6
**notations** 205:18
**note** 207:10
**notes** 49:22 205:23
209:21 246:14,16
**notice** 39:3 74:16
128:17 129:20
142:6 168:6
220:18
**notification** 78:20
79:7 99:14 116:11
118:20 120:6,7
181:6
**notifications** 142:9
**notified** 82:25
**notify** 83:7
**notifying** 82:21
94:19
**november** 15:12
15:13 21:14
**number** 39:4,13
39:16,17,18,20,21
39:24 54:16 55:16
123:20 124:10,20
124:23,25 125:3,6
125:8 129:1
157:16,19,20,24
158:1,4,14,18
161:24,25 162:2
162:11,12,13
163:3 165:7,7,11
168:24,25 169:5
170:23,24 173:23
185:24 212:9,11
**numbers** 54:6
157:22 158:17
173:7 195:2
205:16 206:2
221:11 243:11

Page 20

[o - okay]

| o | | | |
|---|---|---|---|
| **o**  190:19 226:11 | 93:2,9,17 94:6,14 | 170:4,11,16 171:9 | **october**  21:16,20 |
| **o0o**  3:25 4:3 | 94:24 95:10,16,22 | 172:1,10 173:2,14 | 149:6 |
| **oaks**  15:8,10 29:20 | 96:4,13,17 97:1,8 | 175:19 176:3,14 | **odw**  1:6 |
| 29:23,24 | 97:17 98:3 99:12 | 176:24 178:1,14 | **offer**  124:9 |
| **object**  20:3 43:15 | 99:20 100:6,14,19 | 179:10,14,22 | **offhand**  146:21 |
| 65:8 187:19 202:2 | 101:9,17 102:2,12 | 180:19 181:1,9 | **office**  13:11,25 |
| 216:12 232:25 | 102:18,25 103:7 | 182:25 183:7 | 25:18 32:20 53:11 |
| 233:20 234:11,14 | 103:25 104:9,15 | 184:3,9 185:11,17 | 71:10,17,19,20,22 |
| 243:2 | 104:24 105:6,10 | 186:8,14,22 | 80:15 83:23 90:10 |
| **objected**  17:8 | 105:17 106:3,14 | 187:11,15,21,22 | 90:18 91:3,7 |
| **objection**  16:20,25 | 106:20 107:3,9,22 | 188:1,4 192:12 | 121:12 222:25 |
| 17:6,7,18 18:9,12 | 108:7,14,20 109:1 | 209:6 212:18 | **offices**  116:5 |
| 18:13,17 20:21 | 109:14,22 110:6 | 213:1 214:9 | **official**  21:25 |
| 23:1,6 25:14 | 110:13 111:10,21 | 216:18 217:16,22 | **oh**  194:7 204:10 |
| 33:10 35:15,24 | 112:13 114:5,24 | 218:14,24 220:9 | 210:14 232:17 |
| 44:8 45:2,11,15,22 | 115:21 116:15,25 | 230:3,6 231:24 | **ohio**  198:24 |
| 46:23 47:6 48:16 | 117:11,17 118:4 | 232:8 233:11,25 | 200:22 |
| 48:25 49:24 50:16 | 118:22 119:13,22 | 234:9,20 235:16 | **okay**  7:25 11:3,10 |
| 50:24 51:5,19,24 | 120:9,17 121:3,9 | 235:25 236:16,19 | 12:2,3,6,18,23 |
| 52:8,17,23 53:5,12 | 122:8 123:4 126:9 | 239:3,20 240:9 | 13:1,6,16 14:17,24 |
| 53:19,24 54:13,23 | 127:15 128:1,6,15 | 242:11,20 243:1 | 15:2,5,9,22 16:6 |
| 55:5 56:6,15 57:3 | 129:11,18 130:21 | 243:17 244:1 | 16:13 19:12,16,23 |
| 57:14 58:10,24 | 131:1,25 132:5,11 | **objections**  11:22 | 20:12 21:3,7,13,23 |
| 59:7,17 60:1 61:4 | 132:20 133:1,7,23 | 46:2 69:20 96:1,2 | 22:2,5,15,21 23:17 |
| 61:19 63:1,8,21 | 134:16,23 135:15 | 109:8 173:19 | 23:23 24:5,9 25:6 |
| 65:18 66:15,23 | 135:23 136:8 | 180:6,9 181:15 | 25:13,17,21 27:12 |
| 67:5,15 68:7,13,20 | 137:5,12,21 138:2 | 188:6 195:6 217:1 | 28:6,11,25 29:4,13 |
| 69:2,13 70:5 | 138:11,14,18,19 | **obtain**  160:16 | 30:2,19 31:18,21 |
| 72:15,20,25 73:9 | 139:2,11,18 140:3 | 161:2 167:2 | 32:2 33:7,22 34:6 |
| 73:23 74:4,11,22 | 140:11,16,21 | **obtained**  138:13 | 34:19 35:20 37:7 |
| 75:2,5,10 76:18 | 141:3,11 142:2,12 | 146:23 160:4,15 | 37:23 38:11 39:25 |
| 77:18,25 78:17 | 142:22 143:15,19 | **obviously**  72:7 | 40:14 41:20 44:12 |
| 79:3,10,16,22 81:8 | 144:21 145:4 | 74:3 130:2 165:23 | 44:24 46:2 47:12 |
| 81:13,25 82:6,22 | 147:1,5,19 148:21 | 166:10,14 188:2 | 51:14 52:12 54:7 |
| 83:15 84:4,11,18 | 149:9 150:6,15 | 206:11 | 54:21 55:2,10,13 |
| 85:2,7,12,23 86:12 | 151:1,7,12 152:1 | **occasions**  223:13 | 57:25 59:14 60:17 |
| 86:22 87:9,18 | 155:10 158:23 | 223:14,15 | 61:23,25 64:2,25 |
| 88:5,16,20,25 89:4 | 159:21 160:19 | **occurred**  70:23,25 | 66:8 67:2,11 69:9 |
| 89:14 90:4,11,19 | 161:5,11,18 | 83:7 89:13 92:11 | 70:22 71:6 72:8 |
| 91:10,20 92:3,21 | 165:13 166:12,19 | 128:5,8 | 73:3,7,19 74:18 |
| | 167:16 169:20 | | 75:14 76:11 77:11 |

Page 21

[okay - particular]

77:23 78:7,25
79:24 80:21 81:7
81:24 83:9 86:2
86:18 89:23 91:2
91:24 92:10 98:8
98:23 100:11
101:22 102:7
105:22 106:11
109:18 111:7
112:22 113:14,17
113:24 114:1,20
117:7,23 118:25
120:14 121:21
123:22 126:3
127:5,11 128:10
128:22 133:10
134:25 144:4,13
144:18 145:14
146:4,14,19
147:10,15 148:5
148:12,19 149:2,7
149:17 152:6,25
153:3,14 154:1,9
155:19 156:1,15
156:19 157:18,25
158:18 159:13,15
162:1,3,18 163:7
163:14 164:4
165:21 168:23
169:3,17 170:20
171:20 173:7
174:7,11 175:6
177:5,15 178:5,25
179:8 180:1,23
181:23 182:1,6,14
183:12,13,17,23
184:13,14,18,24
185:22 186:1,6,12
188:10 189:2
190:10 193:6
194:3 195:19,22

197:4 198:5
199:23 201:13
202:9 203:21
205:4 206:5,8,18
207:3,7,25 209:2
209:12,21,24
210:15 211:5,13
212:9,23 214:6
216:1,5 218:9
219:10 220:14,23
221:23 222:13
223:6,9 226:12
227:1,4,7,14,20
229:22 230:14
231:9 233:9
234:23 235:5
236:7 237:15,23
238:24 240:15
242:17
**oklahoma**   175:13
183:14 184:2
190:19 198:9
203:10,16,19
**okmulgee**   175:13
**old**   220:3 221:14
221:16
**once**   81:21 95:8
139:1
**ones**   224:17 226:5
**online**   55:21 99:4
101:6 105:4 113:6
113:16,17,20
114:11 115:6,16
118:2 181:8
**ontario**   185:3
196:15
**open**   72:6
**opened**   73:4
**opinion**   82:7,9
**opportunity**
156:16 180:5

**opposed**   174:17
**order**   1:13 6:12
106:8 164:18
222:10
**ordered**   151:17
**ordering**   151:11
**original**   17:20
245:2
**owned**   15:1

**p**

**p.m.**   245:10
**package**   70:4 72:9
73:4
**page**   3:2,8 12:16
14:2 123:20
124:18 125:3,7
128:18,25 129:24
130:5 156:4,5,20
157:8,8,12,14
158:13 163:12,13
175:8,8,9 177:7
178:10 179:2
182:13 183:11,18
183:22 184:14
186:2 189:3,13,23
190:10,11 191:3
192:20,20 193:2,2
193:9,18,23 194:1
194:3 195:13,13
195:19,22 196:3,6
196:10,12,15,20
196:23 197:5,7,12
197:14,20,20
198:2,9,17,21,24
199:3,5,9,13,16,23
199:25 200:2,9,13
200:17,19,24
201:1,4,8,11,15,19
202:11,14,18,21
202:25 203:2,3,5,9
203:18 225:23

231:3,4,5,10
**pages**   1:12,25
13:12 157:9
195:16,25 196:17
197:1,9 198:7
199:20 200:6,11
225:24
**paid**   28:3 38:3
56:3 57:7 69:17
69:18 83:19 85:16
86:21 87:25 91:5
99:7 104:5 113:7
117:20 134:13
171:15 172:9,25
179:12 204:23
212:7 214:7,18
218:7 237:3 241:1
**palm**   196:21
**paper**   174:9
**pardon**   23:25
206:15 230:4
**parentheses**   13:3
**park**   201:19
202:12
**part**   11:24 30:4
56:2,4 94:2 102:8
102:16 107:19
108:2 109:12,20
110:4 135:12
136:3 141:17
188:14,15 235:6
245:3
**particular**   20:9
31:24 39:3 58:3
85:10,17 90:23
92:13 102:24
103:18 111:6
117:14 123:12
126:23 127:11,18
127:22 128:19
131:10 137:4

CONFIDENTIAL

[particular - podwall]

147:14 168:22
177:25 226:7
**party** 4:11,12
246:12,19
**pasadena** 195:11
**pass** 241:13
244:19
**password** 55:13
55:16
**pause** 179:18,21
**pay** 34:4 40:16
48:1,4 101:5
172:4 204:10,10
204:12,15 209:19
216:2 217:20
218:3 219:6
240:21,22
**payable** 3:21 14:4
**payee** 166:22,24
232:13
**paying** 28:5 38:1
88:7 167:19 204:7
207:22 217:12
219:8
**payment** 39:16
40:10 68:11 86:25
92:2,20 94:20,21
94:22 98:25
100:12,17 101:4
101:12,13,25
102:22 103:6,17
103:19 104:5
105:5,14,15
106:25 114:3
115:8 119:8,11,21
120:5 128:13
130:18 138:25
140:9 168:7,21
170:9,15,23
171:12,16 204:19
208:7 231:16,21

232:15
**payments** 49:10
49:12 68:6 99:19
101:23,23 106:1
107:21 114:18
118:15,20 119:3,6
120:23 122:3,6
123:1 125:14,20
125:25 126:4,4
129:2,3,17,21
138:9 139:9 141:1
156:25 171:21
204:2 215:3,7
216:2,6,10,24
218:11
**payor** 88:24 89:2
166:22,24 167:23
232:13
**payrolls** 53:14
**pennsylvania**
195:17 197:23
199:11 200:4
201:17 202:19
**people** 11:14 27:9
27:16 31:6 38:2
61:17 148:10
**percentage** 81:23
**perfectly** 9:4
**perform** 225:7
**performance**
34:24 37:14,16,18
63:4 67:21 68:11
68:22 73:11 74:14
74:16 86:24 87:7
87:17 88:1 95:3,8
161:10,16 167:3
172:5 185:4 186:4
186:7 191:3
231:12,13
**performances**
28:4 34:4,9 38:9

42:25 43:1,4
46:13 54:10 62:2
86:7 91:18 94:5
102:11,24 111:20
111:24 112:11
126:6 134:11,14
135:9,14 139:10
141:2,10 186:20
218:8 223:21,22
224:7 225:11
**performed** 12:22
139:1 176:12
232:2
**performer** 134:3,7
**performers** 36:8
77:12
**performing** 34:7
69:16 95:2 134:21
134:22
**period** 34:13 35:9
35:21 36:12 37:4
37:8,13,25 38:7,12
38:15,19 40:3,18
40:23 41:3 42:4
44:22 45:14 47:21
49:6 51:15 59:25
61:15,15 66:22
70:23 71:1 80:19
89:13 90:3 91:4
92:16 99:11 102:1
111:17 112:9
115:20 125:15,18
126:23 214:15,20
215:8
**permanent** 15:3
15:14
**permission** 150:12
150:13,20 153:19
**permitted** 7:18
**person** 217:4,19
240:7 246:20

**personal** 44:10
162:16 218:5
226:15,18
**personally** 75:18
76:4 101:15
118:12,18,24
140:19
**pertained** 146:12
**petersburg** 200:15
**phoenix** 197:4
**phone** 153:9
**physically** 174:8
**pick** 64:7 68:11
71:23 148:9
**picked** 70:3
**picking** 67:21 68:6
69:12
**piece** 174:9
**pile** 209:13
**pittsburgh** 201:17
**place** 68:19 69:11
80:19 84:2,7
91:16 92:25
**placed** 12:7 39:2
205:9
**places** 225:5,8,12
233:10
**plaintiff** 1:5 2:2
**plans** 16:2
**please** 10:14 12:15
17:20 46:7 59:21
116:19 124:22
135:18 193:2,9
224:10 232:12
**pllc** 2:8
**plural** 88:3
**podwall** 1:4 3:22
144:13 204:3,7
208:7 211:7
217:14

Personal Court Reporters, A Veritext Company
818-988-1900

[point - prussia]

| | | | |
|---|---|---|---|
| **point** 22:9 24:23 35:12 61:9 71:11 80:7,7 83:4 142:20 144:14 145:14,24 233:22 234:7 235:15 | **prepared** 12:24 13:4 182:19 183:14 185:3 215:9 242:9,18 | 164:19,22 174:6 222:6 227:8 232:2 | 21:11,14,21 28:7 29:9 |
| **pointed** 233:15 242:24 244:18 | **preparing** 134:25 135:2,6 | **problem** 10:23 93:22 | **proficient** 51:12 |
| **pointing** 123:10 123:11 210:14 | **press** 6:13 | **problems** 58:18 219:7 220:7 240:25 243:22 | **program** 226:9 |
| **poor** 15:24 | **pretty** 11:13 225:9 | | **promoter** 88:24 89:3 100:24 101:2 160:16 |
| **populate** 127:3,14 156:16 | **previously** 15:7,7 127:20 167:14 173:9 176:19 183:5 184:8 185:16 186:13 188:24 | **procedure** 17:3,12 18:22 20:6 68:18 69:10 70:1 76:11 76:15 80:18 84:1 84:7,15 89:23 90:1 92:25 94:19 101:24 104:13 122:4 127:20 140:19 176:19 180:12,13,24 181:4,18 183:5 184:8 185:16 186:13 187:10 188:23 189:8,9,20 189:21 190:6,17 190:18,25 191:1,7 192:2 | **proper** 20:5 185:19 186:15 187:13,23 |
| **populated** 156:19 157:6 | | | **properly** 17:2 |
| **portion** 13:20 17:22 82:15 | **primm** 159:16 160:7 167:6 171:25 173:1 189:14 232:14 | | **prosecute** 7:12 |
| **portions** 13:10 122:14 | | | **prosecuted** 6:1,11 8:22 |
| **posed** 7:1 43:17 | **print** 58:4 61:1 97:19 111:3 122:12,14,19 220:20 221:7,10 221:11,17 222:10 | | **prosecution** 6:3 9:14 |
| **position** 117:5,9 | | | **protect** 213:24 |
| **possible** 6:3 219:19 230:22,23 | | | **protective** 1:13 164:18 |
| **post** 71:10,17,18 71:20,22 | **printed** 103:20 146:15 | **procedures** 81:19 82:20 91:16 | **protects** 6:9 |
| **potentially** 111:15 145:11 162:11 | **printing** 60:16 | **proceeding** 12:1 18:16 96:1 | **protocol** 68:18 69:11 137:17 |
| **potion** 43:7 | **printout** 123:12 163:5 209:19 | **proceedings** 246:10 | **protocols** 81:19 |
| **practice** 76:14 89:12 104:13 135:13,20 136:4 137:2,17 138:23 139:6,15 140:25 | **prior** 46:24 50:21 59:18 68:12 69:16 91:11 92:4 95:2 99:21 101:18 107:23 111:2,11 132:4 136:17 146:18 147:8 155:11 173:3 246:7 | **proceeds** 214:20 | **provide** 16:24 32:7 34:1 37:25 41:14 57:8,21 58:7 60:6,11,13 83:24 85:5,11 151:22 153:17 211:13 |
| | | **process** 19:22 180:3 | |
| | | **produced** 13:11 13:14,21,24 14:6 205:11 | **provided** 33:19 37:12 93:6,14 96:12 154:24 155:1,4 208:25 209:2 211:3,14 217:5 |
| **practices** 94:2 | | **producer** 31:4,17 | |
| **prefer** 156:2 186:24 | **privilege** 5:19 6:23 213:22 | **production** 167:20 | **providing** 33:1 43:9 102:22 103:5 208:23 211:2 |
| **premarked** 12:6 | | **profession** 21:24 | |
| **preparation** 143:24 | **probably** 12:8 23:19 112:3 | **professionally** 20:14,16,19 21:8 | **prussia** 200:4 |
| **prepare** 143:13 236:8 | | | |

Personal Court Reporters, A Veritext Company
818-988-1900

**publicist** 236:11
**publicity** 39:15
**pull** 114:21 125:19
**purpose** 42:9,13 42:19 61:3 141:7 141:15 188:13
**purposes** 42:18 141:18 143:10 187:3 209:4,5,9
**pursuant** 7:23 10:10 13:11,15,21 13:25 17:2,12 19:25 20:5
**put** 6:1 18:24 44:16 97:19 110:21 130:9 152:20 154:4 157:13 159:14 180:8 185:22 227:22

**q**

**qualified** 82:9
**qualms** 222:21
**question** 7:1 15:6 15:24 17:8,9,10,14 17:19,21 18:17 19:2 20:13 21:1 23:12 33:17 43:17 46:7 48:10 56:9 59:9,20 82:13 103:3,13 107:25 126:18 133:17 136:17 179:15 182:15 188:5,7 191:15,17 194:13 194:16,22 210:3 213:15 217:25 218:9 221:16 230:1,2 234:18 235:2 239:13 244:12
**questioned** 204:23 207:23
**questioning** 7:25
**questions** 5:25 6:8 7:4,9 9:19 10:13 11:5 14:10,13,14 14:16 90:23 186:19 187:16,18 187:22 188:2,18 213:13 214:6 217:9 219:12,13 219:16,18 222:18 223:6,9,11 238:19 238:20 240:1,16 243:20 244:11
**quick** 61:10 121:22 122:2 178:5,9 219:18
**quickly** 102:7 105:9,11 111:13 175:7 177:4 184:14 205:4 211:17 244:24
**quiet** 9:6
**quite** 22:25 23:3 50:9,10

**r**

**r** 36:15,15 112:7 185:7
**raised** 71:11
**rama** 185:3,7 202:25,25
**ramon** 186:3,7
**ran** 210:8,16,20,21
**rapids** 158:5 189:23
**read** 17:14,19,23 73:25 82:16 86:16 96:8 129:5 165:1 168:14 186:5 197:16 201:22,24 202:7
**reading** 6:12 220:18 246:10
**ready** 144:6,7
**real** 102:7 177:4 244:24
**really** 11:24 63:23 68:4 144:25 223:23 226:16
**reask** 51:2 70:24 80:25 100:17 114:9 127:7 182:15
**reason** 10:17 12:3 15:17 31:24 42:17 64:11 69:18 90:24 92:14 130:1 141:25 213:18 214:2
**recall** 62:12,15 144:10,13 149:20 152:8 204:21 206:18,21 210:24 211:2,13 239:15
**receipt** 91:14 98:23 101:24 106:23 122:6 135:9 173:11 181:4,6 215:2,6
**receipts** 216:24
**receive** 70:8,10,12 70:16 71:7 79:6 85:20 86:5 87:15 88:2,3 89:10 91:25 92:17,18 93:24 96:8 97:12 97:14,23 98:8 104:3 110:17 116:10,21 118:19 138:1 140:9 142:6 167:4 172:5 214:13
**received** 37:16 54:9 58:15 71:6 71:25 73:20 74:3 75:16 87:6 89:21 94:13 95:2 96:20 103:16 105:22 111:1 113:2 119:9 120:15 123:2 125:20 126:5 129:4,21 130:17 131:22 132:3 141:1 167:8,14 169:15 171:7,24 216:3 218:11 231:22
**receiving** 76:13 89:24 105:3 116:13,24 130:7 137:10 144:10,18 145:2 204:19
**recess** 61:12 121:23 178:7
**recognize** 126:19 205:13,14 207:14 209:14 224:11 225:24
**record** 7:16 10:22 11:23 12:11 17:18 17:22 18:16 21:19 42:15,21,24 43:12 44:18,19 46:10 47:9,12 49:2,6 54:7,18 72:4 82:15 96:2 104:7 104:17 105:20 106:11,25 117:8 117:15,19 119:11 119:16,20,25 120:16,19,22 127:21 128:13

[record - report]

129:6,9,16 131:16
139:8 140:25
141:9 157:4
160:11 164:6,11
168:9,16,16,17,18
169:25 170:9
174:9 180:9
182:12,16 183:13
184:19 185:2
186:3 187:7
188:19 189:10,13
189:23 190:12,21
191:2,20,23
193:18 198:15
205:17 212:25
213:3,5 215:2
216:6 218:10
236:20 239:8,14
242:4 244:25
**record's** 195:2
**recorded** 54:12,16
54:21 57:12 59:23
103:24 105:14
106:2,7,17 107:8
127:6,9,24 128:20
128:23 129:7
130:7,13,25
131:12,23 132:23
133:5 147:8 157:6
161:17 169:14
170:14,21 171:25
173:8 174:19
175:12 177:20
214:20,25
**recording** 43:12
44:4 106:1 122:3
135:7 169:24
176:20 177:17
180:9
**recordings** 44:20
45:9,19 46:4,16

47:5 107:6 117:8
122:5 128:4
129:14,15 133:14
133:18 139:25
143:3 169:17
216:10,23
**records** 6:18 38:22
44:4 57:19 133:12
133:20 139:23
151:23 152:7
153:18 154:3,13
154:19,22,23
155:4,9 182:2
216:7 233:9,16
**recovery** 31:7
**redacted** 13:12
**reduce** 172:20
**ref** 159:11 165:3
**refer** 14:12 25:10
44:24 181:17
**reference** 165:6
**referenced** 162:7
**referencing**
159:25 166:24
**referring** 44:15
46:13 73:7,15
162:5,10 165:8
166:1 206:14,16
230:9
**reflect** 182:13
194:24 198:15
**reflected** 176:12
**reflects** 158:19
**refresh** 65:1
165:16 207:20
211:5
**refusal** 240:11
**refuse** 6:8 7:4
214:22 239:6,11
239:22 240:2,17

**regard** 5:21 6:17
**regarding** 8:11 9:1
90:23
**regular** 107:19
108:2,11 133:20
139:6 140:25
**regularly** 133:15
140:14
**related** 37:3 38:24
59:15 150:21
208:14 211:7
**relating** 9:12
**relation** 6:5 120:4
129:16
**relationship** 32:13
77:17
**relative** 246:18
**release** 95:9,12
138:25 150:20
151:4 152:7
**released** 138:9
**releasing** 95:20
108:4
**relevance** 67:6
236:21 240:9
**relevant** 144:3
**reliability** 229:6
**reliable** 58:22 59:2
108:25 141:8
**relied** 238:12
**relies** 117:2
**rely** 93:8,13,22
137:6 143:11
**relying** 142:20
143:6
**remember** 18:10
23:23 24:1,22
26:6,8 28:10,17,20
28:20 29:9 31:1
31:11 32:24 33:23
34:17 36:13 39:6

39:17 55:15 58:20
65:23 66:1,2,4
74:20 81:5,16
91:22 144:12,18
144:23,25 145:2,5
145:7,12 146:21
150:1,2 152:4
153:9 154:14
155:25 158:16,20
158:25 159:6
165:9,15,19 204:4
204:11,13,14,17
204:18,22,25
205:2,3 207:16
208:22 209:24
211:8 220:1,2
222:3 223:11
224:6,20,21,24
225:4,5 226:1,2,5
235:19 236:17
237:4,5,14,20,22
239:2,5 245:8
**removal** 150:10
153:1,5
**remove** 145:25
146:8 149:3
152:18 154:4
**removed** 146:11
153:11 154:6
**removing** 149:7
**repeat** 11:8 59:20
107:24 116:18
135:18
**repeatedly** 59:18
**repeating** 9:9
**rephrase** 11:8
43:25 46:8
**replaced** 65:7
**report** 3:11,13,15
3:17,19 13:3,19,23
123:15,25 124:4

Page 26

[report - robinson]

125:13 126:4,7
172:13 210:9,17
210:21 215:12
**reported** 1:22
215:8,17 246:4
**reporter** 11:12
17:23 18:14 80:6
82:16 164:15
179:23 244:21
**reporter's** 246:1
**reports** 57:22,23
58:1,8,15 123:7
124:7 127:12
135:1
**represent** 4:8 13:8
13:13,19,24 14:5
31:11,18 32:5
77:12 162:20
205:11
**representation** 5:8
**represented** 4:18
32:3,15 33:8,11,12
**representing**
31:21 35:13,16,17
78:11
**represents** 172:25
**request** 60:20,21
60:22 122:22
145:3 154:12
**requested** 17:22
82:15 154:14,18
210:23 246:11
**requesting** 205:25
206:1,3 210:24
**res** 159:16
**research** 62:16
**reside** 14:21
**residence** 15:3
29:18,19,24 38:3
71:10,16,19

**residences** 71:15
**resort** 203:14
**resorts** 167:7
232:14
**respect** 17:1 25:14
33:10 35:16 58:11
69:10
**respectful** 242:1
**response** 6:25
83:24
**responsibilities**
38:6,16
**responsible** 38:21
217:11
**responsive** 81:25
233:1,20 234:15
**rest** 188:16 191:11
**restate** 17:7
**restroom** 61:10
**result** 154:21
**retired** 16:7 29:12
29:16 30:3
**retrieve** 148:11
**return** 179:5
**returns** 60:3 61:3
143:13,25 215:10
215:13
**revenue** 34:24
212:16 215:14,19
**review** 12:10
57:11 86:11,15,20
87:5,11,14 88:1
160:4 245:5
**reviewing** 89:25
**rhonda** 2:9 4:8
124:24 163:20,25
165:1 180:6
186:18 191:11
219:15
**richmond** 200:11

**ridgefield** 202:23
**right** 5:1,24 6:7,25
7:2,2,4,6,10 8:1,3
10:3,7 12:11 13:6
16:5 19:23 21:7
21:19 22:17 26:5
29:7 37:23 38:5
39:13 50:1,8
51:11 52:4 55:17
60:24 61:8 63:7
63:12 64:12 67:18
70:15 74:3 75:14
76:23 80:4 84:14
89:20 90:8 91:13
96:9 100:11
103:15 108:13
109:5 111:13
112:17 114:12
115:18 119:2
120:7,22 123:20
124:12 126:15
130:15 146:21
152:23 153:8
156:1 159:10
160:9 161:8,23
163:7,16,19
165:24 166:6
167:2,9,23,25
168:9,12,23 169:8
169:8 171:19
173:13 174:2
175:11,16 176:1
177:3,6,16,20
178:5 180:18,21
181:23,24 182:2
184:19 187:11,25
190:10 192:4,24
201:1,8 202:11
204:25 206:4
209:14 211:24
213:12 214:18

217:15 219:5
223:2 225:14,16
236:4,10 237:7,19
238:21 239:9
242:4,22
**risk** 9:19
**river** 203:12,14
**road** 37:22 61:24
62:3 63:19 65:2
72:11 99:24 100:2
**roanoke** 202:11
**rob** 62:17,19,21
83:22,23 90:9,17
91:3
**rob's** 90:18 91:6
**robbed** 240:6
**robinson** 1:7 3:11
3:12,14,16,18,20
4:9 5:23 6:6,13,15
13:3,18,22 14:2,3
14:6 31:2 32:3,16
32:19 33:2,8,16,20
34:2,7,11 35:13,22
36:11,20,21 37:4
37:13,17,20,25
38:16,24 39:19,22
40:1,16,23 41:8
42:5,10 43:9
47:17,24 48:21,24
49:11 51:14,22
52:13,16,22 53:4
56:5,13,24 57:17
57:21 58:7,14
59:15,24 60:14
61:17 63:15,16
65:13,21 66:14,21
67:12,18 68:2,12
69:10 73:15,16,18
73:21 77:13,17,24
78:16 81:18 87:6
87:25 92:16 95:21

[robinson - sent]

97:24 98:10 99:1
99:10,18 100:5
101:5,13 104:5,14
106:24 108:3,5
110:18 116:12
118:1,15,19
125:20 126:5
133:16,21 134:19
135:3,8 138:25
140:9 141:1
146:13,16 147:17
149:18 150:2,3
151:10,23 152:3
152:10 155:3,3,9
155:15 169:15
171:24 173:1
175:17 176:1,12
204:1 205:11
206:9,19 208:1,6
208:10,11,18,23
209:1 212:16
214:7,13,18 215:2
215:13,23 216:2
216:11 217:4
219:6 225:6
230:11,16,20
235:6 237:3,9,12
237:16,17,25
238:6 239:1,18
240:20,21 241:1,4
244:6
**robinson's**  6:19
34:23 38:6 42:21
42:24 43:10,13
44:2,5,21 45:20
46:4,11 49:7
53:23 54:8 56:21
61:2,3,16 62:22
71:4 72:2 80:22
81:2 82:19 84:9
86:7 87:16 89:11

90:3 91:15,17
94:5 101:16,25
102:9,11,23 104:4
104:6 105:24,25
107:15,21 109:12
109:21 110:5
111:19 114:3
117:15 119:6,9
121:7 125:13
134:2,5 136:6,21
137:19,25 138:6
138:10,24 139:9
139:16 140:1,20
141:9 142:8,19
143:6,13,24
148:15 150:10,19
152:25 154:3
160:5,15 170:2
173:11 177:22,24
181:7 182:3,6,17
182:23 183:14
184:1,20 185:3,9
186:3,6 187:8
188:21 189:16
190:1,14 215:6,10
215:13,19 216:24
217:12,21 218:4
223:20 236:11
237:12 240:6
**rock**  203:16
**roger**  31:4,12,19
**room**  11:22
**rouge**  193:3
**royalties**  28:3 36:4
37:5 43:1
**rule**  11:11,25 17:2
17:12 18:21 20:5
68:17
**rules**  10:8
**run**  125:12 126:6
192:4

**runners**  75:22
**running**  186:21
187:15 192:11
**rwillis**  2:11

**s**

**saint**  200:15
**salary**  40:8,10
**sale**  212:17 215:3
215:14 218:12,21
**sales**  215:23 216:3
216:6,11,25
**san**  186:3,7 198:2
198:11,13
**saratoga**  192:6
**saturday**  1:16 4:1
246:5
**saying**  43:17 85:14
144:14 180:10
184:21 188:4
217:7 233:3
**says**  10:13 129:5
159:15 163:1,16
167:6 169:9 174:4
201:25 202:6
207:10 210:5
211:21 231:16
232:13,15
**school**  22:4
**seaside**  177:17
**second**  19:9,20
22:13,15 25:25
27:13,20 28:6
101:12 118:17
119:5 129:7
133:11 156:4,5
157:14 159:10
163:13,20 168:7
171:17 172:16
224:6
**see**  24:20 31:15
39:5,21 47:4

62:16 64:21 79:13
79:19 86:16,20
87:2 88:7,11,14,23
89:2 98:12 99:6
113:7 114:3,17
115:11,16 123:17
131:6,9 156:8
157:16,22 158:15
158:16 159:17
161:25 163:1,6,10
163:15,25 166:22
169:10 173:22
174:4,21 175:12
175:24 176:10
177:16,18 182:9
197:9 201:24
207:10 210:5,6,7
210:13,15 211:18
222:10 231:16
232:14
**seeing**  144:23
207:19 221:17
243:22
**seek**  7:13
**seen**  16:17 115:5
144:8
**self**  5:19 6:10,24
7:3,10
**semi**  29:12,16
**send**  60:17,24 61:1
72:13 78:19 80:14
83:8,12,25 85:13
96:24 97:3,6
135:22 136:5
153:20
**sending**  78:14
96:21
**sends**  174:10
**sense**  103:14
**sent**  72:1 78:20
79:7 80:8 103:21

CONFIDENTIAL

**[sent - smokey]**

131:20 170:2
207:6 237:12
**separate**   52:5 54:5
54:15 89:17
**separately**   53:15
**september**   32:14
144:11 145:10
149:5,24 154:10
**serve**   7:22 18:21
**served**   16:18 17:2
17:11 18:4,7,20
**server**   19:22
**services**   32:6 33:2
33:20 34:1 37:12
37:24 38:2 40:2
40:17 41:15 43:9
**settlement**   168:10
168:20 169:25
170:21
**seven**   31:20 193:9
**she'll**   165:1
**sherman**   15:8,9
29:19,23,24
**shop**   33:25
**shorthand**   181:21
246:13,16
**shortly**   132:9
**show**   37:17 39:23
58:3 67:12,13,19
70:16,18 72:14
73:21 83:13 84:17
84:24,25 85:5,17
85:21 86:6 87:7
88:9,12,15 89:16
89:17,24 90:23
91:4 92:5,12,16
97:16,24 98:10
99:10,18 101:13
102:1 108:5
110:18,20 111:2,6
115:15 116:11,22

117:20,25 119:15
123:13 124:23
125:3,6 128:5,19
129:21 136:6
137:19 138:1
139:1 140:9
157:20,24,25
158:1,4,4,8 160:1
160:5,7,12 167:14
168:22 171:20,25
173:1 175:12,18
175:23 176:2,2,11
177:25 178:11,13
180:17 182:3,7,17
182:24 183:15
184:2 185:10
187:7,9 188:17,18
188:20,22 189:11
189:14,17,22,24
190:2,11,12,15,21
191:9,20,24
192:17,21,24
193:3,6,10,12,15
193:20 194:4,5,20
196:1,6,9,12,15,18
196:21,23 197:2,5
197:7,10,12,15
201:2 203:10
204:9 212:8
218:22
**show's**   92:17
103:21
**showed**   223:14,17
**showing**   92:7
96:20 125:13
135:8 206:3
**shown**   164:10
**shows**   12:21 34:9
34:12,24 63:6,12
63:24 66:10,13,14
68:1,3 70:19,20

72:2 76:13 77:10
77:20 82:20 83:1
83:5 87:16 89:11
90:3 91:15 103:6
104:14 105:24
106:24 114:4
118:16 119:7
123:2 126:22,24
127:18,22 128:8
130:2 136:6 137:3
137:3,11,25 138:7
140:1 159:14
160:10 187:6,17
191:13,18,19
205:25 212:17
214:8,14,14,16,19
215:4,7,15,24
216:3,11,25
218:12 225:12
**sic**   33:3 73:18
112:7
**side**   185:22
**sight**   220:19
243:20,24
**sign**   37:15 71:21
164:21 165:1
244:23 245:5
**signature**   74:21
238:25 246:24
**signed**   94:1 207:2
209:1
**significance**
131:18
**signify**   210:8
**signing**   246:10
**silly**   48:10
**similar**   156:3
**simply**   233:3,22
234:17
**sit**   9:18 10:18 16:1
144:2 237:19

**six**   13:17 14:25
15:11 31:20
**skipped**   200:25
**slip**   106:9 174:20
174:23
**sloan**   192:24
**slowly**   10:24
**small**   220:20
221:7,9,11,11
222:10
**smaller**   221:17
**smokey**   1:7 4:8
8:10 12:21 31:2
32:3 33:8 38:16
38:23 39:22 42:5
43:10 44:2 51:14
54:7 56:5 59:14
59:24 60:14 61:1
63:4,15,24 65:3,12
65:14,21,24 66:13
69:16 72:1 73:14
73:15,18,20 77:12
77:17 78:3,16
80:22 81:2,5,11,18
82:18 84:8 85:14
86:6,21 87:6,15
89:10 90:2 91:15
91:17 92:15 94:4
95:21 97:24 98:10
98:25 99:9,18
100:5 101:5,12,16
101:25 102:9,11
102:23 104:4,5,6
104:14 105:23,25
106:24 107:14,21
108:3,5 109:12,21
110:5,17 111:19
114:3 116:12
117:15 118:1,15
118:19 119:6,9
121:6 125:20

Page 29

[smokey - start]

126:5 133:15,21
134:2,5 136:5,14
136:21 137:19,25
138:6,9,24,25
139:9,16 140:1,20
141:1 142:7,19
143:5,13 145:18
146:12,16 147:17
148:15 149:11,15
149:16 150:10,19
151:10,21,23
152:3,9,25 154:2
155:3,8 160:4,15
169:14 170:2
171:24 173:1,10
204:1,4,12 206:9
206:19 207:1
208:11 214:7,7,13
215:23 216:11,24
217:4,12,20 218:4
219:6 227:10
241:3

**smokey's** 76:12
110:22,23 137:3
137:11 146:2
169:1 218:22

**software** 46:19,22
47:20 48:14,19
49:5 50:5,20
54:19 59:5 121:7
226:9

**sold** 214:8,15
215:7

**somebody** 62:17
62:20 148:9
151:19 206:12
210:23 211:4,6,9
211:11 222:24
236:8

**someplace** 146:20

**songwriter** 31:3

**soon** 105:19
106:23

**sorry** 16:22 24:1
33:5 36:1 39:10
52:19,21 55:6
67:23 80:24 87:4
90:12 93:11,21
96:14 103:13
106:5 107:24
109:16 116:3,18
118:23 121:17
125:23 130:12
144:5 154:11
160:24 161:13
162:18 163:8
165:4 168:13,18
178:23 179:2
182:12 183:18
185:6 195:15
200:25 201:24
203:12 210:1
212:5 218:9,15
219:1 226:7 239:8

**sort** 20:9 22:22
26:24 31:10 32:6
33:25 40:6,17
42:19 48:2 55:17
56:3 57:22 66:20
74:8 92:1,18
94:20 100:13
116:1 120:16
122:23 123:1
125:14 152:23
156:13 165:10
194:21

**sorting** 123:8

**sorts** 223:9

**sound** 64:12 180:7

**sounds** 21:7 27:12
32:15,19 99:17

122:23

**southern** 16:10

**speak** 10:24 11:18
46:7 59:8 63:15
63:16 68:2,5
90:24 143:23
152:25 153:3

**speaking** 11:18
27:25 48:11 72:18

**specific** 75:24
136:3 225:18,25

**specified** 92:13

**speculation** 23:2,7
44:9 57:4,15
58:11,25 59:10
60:2 63:2,9,22
66:24 67:6,16
68:14,21 69:14,21
70:6 73:1 76:20
77:19 78:1 79:4
79:11 81:14 82:1
82:23 84:5 86:3
87:19 89:5 93:3
94:8,15 95:6,11,24
96:4 97:9,18 98:4
99:13,21 100:7,22
101:10,18 102:3
102:19 103:1,8
104:10 108:8,15
109:2 110:7
111:22 112:14
114:25 115:22
116:17 117:1,12
121:10 123:5
126:10 128:2,7
129:12 130:22
131:2 132:1,6,12
132:21 133:2
134:17 135:16,24
136:9,15 137:6
138:3,15,20 139:3

142:3,23 143:16
143:20 147:2,6,20
148:22 149:10
150:16 151:15
158:24 159:22
160:20 161:19
165:14 166:13
167:17 169:21
170:5,12 171:10
172:2,11,14,17
173:4,15 175:20
176:4,15,25 178:2
178:15 179:15
180:20 181:10
183:1,8 184:4,10
185:12,18 186:9
186:15 187:13,23
209:7 212:19
213:2 216:19
217:23 218:25
233:12 234:10,21
243:2 244:2

**spell** 226:8,10

**spending** 58:3

**spent** 224:3

**spoke** 223:3

**stack** 14:11

**staff** 38:2

**stage** 68:12 69:16
175:23

**stamped** 12:17
13:9 14:2 156:6
177:7

**stand** 157:18

**standard** 69:7

**standards** 59:9

**star** 162:13 175:23
191:2,3

**stars** 2:4

**start** 22:17 24:23
25:3 33:17 49:17

Page 30

[start - telling]

49:17 60:12,25
65:20 78:13,23
87:4 119:8 122:19
165:4 189:1
212:15 220:14
221:16
**started**  39:13
49:20 50:2 65:14
65:24 77:4 78:11
78:15 134:20
140:2
**starts**  123:19
**state**  194:15
213:11,22 214:1
246:1
**stated**  23:7 59:19
**states**  1:1
**stay**  7:8 15:17
220:4
**stent**  25:25
**sterling**  193:9
**stern**  1:14 3:3 4:7
7:21 9:23 10:3
19:2 20:8 24:1
123:25 124:17
144:5 179:17
183:10 185:2
191:17 202:5
205:9 213:17,20
219:23 220:11
239:15 241:16,20
241:22 244:15
245:4 246:5
**stern's**  191:12
**sterns**  165:3
188:12 244:20
**stimulate**  187:25
**stipulate**  64:19
**stipulation**  187:20
188:5,8,13 192:14

**stopped**  21:13
31:21
**storage**  146:18,19
146:24 147:11,13
147:16,23 148:1,5
148:8,10,11,13,15
148:17 152:11
**stored**  121:1
**story**  242:3
**straight**  40:9
239:8
**street**  2:9
**strictly**  111:24
**strike**  65:9 68:9,14
69:7,21 81:9 82:1
82:10 83:2,9
84:21 95:5,17
96:5 162:19
173:23 210:2
**stuck**  70:3
**stuff**  32:1 146:3
148:17 195:3
**stupid**  8:24
**sub**  42:19 52:12
**subaccounts**  52:15
52:21 53:1
**subject**  1:13
**subpoena**  3:9,10
4:14,20,23 5:1,4
5:10 7:7,22,23 8:2
10:10 12:11,14
13:11,15,21,25
16:14 17:11 19:4
19:10,25 20:5
144:10,15
**subpoenaed**  223:5
**subsidiary**  52:12
**substance**  205:2
**suite**  2:4,10
**sum**  236:23

**summer**  177:17
**supposed**  179:11
**sure**  10:11 11:13
14:14 42:20 58:9
69:17 79:23 80:3
80:25 84:14 116:9
116:21 136:17
139:13 142:15
148:23 150:14
154:2 162:6
163:23 183:20
187:20 195:1
223:12 230:10,12
235:12,13,14
**sworn**  9:24 246:8
**system**  106:9

**t**

**t**  36:15 112:7
168:9 226:11,11
**tacoma**  196:12
201:8
**taitelman**  2:3
**take**  9:20 10:16,20
11:14 16:13,15
18:14 31:25 39:1
61:10,11 73:3
74:2 75:22 76:3
121:22 122:11
144:4 151:19
152:13,18 156:1,4
170:8 172:15
177:3 178:5
179:23 181:23
184:13,14 195:3
209:12 210:4
218:21 224:5,10
239:22 244:10
**taken**  24:11 46:14
49:21 61:12
121:23 178:7
246:16

**takes**  172:21
**talent**  80:22 81:2
136:21
**talk**  76:23 80:5
102:7 111:13
223:12 231:6
**talked**  5:10 77:15
100:12 223:7,13
223:16
**talking**  11:14
18:14,25 23:9,12
107:7 119:3
124:20 166:2
175:14 178:10,11
179:24,24,25
181:19 222:14,16
222:19,25 224:14
224:17 226:9
227:22 232:17
**tax**  42:18 60:3
61:3 141:18
143:10,13,24
215:10,13 216:2
**taxes**  41:17,18
60:23 172:13
**team**  61:17 109:13
109:21
**tell**  6:15,23 37:20
57:18 58:14 69:12
81:18 98:19
147:13 149:14,23
149:25 171:12
177:9 178:12
188:17,21,22
194:14 212:24
213:8,8 217:10
224:6,11 238:20
239:9 242:3
**teller**  76:7
**telling**  8:12 109:20
113:1 121:18

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

[telling - training]

122:3 160:1 212:7
**temecula** 192:17
199:13 225:1
226:6
**ten** 23:5,14 28:21
29:7 30:15 195:19
222:4,7
**tends** 241:25
**tennessee** 203:3
**tenure** 237:24
**term** 18:21 20:20
25:15 33:11 35:16
53:3
**terms** 29:10 34:23
69:11 106:1
176:20 219:5,8
244:25
**testified** 153:4
173:9 176:19
183:5 184:8
185:16 186:13
187:10 188:24
189:20 192:2
**testify** 9:24 69:6
246:8
**testifying** 109:12
113:5 127:21
180:24 202:3
**testimony** 5:12,25
6:20 12:4 46:24
49:25 59:18 65:9
91:11 92:4 99:22
101:19 107:23
111:11 155:11
173:3 222:20,22
223:1,18
**texas** 2:10 197:2
198:3 201:6
**thackerville** 203:9
**thank** 10:3 70:11
112:6 118:25

152:24 203:22
244:20
**theater** 197:25
199:23 200:19
211:22 212:3
**theirs** 154:5
**thing** 34:18 120:19
162:7 163:24
225:21
**things** 5:16,22
11:13 24:12 27:8
31:7 34:5 43:2
49:12 64:9 65:7
67:19 113:22
147:12 148:10
152:22 159:5
220:1,23 222:10
228:3 229:25
**think** 23:5,15,16
24:22 25:23 29:15
31:4 32:14 37:9
43:8 49:18,19
53:3 57:1 62:6,19
64:10,17,19 66:4,4
66:17 67:3 77:15
89:11 111:2
126:15 128:25
134:2 150:14
153:25 155:17
162:12 164:18,20
165:24 191:14
194:22,24 195:3
202:5 207:15
209:13 220:24
221:5,13 238:8
241:6 242:22
245:7
**thinks** 194:15
**thirteen** 232:16
**thought** 4:22
178:21 194:17

**thousand** 190:24
**three** 15:1 23:17
23:19 24:8 26:4
30:25 70:19,20
185:24 186:19
187:16,18 188:18
223:15 225:21
**thursday** 18:3
19:14
**time** 6:3 7:13
10:12,19 11:15
18:7,15 19:3,6,9
19:16,20,20 22:13
22:13,14,15 26:23
27:13,20 30:4
35:10,20 36:12
37:4,8,21 38:7,15
38:19 40:18,23
41:3 42:4 43:7,8
43:14 44:7,22
45:14,21 46:5,12
47:21 49:6 50:9
50:10 54:8 59:24
61:15,15,18 62:21
65:14,25 66:21
70:23 71:1 75:24
76:1,16 79:7
80:19 85:19 86:5
89:13 90:3,14,16
91:3,18 92:16
99:11 102:1
111:17 112:9
115:20 116:5
125:14,18 128:5
132:10 134:6,10
136:21 139:16,17
140:2,8 142:20
155:8 170:15
171:6 203:25
211:14 214:15,20
215:8 224:3 238:9

243:21 246:17
**times** 11:21
167:21 238:3
**today** 6:2,21 7:5
8:15,16,21 10:9
11:5 12:4,12 15:4
16:1 180:25
223:17 242:7
**told** 68:9 81:11
91:13,25 93:15,23
110:3 115:14
134:3 147:12
149:16,21 150:2,2
151:21 152:3
153:7,10,14
154:15 165:24
180:25 204:12,15
213:12 215:19
230:14,17
**toledo** 198:24
**top** 39:4 123:20
124:12 125:3,7
128:18 163:10,15
173:23 174:3
177:9 181:24
186:2 189:13
190:10 210:4
**topic** 149:18,18
**toronto** 175:23,24
191:2,3
**total** 171:21
180:16
**totaling** 129:3
171:22
**totally** 5:6
**tour** 70:14 72:14
**tours** 72:2 76:12
**track** 28:2 38:8
42:11
**training** 21:24,25
22:1

[tram - vague]

tram 43:14
transaction
165:11
transactions 38:23
38:23 43:14 44:6
45:20 46:5,11
49:8 57:11 115:16
122:24,25
transcribed
246:13
transcript 245:1,5
246:15
transcription
246:16
transfer 94:22
115:10,11 117:25
119:4 129:6 131:8
131:10 142:7
165:12 168:19
169:15 170:2
173:10
transmit 137:2
traveled 62:1
tried 236:25
true 4:15 38:21
156:24 174:25
175:3 246:15
trusted 238:6,15
trusting 241:9,10
trustworthy 109:6
truth 246:8,9,9
truthful 243:15
truthfulness
229:19,22
try 10:24 11:1,19
80:25 86:18
188:14 219:18
242:1
trying 25:22 28:20
163:23 165:16
202:7 222:19,23

227:14 231:6
233:22 234:17
237:23
tucson 198:17
tulsa 203:16
tunica 195:14,19
turn 175:7 177:7
180:4 183:10
192:20 193:2
195:13 197:20
turned 178:21
twenty 184:17
twice 18:5 25:19
two 11:14 70:19
99:19 101:22
105:7 118:15
119:3 129:2 150:5
158:14 162:13,13
162:15,20 171:14
171:21 173:7,11
173:25 174:19
205:9 212:9,11
223:15 224:1
231:10
type 26:12,21 27:2
27:6,13 28:11,13
28:25 62:24 63:3
67:19 118:15
122:24 127:12
218:3
types 119:3
typewriting
246:14
typewritten
246:14
typical 104:13
135:12,20 137:1
138:22
typically 92:17
97:14 99:17
140:20

typographical
242:23 243:3

**u**

u 190:19
uh 142:17 182:20
238:2
ultimately 117:7
153:7
unclear 11:7
uncomfortable
10:14
understand 4:7
8:24 9:21 11:7
17:16 18:25 19:24
20:2 36:2 46:6
55:23 56:8 70:2
77:11 84:15 103:2
114:7 162:6
181:18 187:4
188:3 217:24
221:3,15 222:23
233:18 241:24
understanding
77:5,16 102:21
110:11 116:13,23
159:24 213:19
undertake 90:2
unfortunately
177:6
united 1:1
upcoming 86:7
update 44:20
140:8
ups 241:16
use 39:22 44:14,17
46:10 47:20 48:2
48:4,18 49:5
50:12,19 51:8,16
55:4 59:12 103:11
125:14 126:1,6
128:11 160:14

169:5 174:17
226:13 243:2
usually 74:13
75:12 82:25 84:16
99:18 221:1,1
utah 201:19
utilities 53:14

**v**

vacaville 188:20
189:1,10
vague 20:21 35:15
35:24 44:8 45:2
45:11,15,22 46:24
47:6 48:25 50:16
50:24 51:5,19,24
52:17,23 53:5,12
53:24 54:13 56:6
56:15 58:24 61:19
66:15 67:5,16
68:21 69:2 72:15
72:20,25 73:9
74:11 75:10 76:18
78:17 79:3,16
84:11 85:23 86:12
87:12,18 88:5
89:14 90:4,19
91:20 92:21 93:3
93:9,17 94:6,14,24
96:5,17 97:1,21
98:3 99:13 100:14
100:19 101:9
102:2,12,19 103:8
103:25 104:9,15
104:24 105:17
106:3,14,20 107:3
107:9,22 108:7,15
108:20 109:2,14
109:22 110:6
111:11 114:5,24
115:22 116:16
117:2,17 118:4

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

**[vague - willing]**

119:13 120:9,17
122:8 123:4
127:15 128:1,7,15
129:12,18 132:1
133:7,23 134:17
135:16,24 136:8
137:6,12,21 138:3
138:15,19 139:3
139:11,18 140:3
140:11,16,21
141:3,11 142:3,12
143:16,19 151:1,7
151:14 160:20
161:5 166:12
169:20 170:16
173:4,14 179:15
180:20 181:1,9
183:1,7 185:17
186:9,14 187:12
187:23 217:16,22
242:11 243:17
**valid**  5:9
**valley**  146:20
167:6 199:3
232:14
**van**  14:22 15:13
**vegas**  1:15 4:1
14:22 15:10,14
16:7 24:3 29:23
30:3 192:8 196:6
199:5 224:9 240:6
246:21
**vendor**  3:21 14:4
217:20
**venetian**  192:8
**venue**  37:15,15
54:16 72:19,23,24
87:17 88:19
100:18 160:11
161:9,9,16 167:19
242:2

**venues**  54:5 63:3
**verification**
101:25
**verified**  104:6
130:18
**verify**  99:1,3
101:6 105:5 113:7
118:2 142:15
**version**  201:25
**view**  80:11
**virginia**  199:7,7
**vista**  196:9
**void**  206:12 207:3
207:10
**voided**  3:24
206:24,25 207:6
207:17
**volition**  5:15
**voluntarily**  4:13
4:19 5:7,11,14 7:8
222:19
**voracity**  142:8
**vs**  1:6

**w**

**w**  168:9,18
**wait**  18:12
**wakefield**  211:21
212:3
**want**  4:19,21 5:15
9:3 10:11 14:12
14:14 20:8 27:4,5
39:1 40:5,15 43:6
61:14 64:15 80:5
84:14 88:11,14,23
89:2 111:14,25
117:7,15 122:11
128:11 157:9
162:6 164:3 180:6
187:2 188:15,16
188:21,25 194:12
195:1 212:23,24

213:10,20 214:2
231:5,7 239:8,9
**wanted**  5:10 14:8
57:13 58:2 80:2
122:20 123:1
125:12,19,24
126:3 151:22
154:21 164:1
**wants**  124:24
194:13
**warn**  5:18 6:7
8:15
**warning**  7:14 8:18
9:16
**washington**
196:12 201:9
**way**  13:17 18:24
30:14 87:23 107:6
107:18 123:8
126:19 145:15
154:17 173:22
180:5 187:2
205:16
**ways**  174:19
**we've**  107:7
**wearing**  221:23
222:1,5
**week**  19:6
**weekend**  70:19
232:3
**weekends**  130:3
**went**  10:22 22:1
25:24 28:9 30:20
32:16,18 34:19
35:2,10,11 71:13
78:10 114:1
142:10 145:18
146:18 162:13
224:8,13,23 225:2
225:4,5,15,19
226:4 230:13

239:16 243:8
**west**  14:22 196:20
**westbury**  203:5
**wheel**  152:21
**wife**  152:10
237:13
**willemstad**  199:16
**william**  1:7 3:11
3:12,14,16,18,20
13:2,18,22 14:3
62:9,14,22 63:17
76:24 77:1,6,17,24
78:8,9,14,25 79:7
80:12,15,22 81:2
81:20 82:20,21
83:7,12,21 84:8,24
85:5,11,21 86:6
87:6,15 88:3
89:11,21,25 91:15
91:17 92:1,19
93:6,14,24 94:3,18
94:20 95:9,20
96:8,24 97:6,13,15
98:1,5,9,24 99:10
100:18 101:4
102:8,22 103:5,17
104:4,22 105:4,16
108:3,25 109:10
109:19 110:2,17
111:2 117:24
118:17 119:4,16
129:6 130:7,19
131:6 135:13,21
136:4,5,13,20
137:1,18 138:8,13
138:22,23,24
142:7 161:3 168:6
170:3 172:6,21
174:10
**willing**  9:20

CONFIDENTIAL

[willis - witness]

**willis**   2:8,9 3:4,5
   4:7,16,24 5:3,7
   8:1,7,14,20 9:2,6
   9:10,18 16:20,25
   17:6 18:9,11 20:3
   20:21 23:1,6
   25:14 33:10 35:15
   35:24 43:15,21
   44:8 45:2,11,15,22
   46:23 47:6 48:16
   48:25 49:24 50:16
   50:24 51:5,19,24
   52:8,17,23 53:5,12
   53:19,24 54:13,23
   55:5 56:6,15 57:3
   57:14 58:10,24
   59:7,17 60:1 61:4
   61:9,19 63:1,8,21
   64:21 65:8,18
   66:15,23 67:5,15
   68:7,13,20 69:2,5
   69:13,20 70:5
   72:15,20,25 73:9
   73:23 74:4,11,22
   75:2,5,10 76:18
   77:18,25 78:17
   79:3,10,16,21,24
   80:2,5 81:8,13,25
   82:6,22 83:2,9,15
   84:4,11,18,21 85:2
   85:7,12,15,23 86:3
   86:12,22 87:9,12
   87:18 88:5,16,20
   88:25 89:4,14
   90:4,11,19 91:10
   91:20 92:3,21
   93:2,9,17 94:6,14
   94:24 95:5,10,16
   95:22,24 96:13,17
   97:1,8,17,21 98:3
   99:12,20 100:6,14

100:19,22 101:9
   101:17 102:2,12
   102:18,25 103:7
   103:25 104:9,15
   104:24 105:6,10
   105:17 106:3,6,14
   106:20 107:3,9,22
   108:7,14,20 109:1
   109:8,14,22 110:6
   110:13 111:10,21
   112:13 114:5,24
   115:21 116:15,25
   117:11,17 118:4
   118:22,25 119:13
   119:22 120:9,17
   121:3,9,13 122:8
   123:4,17,22 124:9
   124:14,16 125:2,6
   125:9 126:9
   127:15 128:1,6,15
   129:11,18 130:21
   131:1,25 132:5,11
   132:20 133:1,7,23
   134:16,23 135:15
   135:23 136:8,15
   137:5,12,21 138:2
   138:11,14,17
   139:2,11,18 140:3
   140:11,16,21
   141:3,11 142:2,12
   142:22 143:15,19
   144:21 145:4
   147:1,5,19 148:21
   149:9 150:6,15
   151:1,7,12,14
   152:1 155:10
   158:23 159:3,21
   160:19,23 161:5
   161:11,18 162:4
   163:8,12,14,22
   164:2,5,20,23

165:13,18 166:12
   166:19 167:16
   169:20 170:4,11
   170:16 171:9
   172:1,10,14,17
   173:2,14,19
   175:19 176:3,14
   176:24 178:1,14
   179:2,10,14,17,21
   180:11,19 181:1,9
   181:15 182:25
   183:7,18,23 184:3
   184:9,21,24 185:6
   185:11,17 186:8
   186:14,21,25
   187:11,20 188:3
   188:10 191:14
   192:11,14 194:12
   194:22 195:5
   196:3 202:2 205:8
   205:19 209:6
   212:18 213:1,11
   213:20 214:1,9
   216:12,18 217:1
   217:16,22 218:14
   218:16,24 219:2
   219:13,17,22
   220:10 230:5
   232:5,10,25 233:2
   233:14,19,21
   234:3,14,16,22
   235:1,18 236:3,22
   239:4,24 240:12
   241:13,22,25
   242:11,20 243:1
   243:17 244:1,12
   244:14,19,22
   245:2,6
**willislawfirm.com**
   2:11

**wills**   4:8 64:20
   188:12
**windsor**   196:15
**wire**   94:22 115:10
   129:6 131:6,8,10
   142:6 165:11
   168:19 169:15
   170:1 173:10
**wisconsin**   199:1
**wish**   194:18
**withdraw**   33:17
   126:18 218:2
**withdrawn**   60:11
   60:25 74:1 78:11
   135:1,6 139:23
   143:2 177:23
**witness**   3:2 4:22
   5:1 7:19 8:5,8,23
   9:9,17,21 10:9
   16:22 17:4,24
   18:10,19,23 23:3,7
   23:9 33:12 35:17
   36:1 43:16 44:10
   45:17,24 46:24
   47:1,9 49:2,25
   50:1 52:1,9,19,25
   53:7,14,20 54:1,15
   54:24 55:6 56:8
   56:17 59:7,11,18
   59:20 60:3 61:6
   61:21 63:3,23
   64:23 66:17,25
   67:8 68:10,22
   69:4,5,15 73:11
   74:13,23 75:6,12
   76:21 77:20 78:2
   78:19 80:8 81:15
   82:7,25 83:4
   84:20 85:8,13,16
   86:23 87:21 88:7
   88:17,21 89:6,16

Personal Court Reporters, A Veritext Company
818-988-1900

CONFIDENTIAL

[witness - yesterday]

90:6,12,22 91:11
91:22 92:4,5,23
93:11 94:9,16
95:1,12,23 96:19
97:3,10,19 98:5
99:14,21,23 100:8
100:21,24 101:18
101:20 102:5,14
103:2,9 104:17
105:1,7,11,19
106:5,7 107:11,23
107:24 108:16,22
109:3,16,24 110:9
111:11,23 114:7
115:23 116:18
117:4,19 118:6,24
119:15,23 120:19
121:4,11 124:20
124:23 125:1,5,8
125:10 127:17
128:8,17 129:20
131:3 132:7,13
135:18 136:1,11
136:16 137:8,15
138:4,16 139:4,13
139:20 140:5,23
141:5,13 142:4,24
143:21 144:22,25
145:5 147:7
148:23 149:11
150:7 151:13
155:11,12 158:24
159:4 161:13,20
162:5 163:10,13
163:15 164:8,10
164:20,22 165:14
165:19 166:14
167:18 169:22
170:6,18 172:3,12
172:15,20 173:3,5
173:20 175:21

176:5,16 177:1
178:3,16 179:5,11
179:19 180:1,8,14
180:21 182:13
183:2,21 184:5,11
184:22 185:13,20
186:10,17 187:16
205:20 209:9
212:20 213:14,23
214:3,10 216:15
216:20 217:2,24
218:15,17 219:1
219:14 230:4
232:1,9 233:13
234:2,11 236:1,17
239:22 240:11
241:13,14,24
242:13 243:4
244:19 245:7
246:5,7
**wma**  170:21
**wme**  62:13 63:16
90:17,18 107:20
167:4,15 168:9,20
169:15,25 176:20
181:7
**wolf**  192:20
**woman**  231:7
**word**  17:4 44:14
44:17 151:20
**words**  40:7 127:5
147:25 151:10
168:10 204:25
243:3
**work**  6:5 20:9
24:24 25:17 26:1
26:12,25 27:14
28:11,14 29:1,5,17
29:18 30:12,16
33:16 40:20 44:13
49:20 64:2 71:14

78:16 110:4
221:25 222:2,5
**worked**  22:1 23:10
23:20,24 25:19
26:6,7 29:12
30:14 32:17 65:25
71:8,9,16 78:3
228:7 240:20
241:4
**working**  27:21
29:8 30:4,6,17
40:24 41:3 49:17
61:16,17 65:11,20
65:24 77:4 82:18
134:20 135:4,10
237:24
**write**  205:16
**writer**  31:17
**writers**  26:20
**writing**  45:7 83:18
93:25 206:21
207:12,14
**written**  64:10
**wrong**  53:3 68:1
182:13 231:23
232:1 233:5,7,10
233:16 236:18
237:5
**wrote**  205:23
206:2,12 211:24
**wt**  169:25 170:21

**y**

**yeah**  8:14 12:18
15:23 26:11,20
30:1,11 31:23
33:24 34:10 36:23
39:9 43:5 46:8
48:9 61:11 62:11
64:4 65:5,17
78:19 79:9 80:2
101:3 117:10

123:16 124:2
126:8 132:19
133:6 149:22
150:23 156:10
157:17 158:9,16
159:18 162:1,25
163:3 165:5
166:23 167:18
169:4 175:10,14
175:25 179:11
186:5,25 190:7
194:18 202:8
204:10 211:20
221:1,8 222:6,12
223:5 225:9,10
229:24 231:11
233:13 236:9
242:8 243:25
**year**  40:13 41:19
47:15 60:4,9,15,20
60:21 61:2 65:23
66:18,21 82:19
121:15,18 125:25
126:5 143:10
144:1 146:17
220:16 221:22
224:16,25 225:6,7
232:17
**years**  15:1,23 22:1
24:8 26:4 28:21
29:8 30:15 31:20
65:3 67:4 78:2
79:1 146:15 147:8
220:3 221:14,15
221:21 222:4,7
225:10 238:11
**yell**  231:6
**yelling**  231:7
**yesterday**  19:13
19:14,15

Page 36

CONFIDENTIAL

**[yonkers - yorktown]**

**yonkers**   190:11,12
**york**   22:5 190:11
   190:12 197:15,15
   198:21 199:25
   203:5 211:22
   212:4
**yorktown**   2:9

Personal Court Reporters, A Veritext Company
818-988-1900

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.